**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Fort Lauderdale Division**

CASE NO. _____

ABS HEALTHCARE SERVICES, LLC,
HEALTH OPTION ONE, LLC, AND
ONE STOP QUOTES, INC.,

      Plaintiffs,

v.

ANDREW SHADER, COREY SHADER,
NATIONAL HEALTH SOLUTIONS, INC.,
INFINIX MEDIA LLC, PRODIGY
HEALTH GROUP LLC, ADAM
BEEMAN, JOY STORMONT,
ALLIANCE MARKETING CORPORATION,
KRATOS INVESTMENTS LLC, HEALTH
TEAM ONE LLC, RICHARD RYSCIK,
SCOTT OFFUTT, BEEMAN'S FUTURE INC.,
CS MARKETING LLC, and C SHADER
INVESTMENTS LLC,

      Defendants.

_____/

## COMPLAINT

Plaintiffs ABS Healthcare Services, LLC ("ABS") and Health Option One, LLC, ("HOO"),

both doing business as Insurance Care Direct (referred to collectively herein as "ICD"), and

Plaintiff One Stop Quotes, Inc. ("One Stop Quotes"), sue Defendants Andrew Shader and Corey

Shader (collectively, the "Shaders"), National Health Solutions, Inc. ("NHS"), Infinix Media LLC

("Infinix"), Prodigy Healthy Group LLC ("Prodigy"), Adam Beeman ("Beeman"), Joy Stormont

("Stormont"), Alliance Marketing Corporation ("Alliance"), Kratos Investments LLC ("Kratos"),

Health Team One LLC ("Health Team"), Richard Ryscik ("Ryscik"), Scott Offutt ("Offutt"),

Beeman's Future Inc. ("BFI"), CS Marketing LLC ("CS Marketing"), and C Shader Investments LLC ("CSI") (collectively "Defendants") and allege upon personal knowledge as to Plaintiffs' own acts and status, and upon information and belief as to all other matters, as follows:

## NATURE OF THE CASE

1.      This case is about dishonesty, fraud, and greed.  Defendants saw that ICD, a family-owned business, had achieved great success and they sought to profit from ICD's years of hard work, development, and ingenuity.  To that end, Defendants devised a criminal scheme to misappropriate, among other things, ICD's confidential information, trade secrets, customers, and business through a pattern of racketeering activity spanning years and continuing today.

2.      Defendants, acting in concert, have unlawfully, knowingly, and intentionally conducted, and are continuing to conduct, through a pattern of racketeering activity an enterprise referred to herein as the "ICD Misappropriation Enterprise," an association in fact.

3.      The purpose of the ICD Misappropriation Enterprise (or the "Enterprise") was to surreptitiously and illicitly compete with ICD and steal ICD's proprietary trade information, trade secrets, business model, agents, and customer base in order to profit for themselves and to harm ICD.

4.      The Enterprise was hatched, funded, and directed by Defendants Andrew and Corey Shader, two brothers, working with their close friend and former employee, Defendant Adam Beeman, their confidant, Defendant Scott Offutt, Beeman's mother, Defendant Joy Stormont, and Beeman's best friend, Defendant Richard Ryscik.  While working under non-compete agreements with ICD, the Shaders plotted and started to set up the Enterprise.

5.      The Shaders worked in concert with the other Defendants to open competing businesses using figureheads and fraudulently concealing the real owners—so as to go

undetected—and induce ICD and others to do business with them.  These businesses improperly used information about ICD's business that was obtained by the Shaders and others during the course of their years of work for ICD.

6.      The Shaders developed and built the Enterprise by recruiting individuals whom they could easily threaten and control, including felons involved with drug trafficking.  The Shaders dangled the promise of quick riches to pull others into the Enterprise, and obtained their loyalty and silence through intimidation, threats, and bribes.  On more than one occasion, the Shaders recruited individuals into the Enterprise out of drug rehab programs.  On at least one occasion, a past participant in the Enterprise relapsed under the stress of the Enterprise's illegal activities and died due to an overdose.

7.      To prevent ICD from discovering their criminal scheme, Defendants, among other tactics, utilized fakes names or aliases in their business dealings, set up front companies, installed "figureheads" such as Defendants Stormont and Ryscik to purport to run those front companies, and communicated on temporary "burner" phones rather than their primary cellphones.

8.      But Defendants were unable to fully hide their fraud and deception and, as is often the case, their text messages and fund transfers have left a trail.  The money trail leads directly to Defendants, and the text message trail reveals Defendants' efforts to conceal facts of their scheme and fabricate a "clean" story.

9.      ICD and One Stop Quotes bring this action for damages and injunctive relief because Defendants have refused to cease their illegal enterprise and have caused (and continue to cause) ICD and One Stop Quotes substantial harm.  Defendants' acts of racketeering have already caused tens of millions of dollars of harm to ICD and One Stop Quotes, and that harm is continuing.

## THE PARTIES

10.     Plaintiff ABS is a Florida limited liability company headquartered in Deerfield Beach, Florida.

11.     Plaintiff HOO is a Florida limited liability company headquartered in Deerfield Beach, Florida, and acts as a licensed general insurance agency that provides marketing and compliance support and access to products including, but not limited to, limited medical, short term medical, term life, final expense, accidental death, critical illness, dental and discount medical coverage and services such as telehealth access to sub-agencies.

12.     Plaintiffs ABS and HOO do business under the name Insurance Care Direct, commonly referred to as "ICD."

13.     Plaintiff One Stop Quotes is a Florida corporation headquartered in Deerfield Beach, Florida, that markets Medicare insurance coverage.  One Stop Quotes is owned by the co-founders of ICD.

14.     Defendant Andrew Shader is a resident of Broward County, Florida and is *sui juris*.

15.     Defendant Corey Shader is a resident of Broward County, Florida and is *sui juris*.

16.     Defendant Scott Offutt is a resident of Broward County, Florida and is *sui juris*.

17.     Defendant NHS is a Florida corporation doing business in Florida and headquartered at 2425 E. Commercial Blvd., Suite 300, Fort Lauderdale, FL 33308.  At all times relevant hereto, Andrew Shader was the President of NHS.

18.     Defendant Infinix is a Florida limited liability company doing business in Florida and headquartered at 2425 E. Commercial Blvd. Suite 300, Fort Lauderdale, Florida 33308.  Infinix is owned and controlled by Andrew and Corey Shader.

19.     Defendant CSI is a Florida limited liability company headquartered in Fort Lauderdale, Florida.  CSI is owned and controlled by Defendant Corey Shader.

20.     Defendant CS Marketing is a Florida corporation headquartered in Fort Lauderdale, Florida.  CS Marketing is owned and controlled by Defendants Corey Shader and Scott Offutt.

21.     Defendant Prodigy is a Florida corporation headquartered at 551 NW 26th Street, Pompano Beach, Florida 33064.  Prodigy is licensed as an insurance agency in Florida, among other states.

22.     Defendant Adam Beeman is a resident of Broward County and is affiliated with Prodigy, Kratos, and Health Team and is *sui juris*.

23.     Defendant Joy Stormont is a resident of Palm Beach County and a purported owner of Prodigy and is *sui juris*.

24.     Defendant Alliance is a Florida corporation and headquartered at 2425 E. Commercial Blvd., Suite 101, Fort Lauderdale, FL 33308, and is affiliated with Defendant NHS and is owned by Defendants Corey Shader and Andrew Shader.

25.     Defendant Kratos is a Florida limited liability company headquartered in Miami Dade County, Florida.  Kratos is a licensed 21-05 Florida insurance agency.

26.     Defendant Health Team is a Florida limited liability company headquartered in Doral, Florida.

27.     Defendant Ryscik is a resident of Broward County, Florida and is *sui juris*.  Ryscik is the purported president of Kratos.  He is also listed as the authorized representative of Health Team.

28.     Defendant BFI is a Florida corporation headquartered in Fort Lauderdale, Florida.  BFI is owned and controlled by Adam Beeman.

## JURISDICTION AND VENUE

29.     This court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C.

§ 1331, and under 18 U.S.C. § 1964.

30.     The Court has personal jurisdiction over Defendants because each Defendant has

engaged in a pattern of racketeering activity that both occurred within and targeted this District.

In addition, Defendants Andrew Shader, Corey Shader, Adam Beeman, Richard Ryscik, Joy

Stormont, Scott Offutt, CSI, CS Marketing, Beeman's Future, NHS, Infinix, Alliance Marketing,

Kratos, Prodigy, and Health Team reside or have their primary place of business within this

District.

31.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), as "a substantial part

of the events or omissions giving rise to the claim occurred" in or impacted this District.

## FACTUAL BACKGROUND

### A.  ICD's Business

32.     ICD is a family-owned business established in 2001, which has grown into one of

the nation's largest health and life insurance agencies.

33.     Among other things, ICD offers insurance plans and tailored memberships that

include health benefits, products, and services ("ICD Plans") to individuals.  The ICD Plans

include insurance underwritten by a diverse group of benefit companies and insurance carriers.

34.     Individuals become insureds under the ICD Plans by becoming members of the

association or other group to which a master group insurance policy has been issued by the

insurance carrier.  Association membership provides access to benefit services such as telehealth.

35.     To market and sell ICD Plans, ICD enters into contracts with, among others,

insurance agencies and insurance agents.

36.     ICD identifies prospective customers by purchasing "leads" from third parties or by acquiring "leads" through an affiliated subsidiary. These leads consist of the names of individuals who have expressed a desire to obtain health insurance or benefits through insurance plans such as the ICD Plans.

37.     ICD markets to these prospective customers through insurance agencies with which it contracts. The insurance agencies are licensed under the laws of the applicable states, including Florida. The insurance agencies operate call centers which place calls to the prospective customers identified in the leads provided by ICD and market the ICD Plans to them.

38.     The individuals who staff the call centers and actually make the sales calls to prospective customers are insurance agents licensed under the laws of the applicable states, including Florida. The agents list their licenses under the insurance agencies that have contracted with ICD.

### B.  The Shaders Begin Working for ICD

39.     The Shaders began working for ICD in 2013, which is how they hatched their plan to misappropriate ICD's business for their own profit, and to sabotage ICD's business operations to prevent ICD from effectively competing with the Shaders' companies. The Shaders are the ringleaders of Defendants' scheme, but the Enterprise is held together by the coordinated acts of each individual participant.

40.     When Corey Shader first interacted with ICD, he was working at a call center run by his parents and was cycling in and out of rehab. ICD then brought Corey into ICD and taught him how ICD ran its business, including its proprietary and industry-leading distribution model. Corey then brought his brother, Andrew, into the insurance business.

41.     By 2014, Andrew Shader and the Shaders' wholly-owned company, NHS, had entered into an exclusive contractual relationship with ICD.  NHS is an insurance agency, and was required to market ICD Plans pursuant to its 2014 contract with ICD.  This contractual relationship was extended via a further agreement and addenda executed in 2015 and 2016.

42.     During this period, ICD employees conducted trainings for NHS, the Shaders, and their call centers, including through revealing confidential and proprietary information and trade secrets to the Shaders and NHS.

43.     Eventually, the Shaders were making millions of dollars through their business dealings with ICD.

## C.   Defendants Develop a Scheme to Steal ICD's Trade Secrets, Customers, and Business

44.     While under contract with ICD, by no later than 2018, the Shaders and NHS, working closely with Adam Beeman, one of their confidants, developed a scheme to set up businesses—many of which are run by Beeman—that would impermissibly compete with ICD.

45.     In 2018, at the same time that they were negotiating a new contract with ICD, the Shaders were already plotting to steal key components of ICD's business, including its trade secrets and customers, in order to establish these illicit competing businesses.

46.     The Shaders' plot is evidenced by a series of meetings and communications that occurred during these contract negotiations.  Beginning in or around November 2018, each of the Shaders fraudulently represented to ICD that they wanted to leave the insurance business.  In truth, the Shaders did not intend to get out of the business.  Instead, they were already working to establish competing businesses that would not have any contractual obligations to ICD.

47.     As Corey Shader wrote in a November 18, 2018, text message, his brother "Andrew wants to take a year off and come back Cohen free," referring to Seth Cohen, one of ICD's

founders.  But Corey Shader then wrote "we can't stop for a year" because there was "Too much market share to lose."

48.     Because of their desire not to lose market share, beginning in December 2018 and leading into January 2019, Corey and Andrew Shader negotiated via email, phone, and text with ICD to establish a new contractual relationship with ICD based on the false representation that the Shaders were transitioning out of the insurance industry.

49.     Both Corey and Andrew Shader, through phone and text messages, repeatedly represented to ICD that they were transitioning out of the industry, and that they would need a new contractual basis for their remaining business relationship with ICD.

50.     Corey Shader subsequently held a series of meetings with the agents working in his call centers wherein he falsely claimed that he and Andrew had decided to exit the insurance business.

51.     On January 19, 2019, ICD and the Shaders entered into an Agreement for Payment of Fees, Compensation and Residuals, as amended (the "Agreement").  Pursuant to the Agreement, their company, NHS, was required to exclusively market the ICD Plans.  Section 5 of the Agreement provides in relevant part that the Shaders cannot solicit an actual or prospective customer of ICD or solicit independent marketers producing significant sales for ICD:

> "Non-Competition, Non-Solicitation. For the period commencing on the Effective Date and ending three (3) years thereafter, none of the NHS Parties will knowingly, (a) encourage any person known by them to be a then current active customer or member, or known by them to be a then prospective customer or member in current and active negotiation for a Membership Plan (collectively, "Members") with the ICD Parties, that such Member should change to the health insurance program or health products or services of a company other than those provided by the ICD Parties or their current carriers or discount plans, or (b) solicit or contract with any independent marketer known by them to be then currently producing significant sales for either of the ICD Parties, or any known significant competitor of ABS or HOO, in a field which directly and materially then competes with the ICD parties."

52.     Section 5 of the Agreement also provides in relevant part that the Shaders' company

Infinix's ability to sell healthcare leads is limited as follows:

> "This paragraph (5) does not apply to independent marketers or agents used
> by either of the ICD parties in connection with Medicare products, including, but
> not limited to, "Medicare advantage" or Medicare supplements. It is agreed by the
> Parties that this Agreement does not apply to Infinix Media, Inc. ("Infinix") or to
> its business activities, with the exception of the provisions of this Section 5 solely
> with respect to the sale of healthcare plans (the "Plan Exception"). The Plan
> Exception will terminate and no longer be applicable to Infinix upon the sale of a
> majority or controlling interest of its ownership."

53.     Infinix provides "leads," which are the names of individuals who have expressed a

desire to obtain health insurance or benefits.

54.     The Agreement was amended on January 29, 2019, to add the following provision

with respect to Section 5:

> Notwithstanding any language to the contrary in the "Agreement for
> Payment of Fees, Compensation, and Residuals", ("Agreement") (executed by the
> NHS Parties on January 19, 2019), the ICD Parties now agree that the NHS Parties,
> and their affiliated Alliance Marketing Corp, may only offer, sell and bill for
> Wellness, Lab and Dental plans through downlines/agents identified in "Exhibit C"
> to the Agreement. The NHS parties have been made aware that such
> downline/agents should first offer and sell ICD Party core and addon products prior
> to offering any other product. This paragraph shall take precedence over any
> contrary or conflicting terms set forth in the Agreement.

55.     As a result of the amendment, the Shaders and NHS were permitted to market other

insurance plans, but only after first offering and selling ICD core and add-on products.

56.     In accordance with the Agreement, the Shaders and NHS represented that, through

call centers, they would solicit customers for ICD products.  But the Shaders and NHS never

intended to abide by the Agreement.  Nor did they disclose to ICD that they were already in breach

of their obligations to ICD and were working with Beeman to set up illicit competing businesses.

57.     To avoid detection by both ICD and regulators, the Shaders and Beeman hid Beeman's involvement in the businesses, setting up figureheads that supposedly "owned" the competing companies, but in fact did not.   The Shaders and Beeman then had former ICD agents or people with knowledge of ICD's business operation and trade secrets serve as "managers" of the businesses, which Beeman and the Shaders in fact operated.

58.     To carry out the scheme, the Defendants have conspired with others, including exclusive licensed agents of ICD, to steal ICD's business by, among other things, setting up sham, competing entities, interfering with the ICD Exclusive Agent Agreements, illicitly soliciting ICD's customers and prospective customers, and misappropriating ICD's confidential information and trade secrets.

59.     Even with the Enterprise already in motion, and with the Shaders and other Defendants already having set up competing businesses built upon information and trade secrets stolen from ICD, the Shaders continued to fraudulently represent to ICD, including through phone conversations, emails, text messages, and otherwise, that they would not engage in the very illegal conduct they had, in fact, been engaging in.

60.     Instead of complying with the Agreement, Defendants have engaged in a scheme by which they solicit customers for Plans offered by agencies other than ICD.   In this way, Defendants are improperly soliciting ICD's actual and prospective customers and illegally competing with ICD.   Utilizing Corey and Andrew Shader's network of businesses that they control and operate, such as NHS, Infinix, Alliance, CS Marketing, and CSI, the Defendants have worked to create an underground parallel operation to provide the foundation for the Enterprise.

61.     Defendant Alliance is in the business of selling ancillary insurance products. Like Infinix, Defendant CS Marketing is involved in the identification of prospective customers.

Defendant CSI is Corey Shader's personal management company that represents his interests in his assorted network of businesses.  All three businesses, alongside NHS and Infinix, are controlled by Corey and Andrew Shader.

62.     In reliance upon Defendants' fraudulent misrepresentations, Plaintiffs permitted Defendants to continue working for ICD and to continue having access to the trade secrets, customers, and other valuable information that Defendants stole to run their competing businesses.

63.     Beyond the ICD's exclusive agents, Defendants have conspired with others, such as Kyle McAndrews, a confidant of Adam Beeman's, and Jamie Ryscik, the brother of Beeman's best friend, Richard Ryscik.  Each of the Ryscik brothers were installed by the Shaders and Adam Beeman as figureheads for businesses that directly compete with ICD.

64.     The Enterprise has also worked closely with others such as First Enroll, LLC, Enrollment 123, Inc., and Affordable Healthcare 123.  First Enroll, LLC, provides a platform for billing and enrollment purposes.  Enrollment 123, Inc. provides the frontend and backend systems that enable Defendants to operate.  Affordable Healthcare 123 is an independent marketing website that directs insurance agencies to individuals who may want to buy additional healthcare coverage.

**D.  How the Enterprise Operates**

65.     The Shaders sought to keep the Enterprise and its criminal activity hidden from ICD by preventing ICD's own agents from revealing anything that would give away the Enterprise.

66.     To hide the existence of the Enterprise, the Shaders lied to ICD as well as to individuals working at their own call centers, falsely representing that they were getting out of the insurance business.

67.      Instead, the Shaders, working in concert with the other Defendants, have funded a series of companies to carry out the Enterprise, and have provided financial incentives to agents

to convince them to violate their contracts with Plaintiffs and to provide information regarding ICD's trade secrets.

68.     At all times relevant hereto, Andrew Shader and Corey Shader created and funded Defendant Prodigy, a call center for health insurance sales, with Adam Beeman's assistance, and through leads provided by Infinix.

69.     Prodigy, in turn, contracts with Ryan Kelty, an ICD agent, to serve as manager for Prodigy.

70.     In a complaint filed in February 2021 in Broward County, Florida, Prodigy admitted that it has an agreement with Beeman's company, Defendant BFI, to provide certain unspecified "marketing, management, and consulting services."  BFI is a shell company owned and controlled by Adam Beeman.

71.     Defendants used Prodigy and Infinix to surreptitiously and illicitly compete with ICD and steal ICD's proprietary trade secrets, business model, agents and customer base.

72.     Similarly, Defendant Kratos is an insurance agency, incorporated in 2019.  On paper it is controlled by Adam Beeman, a felon who was convicted of trafficking in opioids, and Ryscik, who has no experience in the insurance industry and works for a fire-sprinkler business.

73.     By their own prior admissions, neither Beeman nor Ryscik have substantial capital of their own.  In reality, the Shaders have provided the funding for Kratos, including by funneling funds through Beeman and/or BFI.

74.     Indeed, the February 2021 Broward Complaint describes how a company controlled by Corey Shader, Defendant CSI, "has entered into financial transactions with BFI."  In other words, the Broward Complaint admits that the Shaders have provided funding for their friend, Beeman, and others engaged in the Enterprise.

75.     Because Beeman is closely connected to the Shaders, he and the Shaders decided to install Beeman's best friend, Ryscik, as a figurehead, or a front to hide their scheme from ICD. Specifically, the Shaders and Beeman, working in concert with other Defendants, had Ryscik on paper assume a majority ownership interest in Kratos, Health Team, and their affiliates.

76.     Ryscik, who previously had no meaningful background in the insurance business, controls Kratos and its affiliates only on paper.

77.     In reality, Beeman controls Kratos and its affiliates, including making all key financial decisions, but Defendants have falsely represented that Ryscik is the sole owner of Kratos and its affiliates.

78.     The truth is that the Enterprise set up Kratos and its affiliates such that, on paper, Beeman only has a less than ten percent interest in order to evade insurance regulations that prohibit a convicted felon from having a stake larger than ten percent in an insurance business.

79.     For example, on January 24, 2020, Kratos represented in its 2020 Florida Limited Liability Company Annual Report filing to the Florida Secretary of State that Ryscik was the "President" of Kratos, when, in reality, he plays no role beyond that of a façade for Beeman.

80.     Similarly, also on January 24, 2020, Health Team represented in its 2020 Florida Limited Liability Company Annual Report filing to the Florida Secretary of State that Ryscik was a manager of Health Team, when, like Kratos, he plays no role beyond shielding Beeman from regulatory scrutiny.  Beeman has also facilitated this practice of hiding his true ownership interest for other business entities established to compete with ICD.

81.     Belying this dubious corporate structure, Ryscik, a purported owner of Kratos and its affiliates, has not made any capital contributions or other monetary contributions into any of these entities that he claims to "own" or "control."

82.    After intentionally appointing Ryscik, someone unknown to ICD, as a figurehead owner, Beeman, along with Kratos and Health Team, has facilitated the appointment of numerous agents who have Exclusive Agent Agreements with ICD and has provided the vehicle and infrastructure through which these agents have violated their obligations to ICD.

83.    In addition to facilitating the appointment of numerous agents, Kratos, working with NHS, and utilizing BFI and CSI, has facilitated the overall operation and financing of the Enterprise.  For example, to provide money to the former ICD agents who the Enterprise needed to set up the competing companies, the Shaders paid them funds from NHS that they characterized as severance payments.  In truth, this money was to compensate the agents for their time while they worked to establish companies such as Prodigy and Kratos.

84.    Defendants have worked in concert to keep the Enterprise and its criminal conduct hidden from ICD for long as possible.  Upon information and belief, Corey Shader went so far as to issue threats to individuals at the Shaders' call centers regarding potential communications with ICD.

85.    The Shaders, in furtherance of the Enterprise, enforced these restrictions on communications with ICD by threatening to withhold access to valuable leads, provided by Defendant Infinix and working alongside Alliance and CS Marketing.  Throughout the duration of the Enterprise, the Shaders used access to these valuable leads, which are the lifeblood of the insurance marketing business, to bribe and coerce individuals to violate their pre-existing contractual duties to ICD.

86.    Specifically, Corey Shader threatened individuals under contract with ICD who worked in the Shader-controlled call rooms that he, Andrew Shader, and their businesses,

including NHS, Alliance, and CS Marketing, would cut off access to leads from Infinix, among others, to any ICD agent who revealed any aspect of the Enterprise to ICD.

### E. The Enterprise's Pattern of Racketeering Activity

87.     The ICD Misappropriation Enterprise, which consists of all Defendants, has as its primary purpose the enrichment of Defendants through a continuing pattern of criminal activity directed at ICD involving bribery, fraud, and theft.   Each Defendant has participated in the affairs of the Enterprise and its racketeering activity, including as described herein.

88.     The Enterprise consists of a close-knit group of persons and entities with extensive ties to one another.

89.     The Enterprise has been in operation since at least 2018, and has worked throughout the last three years in order to effectuate its criminal purpose, becoming increasingly aggressive in its efforts to harm ICD and to enrich Defendants.

90.     Defendants Andrew and Corey Shader and Defendant Beeman have direct or indirect ownership or control over many of the other Defendants who constitute the Enterprise. The Shaders own and/or control Defendants NHS, Infinix, CSI, CS Marketing, and Alliance Marketing.

91.     The Shaders' close friend and former employee, Adam Beeman, owns or controls Defendants BFI, as well as Kratos and Health Team, each of which was established with financing from the Shaders, much of it funneled through BFI.

92.     Defendant Ryscik, Adam Beeman's longtime best friend, is the front person and registered officer for Kratos, Health Team, and their affiliates.

93.     Defendant Offutt is a close confidant of the Shaders, working at both Infinix and CS Marketing, among other Shader-related companies.   Offutt assists both Corey and Andrew

Shader with the management of their assorted business interests and was actively involved in the scheme to establish new, illicit competing businesses, such as Defendant Prodigy.

94.     The Shaders and Beeman created, funded, and supported Prodigy, which on paper is owned by Beeman's mother, Defendant Joy Stormont.  Prodigy works closely with Defendant Infinix.  For example, to support Prodigy's operations when it was first founded, Infinix provided Prodigy computers.

95.     The close coordination between Defendants relating to the Enterprise is also reflected in extensive communications among and between Defendants.

96.     For example, in one text message exchange dated March 12, 2019, Defendant Beeman is coordinating with Christopher "Brett" Mason, a confidant, the logistics for setting up the operations for Prodigy.  Beeman wrote: "Have the courier call Allison," and Beeman then provided Allison's phone number.  Beeman's message refers to Allison Neidler, who is Corey Shader's personal assistant.  Neidler used to work for Infinix, and at one point was romantically involved with Bradley Tierney, one of ICD's agents who subsequently worked on behalf of the Enterprise.

97.     Separately, ICD agent Ryan Kelty texted with Adam Beeman in March 2019 that he had received computers that "had a[n] Infinix password on them," demonstrating material support from Infinix, and, by extension, the Shaders.

98.     The close coordination is also demonstrated by the flow of money to and from BFI and CSI, financial conduits for the Defendants that are controlled by Beeman and Corey Shader, respectively.

99.     Corey Shader and Andrew Shader have designed and financed the Enterprise, including by funneling money through Adam Beeman and Beeman's shell company, BFI.  The

Shaders invented the scheme to steal ICD's confidential information and trade secrets in order to create illicit competing businesses staffed with former ICD agent, working closely with Beeman to set up these new companies.

100.   The Shaders have effectuated the Enterprise's criminal purpose through a series of interrelated companies, including NHS, Alliance Marketing, Infinix, C Shader Investments, CS Marketing, and Prodigy.   The Shaders often use Scott Offutt to manage and oversee their interrelated companies.

101.   Joy Stormont has participated in the affairs of the Enterprise and its racketeering activity by serving as the front person for Prodigy, which is really controlled by the Shaders and her son, Adam Beeman.   Stormont has allowed Beeman and the Enterprise to evade insurance regulations that otherwise would prohibit Beeman, a convicted felon, from operating an insurance business.

102.   Indeed, on at least one occasion, Beeman asked that Stormont's name be used on communications as a means to hide Beeman's involvement.   For example, on March 26, 2019, Beeman texted Mason, asking that he "Send me an email from joy saying your very disappointed in the process so far blah blah maybe HII would have been a better choice something along those lines bitching about no core product."

103.   Adam Beeman has participated in the affairs of the Enterprise and its racketeering activity by setting up and financing—along with the Shaders—Defendants Kratos, Health Team, and their affiliates to covertly harm ICD.

104.   Beeman, along with Ryscik, has engaged in a scheme to steal ICD's confidential and trade secrets by staffing these businesses with former ICD agents.   Beeman and Ryscik have further engaged (and are engaging) in insurance fraud by falsely representing that Ryscik is the

owner and controlling agent of these businesses, when in fact Beeman, a convicted felon, is in charge.

105.    Due to his status as a convicted felon, and in furtherance of the Enterprise and its scheme to harm ICD, Beeman has fraudulently applied for insurance agency licenses without disclosing his true majority ownership, management, and control of the entities that he is actively involved in owning and operating.  In applying for insurance licenses with various state regulators throughout the country, including the Division of Insurance Agent and Agency Services of the Florida Department of Financial Services, Beeman has misrepresented that others, such as Ryscik, are the true owners of Kratos and Health Team, among others, so that he can obtain business entity licenses in different states without needing to disclose his criminal record.

106.    The racketeering acts committed by Defendants were part of Defendants' regular way of conducting business.  Indeed, Defendants' entire business model has been predicated on stealing valuable information and trade secrets from ICD, paying to steal Agents away from ICD, and lying to insurance regulators.

107.    As detailed herein, Defendants devised a scheme to defraud ICD, including by using a series of fraudulent misrepresentations in order to acquire ICD's trade secrets. Specifically, during the course of their business dealings with ICD, the Shaders represented that they would protect ICD's trade secrets and confidential information.  The Shaders further represented that they would not compete with ICD, but instead would sell only ICD plans.  In late 2018 and early 2019, in connection with signing a new agreement with ICD, the Shaders falsely represented to ICD that they were going to leave the insurance business.

**F. Clear Evidence of Defendants' Criminal Enterprise**

108.    One of the employees of the Shaders, and a person who worked with the Defendants to secretly set up companies to illegally compete with ICD in this action, was Christopher "Brett" Mason, who is now deceased.  Mason was part of the Enterprise until his death.

109.    Tragically, all the secrecy, lies, and fraud relating to the creation of these businesses put Brett Mason, who was a recovering addict, under tremendous stress.  Mason knew the Shaders and their co-conspirators, including Defendants, were swindlers and felt tremendous pressure from them.  Eventually Mason could not live with the lie any longer and he relapsed into his addiction and overdosed and died.

110.    Texts messages retrieved from Mason's phone after his death lay bare how Defendants created and operated their criminal Enterprise.  Through these text messages, along with numerous other communications exchanged across state lines, Defendants pursued their scheme to defraud ICD, steal ICD's trade secrets, and engage in commercial bribery in order to lure away Agents under contract with ICD.

111.    The statements made by Mason in these text messages are ones that he made while actively engaged in the Enterprise's criminal activity and in furtherance of its illegal conduct.

112.    The Enterprise was created with the purpose of stealing business from ICD and trying to keep that a secret until the expiration of the non-compete periods in the various agreements described above.  In the words of Corey Shader, the goal of this whole secret operation was to become "Cohen free," referring to Seth Cohen, part owner of ICD.

113.    In a November 18, 2018, text exchange with Mason, Corey Shader discusses his brother Andrew's suggestion—"Andrew wants to take a year off and come back Cohen free"—

but then Corey Shader says "we can't stop for a year" because there was "Too much market share to lose."

114.    The Shaders' Plan B—and the foundation of the Enterprise—was the scheme to set up the sham companies to secretly compete against ICD.  To avoid these obligations and to steal ICD's business, they essentially recreated a parallel business. Together with Beeman, they recruited ICD's agents and installed them to manage the sham companies.  For example, in one text message from November 5, 2018, Corey Shader wrote that he was considering Bradley Tierney, an ICD agent, as a call center principal.

115.    In another text exchange, dated March 12, 2019, Beeman was desperately trying to hide the fact that the competing companies were being set up, even refusing to use couriers that knew the name of one such company (Prodigy), and directing that the company's name not be used when answering customer calls.  Beeman: "The courier only [knows] your name right?" Mason: "No. She knows the name of the company."  Beeman: "God.  Get another courier."  Mason: "Why is that a problem?"  Beeman: "Cause it is."

116.    Similarly, on October 1, 2019, Beeman instructed Ryan Kelty: "When answering custo calls.  We answer "Customer Service" not the name of the company.  Fix this now please."

117.    As recently as January 2020, Corey Shader, via text, sought to hide Beeman's involvement in the Enterprise.  Leading up to January 2020, ICD had grown concerned that Beeman was impermissibly interfering with ICD's business.  Seth Cohen, a principal of ICD, asked if Corey Shader knew of what Beeman was up to—to which Corey Shader feigned ignorance.  In reality, as explained throughout, Corey Shader was working with Beeman to impermissibly interfere with ICD's business and steal its trade secrets and customers.

21

118.    The text messages also acknowledge the stealing of ICD agents in direct violation of the ICD agreements and the concern that the Enterprise had recruited too many of ICD's agents. On March 26, 2019, Adam Beeman wrote to Ryan Kelty and Brett Mason: "So u guys are 3 aware u have capped urself out on old reps. No more. Cool?"

119.    Indeed, the text messages involve agents including Adam Bassell, Ryan Kelty, James Hardill, and Brad Tierney, who all have exclusive agent agreements with ICD that required they protect ICD's trade secrets and confidential material, and Corey and Andrew Shader who also have agreements with ICD that contain exclusivity provisions and a requirement that they protect proprietary information. Certain ICD agents also have email addresses demonstrating that they were doing business as agents for Kratos in violation of their ICD Agreements.

120.    Brett Mason was brought into this scheme by the Shaders and Beeman to work with other ICD agents to steal business away from ICD through the creation of competing entities.  Brett was told in no uncertain terms that he was not allowed to tell anyone about the competing business and was to lie about what his job was to anyone who knew ICD or Seth Cohen, an owner of ICD. In fact, they directed Brett to change his name and start using his first name "Chris," despite the fact that his whole life he was called "Brett," in order to make sure that no one would detect the illegal scheme.

121.    When Ann Mason asked her husband Brett about why it had to be kept a secret: "He told me that Corey had been paid a lot of money not to sell insurance other than for ICD, so that no one could find out about the new operation that Corey was launching with Beeman because that business would involve marketing and selling insurance products other than ICD Plans and thus compete with ICD. . . Brett was particularly paranoid that word of this new business would get to Seth Cohen, who I understand is an owner of ICD . . . Brett also told me that as part of this

scheme, and in order to hide Corey's involvement in the new business, the 'call center' would appear to be run and owned by Beeman, although it would be initially funded by Corey. According to Brett, Beeman did not have the financial wherewithal to set up and operate the 'call center.'"

122.    The text messages exchanged by the Defendants show an elaborate criminal scheme including using fake names and funneling money in ways to ensure there would be no detection of the link to the Shaders or their companies like NHS, Infinix, CS Marketing, and Alliance.

123.    All the while the Shaders were fraudulently representing to ICD that it was business as usual as they routed business to the competing companies that they were funding and running.

124.    The importance to Defendants of the secrecy of the Enterprise is highlighted by the fact that when Brett Mason died on January 7, 2020, Beeman threatened his widow Ann Mason that if she told anyone about the fact that they had been scamming ICD, that he would come after her.

125.    Brett Mason's text messages provide critical insights into how Defendants operated their criminal Enterprise. A competing business that Mason was working with in 2018 and 2019 was Prodigy, and Beeman's mother, Joy Stormont, who had no experience in the insurance industry, was made the "front" person for the business.

126.    The business got funding funneled through various people and entities, including Defendant Kratos. For example, in a July 24, 2019, text message, Beeman asks whether Prodigy needs "other money from me" and Ryan Kelty indicates the money will come through "Kratos," a Defendant in this case. In addition to Kratos, both CSI and BFI were used as financial conduits to move money throughout the Enterprise.

127.    The Shaders' company Infinix also provided support, in addition to computer equipment and leads from Infinix that were being funneled through Beeman.  Upon information and belief, Scott Offutt facilitated Infinix's support of the Enterprise.

128.    Defendants were also instrumental in the organization and funding of a California operation set up to illegally compete with ICD.  The California operation was fronted by ICD agent Brad Tierney and was conducted through a company (Maxim Health, Inc.) from late 2017 until the first half of 2019; in 2019, Maxim's business was transferred to a new entity (Legacy Insurance Solutions, LLC).

129.    Tierney also did not have the money or expertise necessary to himself start a new business.  As the text messages show, that money and organizational assistance was furnished by Defendants. For example, in 2019 alone, Kratos furnished $900,000 to Tierney's California operation.  Beeman claims that the furnished money was his. However, a contemporaneous affidavit he executed in connection with his divorce shows that he did not have that sort of money on hand.

130.    Instead, Corey Shader set up another shell company, H Marketing S, that he used to funnel money to and from Maxim and then Legacy.

131.    The text messages also show an elaborate scheme to hide individual identities in an effort to go undetected by ICD.  For example, Adam Beeman pretended he was Richard Ryscik, and told Brett Mason to refer to him as "Richard" when communicating with others about the business.  On March 6, 2019, Beeman texted Kelty and Mason and stated: "I'm Richard Btw". Kelty then replied: "Do we have to [be] different people as well?"  Beeman responded: "Naw." Beeman, along with other Kratos employees, routinely adopted Ryscik's persona throughout the

course of their business.  In one instance, Beeman even told another person that he was Ryscik during an in-person meeting.

132.    Defendant Beeman used other aliases to hide the identity of other ICD Agents who were working to set up competing businesses. For example, he referred to Bradley Lawrence Tierney as "Larry" in the text messages, including when he was discussing sending Mason out to California to help "Larry" (Tierney) with the competing business that he and the Shaders started in California.  The text messages include multiple messages about trips to California to help "Larry" with the competing business they set up in California, first Maxim and thereafter Legacy.

133.    Further, on June 19, 2018, Mason is texting with Bassell, who says: "Assuming they got you flying to Cali next week?" Mason: "Yes. Office has been struggling" Bassell: "Oh ya big time." Mason: "I've been talking with larry. They definitely got some issues but nothing that can't be fixed." Bassell: "Makes sense."

134.    To facilitate his involvement in the Enterprise, Corey Shader informed Scott Offutt of the practice of using aliases.  For example, on July 12, 2018, Corey Shader wrote to Brett Mason saying "Brett: Just want to confirm Scott knows about Larry before I call him. Yes Offutt knows about Larry."  Thereafter on July 20, 2018, Corey Shader is texting with Brett Mason about the management of these illicit competing businesses saying: "Are you still considering making Larry and Adam principals."

135.    The link between all of these companies and how they operated collectively as the Enterprise is highlighted in the text messages.  For example, according to a photo contained in the texts, Defendant Health Team appears on Beeman's screen as he is looking at sales numbers for Prodigy Health and the top of the report is titled "Kratos Agency Weekly Totals" referring to

Defendant Kratos.  Another photo shows a spreadsheet referencing Kratos, Infinix, CS Marketing, and Prodigy.

136.   The text messages also reveal how Defendants fraudulently paid to access the licenses of licensed insurance agents in order to have valid licenses to use in their businesses.  The license holder was simply paid as a "front" in order for Defendants to evade regulatory requirements.

137.   In one text message exchange, Defendant Beeman states that they can use his friend's girlfriend as a license holder in name only in exchange for paying her $400 a month.  On July 24, 2019, Beeman wrote to Ryan Kelty and Brett Mason: "U guys want a female lic[ense] that will always be there for 400$ a month.  Doing a friend in prison a favor.  My boy Enzos chick. It's a lock and u can buy all the states and not worry."

138.   In another text message exchange, Defendant Beeman references another fraudulent licensure scheme whereby Defendants would pay $500 for a woman to obtain a license, and then $400 a month to utilize her license as their own.  On August 8, 2019, Beeman wrote to Ryan Kelty and Brett Mason: "Just emailed u Ryan with the chick issabel with will be the license ur gonna use." "500$ ASAP for passing as a bonus. And 400$ monthly." "So do 500 and then direct deposit 400$ a month I'm sure she will claim whatever to get the most."

139.   Similarly, Beeman explained over text messages that his mother, Defendant Joy Stormont, should be paid $350 "weekly every Friday" for her role as the front person for Defendant Prodigy.  Stormont completed the Florida insurance licensing process for the sole purpose of allowing her son, convicted felon Beeman, to commit insurance fraud and advance Defendants' criminal enterprise.

140.    In furtherance of the Enterprise, Beeman also forged Brett Mason's signature after his death on insurance appointment paperwork.  Ryan Kelty then used the credentials forged by Beeman.  Although Mason died on January 7, 2020, he somehow was appointed as a licensed agent for United States Fire Insurance Company on April 1, 2020.

141.    Moreover, Beeman, a licensed notary, worked with Kelty and Kyle McAndrews to improperly notarize documents throughout the normal course of business.  On May 2, 2019, Kelty texted Beeman that he "was gonna say just to make it more official have you notarize it as well," to which Beeman replied, "Sent to Kyle and he will stamp and sign for me."

142.    In furtherance of the Enterprise, Defendants also stole confidential and proprietary sales information from ICD's call centers.  The text messages show Beeman telling Mason and Ryan Kelty how Kratos' sales figures were doing compared to some of ICD's call centers.  For example, on December 16, 2019, Beeman wrote "u guys beat Falc . . . and poh," referring to the confidential sales figures for Priority One Health, a call center exclusive to ICD, and Premier Health Associates, a call center exclusive to ICD that is run by an individual named Nick Falcone.

143.    In another text that day, Beeman wrote: "Geeks is the only office I know that beat u . . .  They did 600.  They have a lot more states too."  This message refers to the confidential sales figures of ICD's exclusive call center, Health Geeks.

144.    Beeman further wrote "The new puppet master Ati had 5 yesterday None today lol," referring to the confidential sales figures of Americas Trust, a call center exclusive to ICD. Beeman then wrote "Ehs did 20 or so . . . 20 ran 15 @ 600 for poh," referring to the confidential sales figures for Elite Health Solutions and Priority One Health, both call centers exclusive to ICD.

G.  **The Shaders and Beeman Used The Enterprise's Ill-Gotten Gains to Fund Their Competing Medicare Business**

145.    The ill-gotten proceeds derived from the ICD Misappropriation Enterprise were used to fund the day-to-day operations of Shader and Beeman's two Medicare companies, Insurance Pipeline, Inc. ("Insurance Pipeline") and Affordable Insurance Group, Inc. ("Affordable Insurance"), including their payroll, office expenses, and purchase of leads.  These companies compete directly with Plaintiff One Stop Quotes in marketing Medicare insurance coverage.

146.    Insurance Pipeline is a Florida corporation headquartered in Fort Lauderdale. Insurance Pipeline is owned and controlled by Defendants Andrew and Corey Shader.  Insurance Pipeline's registered agent is Andrew Shader.

147.    Affordable Insurance is a Florida corporation headquartered in Fort Lauderdale. Affordable Insurance is owned and controlled by Defendants Andrew and Corey Shader.  Andrew Shader is Affordable Insurance's registered agent.

148.    Upon information and belief, during the relevant period, Adam Beeman maintained an ownership interest in Insurance Pipeline and Affordable Insurance.

149.    Upon information and belief, the Shaders omitted any acknowledgement of Beeman's ownership interest in Insurance Pipeline and Affordable Insurance when applying for regulatory licensure.  The Shaders actively concealed Beeman's involvement from state regulators because, due to his status as a former felon (for drug trafficking), Beeman is legally prohibited from owning any sizeable equity stake in a Medicare insurance business, which markets products for seniors.  Nevertheless, the Shaders gave Beeman a large stake in Insurance Pipeline and Affordable Insurance.

150.    Upon information and belief, the tax filings for Insurance Pipeline and Affordable Insurance deliberately omitted Beeman's ownership stake in the two companies.

151.    At all relevant times, both Insurance Pipeline and Affordable Insurance have marketed Medicare insurance coverage to consumers who have expressed an interest in obtaining such coverage, including marketing Medicare Advantage plans that are government-backed

152.    From 2017 through the present, ICD's affiliated company, One Stop Quotes, has marketed Medicare insurance coverage offered to consumers who have expressed an interest in obtaining such coverage.

153.    Because of Insurance Pipeline and Affordable Insurance's constant access to the proceeds of the ICD Misappropriation Enterprise, they have been able to compete with One Stop Quotes in a manner that would not otherwise have been possible.

**H.    Defendants' Criminal Enterprise Has Caused Substantial Harm to ICD and One Stop Quotes**

154.    In 2019, as a direct result of the Enterprise's illegal acts, ICD experienced a substantial reduction business, amounting to tens of millions of dollars in lost business.

155.    In 2020, as a direct result of the Enterprise's illegal acts, ICD once again experienced a substantial reduction of business, amounting to tens of millions of dollars in lost business.

156.    ICD continues to suffer lost customers and sales as of the date of this Complaint.

157.    The Shaders and Beeman substantially decreased One Stop Quotes' sales, profits, and local market share in the Medicare insurance marketing business by using racketeering proceeds to fund and operate their directly competing businesses, Insurance Pipeline and Affordable Insurance.

<u>**Count I**</u>
**Civil RICO, 18 U.S.C. § 1962(c)**
(**ABS and HOO Against Defendants Corey Shader, Andrew Shader, Infinix, Prodigy, Adam Beeman, Kratos, Health Team, BFI, and CSI**)

158.    Plaintiffs incorporate all of the above allegations as if they were fully stated here.

159.    Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 ("Section 1962").

160.    Defendants operated the ICD Misappropriation Enterprise through a pattern of racketeering activity, which caused substantial injury to Plaintiffs' business and property.

161.    The Enterprise including all Defendants is an associated-in-fact enterprise whose activities affect interstate commerce.

162.    The Enterprise including all Defendants is composed of the following people and entities:  Andrew Shader, Corey Shader, National Health Solutions, Inc., Infinix Media LLC, C Shader Investments, Prodigy Healthy Group LLC, Adam Beeman, Beeman's Future Inc., Joy Stormont, Alliance Marketing Corporation, Kratos Investments LLC, Health Team One LLC, CS Marketing, Scott Offutt, and Richard Ryscik.

163.    Defendants Corey and Andrew Shader were the ringleaders of the Enterprise, and supervised and managed the entire operation.

164.    The Shaders used their personal web of companies to facilitate the Enterprise:  NHS worked to set up businesses that would compete with ICD, and would provide funding to agents poached from ICD; Prodigy, Kratos, and Health Team illicitly competed with ICD and stole, *inter alia*, its proprietary trade secrets, business model, agents, and customer base;  Infinix was used to coerce agents and entities by controlling access to leads; and BFI and CSI, along with Kratos, facilitated the movement of money throughout the Enterprise.

30

165.     Beeman, the Shaders' confidant, was instrumental in setting up the businesses that would compete with ICD and managing day-to-day operations of the Enterprise.

166.     Defendants are each a person within the meaning of 18 U.S.C. § 1961(3) and separate from the Enterprise.

167.     Defendants agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs and stealing Plaintiffs' business and trade secrets, including as follows.

168.     Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of mail fraud, wire fraud, theft of trade secrets, and commercial bribery.

### I.   Defendants' Acts of Mail and Wire Fraud

169.     Defendants committed mail and wire fraud from 2018 to the present, in violation of 18 U.S.C. §§ 1341, 1343, by using both the mail and electronic communications for the purpose of executing their scheme to illicitly compete with ICD, including through defrauding ICD and stealing ICD's valuable trade secrets and customers.

170.     In December 2018, Corey and Andrew Shader falsely represented to Seth Cohen, a principal of ICD, that they were no longer going to be in the business of selling insurance because they were concerned about issues with regulators.  Based on that false representation, ICD sent Corey Shader, via email correspondence, in January 2019, a revised contract.

171.     As part of the scheme to defraud ICD and in furtherance of the Enterprise, in December 2018, Corey and Andrew Shader falsely represented to ICD, including through email and text message communications, that they had no intention of continuing to work in the insurance business.  Relying upon these false statements, ICD in response agreed to continue doing business

with the Shaders and NHS—thereby allowing them access to ICD's confidential information, trade secrets, and customers.

172.    As part of the scheme to defraud ICD and in furtherance of the Enterprise, Beeman, operating in concert with the Shaders, fraudulently misrepresented to numerous insurance regulators, including the Division of Insurance Agent and Agency Services of the Florida Department of Financial Services, the ownership structure of Kratos and Health Team so that they could obtain licenses—and be then able to compete with ICD—without having to disclose his criminal record, which would have prevented Kratos and Health Team from securing these valuable licenses.  In doing so, Beeman falsely represented that Ryscik was the true owner and decision maker of Kratos and Health Team.

173.    Additionally, on and around April 1, 2020, Beeman, in furtherance of the Enterprise, forged Brett Mason's signature on insurance appointment paperwork after he had died so that Mason's name would be associated with an appointment for United States Fire Insurance Company.

174.    As part of their scheme to defraud ICD and to steal its trade secrets, customers, and business, Defendants exchanged numerous electronic communications, including text messages, across state lines, in furtherance of their fraudulent scheme.  As described above, these text message communications allowed Defendants to coordinate the Enterprise and to seek to cover their tracks.

**J.   Defendants' Theft of Trade Secrets**

175.    As part of the Enterprise, Defendants also engaged in the theft of trade secrets in violation of 18 U.S.C. § 1832 by using their prior work for ICD, which granted them access to confidential information, in order to misappropriate ICD's trade secrets.  Defendants intended to

convert ICD's trade secrets for their own economic benefit, and both knew and intended that this theft would harm ICD.  Specifically, through the scheme described above, Defendants without authorization obtained some of ICD's trade secrets in order to establish their own competing businesses.

176.    Among the ICD trade secrets Defendants stole and appropriated for their own economic benefit are: (1) ICD's overall business model, (2) ICD's marketing process, (3) ICD's onboarding, training, and licensure techniques, (4) ICD's prequalification process, (5) ICD's product offering methodology, (6) ICD's quality assurance protocols, (7) ICD's sales training process, (8) ICD's commission advance model, (9) ICD's customer names and information, and (10) ICD's provider relationships, among others.

177.    Throughout 2018 and 2019 to the present, Adam Beeman and Corey and Andrew Shader created, funded, and supported Prodigy, Kratos, and Health Team to illicitly compete with ICD and steal ICD's trade secrets, business model, agents, and customer base.  As Corey Shader wrote, the goal of the entire operation was to become "Cohen free"—meaning, free of ICD.

178.    Throughout the relevant time period, Beeman has falsely represented that Ryscik is the true owner and controlling agent of Kratos and Health Team so to avoid disclosing his true involvement in Kratos and Health Team.  Beeman has also sought to avoid disclosing his true involvement in Prodigy.

179.    Throughout 2018 and 2019 to the present, Infinix facilitated Prodigy, Kratos, and Health Team's illicit competition with ICD, and its endeavor to steal ICD's trade secrets, business model, agents, and customer base by engaging in the practice of using leads to coerce ICD's agents to breach their contractual obligations to ICD.

180.    Throughout 2018 and 2019 to the present, Prodigy, Kratos, and Health Team worked with the other Defendants to illicitly compete with ICD by, among other things, stealing ICD's proprietary trade secrets, business model, agents, and customer base.

181.    Throughout 2018 and 2019 to the present, BFI facilitated Prodigy, Kratos, and Health Team's illicit competition with ICD, and their endeavor to steal ICD's trade secrets, business model, agents, and customer base, by among other things, financially supporting them and providing marketing, management, and consulting services.

182.    Throughout 2018 and 2019 to the present, CSI facilitated funding and support to BFI.  Specifically, CSI is used by the Shaders to move money around the Defendants and their affiliates.

183.    As part of the text message coordination amongst the Defendants, Beeman instructed individuals not to reveal company names or even Beeman's persona, writing that "When answering custo calls.  We answer 'Customer Service' not the name of the company" and that "I'm Richard Btw," to mask his identity to further the Enterprise.

184.    Also, in furtherance of the Enterprise, Beeman used text messages to direct the flow of money to and from Prodigy and Kratos, writing to Ryan Kelty whether Prodigy needs "other money from me" and Kelty indicating that the money will come through Kratos.  Moreover, Beeman coordinated the flow of agents though text message, writing to Kelty and Mason: "So u guys are 3 aware u have capped urself out on old reps. No more. Cool?"

185.    Additionally, in furtherance of the Enterprise, Beeman coordinated through text message and email the acquisition of license holders in name only.  Writing to Kelty on both July 24 and August 8, 2019, Beeman wrote: "U guys want a female lic[ense] that will always be there for 400$ a month.  Doing a friend in prison a favor" and "Just emailed u Ryan with the chick

issabel with will be the license ur gonna use." "500$ ASAP for passing as a bonus. And 400$ monthly." "So do 500 and then direct deposit 400$ a month I'm sure she will claim whatever to get the most."

### K. **Defendants' Practice of Commercial Bribery**

186.    As part of the Enterprise, Defendants engaged in commercial bribery from 2018 to the present in violation of Florida Statute Section 838.16 by paying existing ICD Agents to violate their contractual obligations to ICD in order to sabotage ICD and steal its trade secrets.

187.    Throughout the duration of the Enterprise, the Shaders have bribed ICD agents by promising them access to valuable leads through their company, Infinix, as well as Alliance and CS Marketing, in order to keep the agents from revealing the existence of the Enterprise to ICD.

188.    In addition, Kratos provided ICD agent Bradley Tierney approximately $900,000 to assist with establishing a California operation that competed with ICD, thereby inducing Tierney to violate the contractual duties he owed to ICD not to compete.  Kratos also facilitated the employment of several of ICD's agents who competed directly with ICD in violation of their contractual duties.

### L. **Defendants' Have Engaged in Racketeering**

189.    The mail fraud, wire fraud, commercial bribery, and theft of trade secrets set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

190.    Defendants committed dozens of these predicate acts over more than two years. These acts had the same or similar purposes, results, participants, victims, and methods of commission, and were otherwise interrelated by distinguishing characteristics and were not isolated events.

191.    Defendants have directly and indirectly conducted and participated in the conduct of the Enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

192.    As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in that Defendants stole Plaintiffs' valuable trade secrets as well as customers, and have used the information stolen from Plaintiffs to take business from Plaintiffs.

193.    Defendants' scienter is established by the pattern of intentional and knowing material misrepresentations described above.

194.    Defendants' racketeering acts were a regular way of conducting their ongoing business with Plaintiffs and of conducting or participating in the ongoing RICO Enterprise.  The racketeering acts were sufficiently continuous to form a pattern of racketeering activity.

195.    Defendants' racketeering acts pose a threat of continuing criminal activity as Defendants continue to establish new businesses that rely upon ICD's trade secrets and confidential information.

196.    Defendants' racketeering scheme has caused Plaintiffs tens of millions of dollars in damages due to lost business, as Defendants have directly stolen ICD's customers and further stolen large amounts of ICD's business by illicitly establish direct competitors based upon ICD's proprietary, trade secret information.

197.    By reason of this violation of 18 U.S.C. § 1962(c), Plaintiffs are entitled to recover from Defendants treble damages, plus interest, costs, and attorneys' fees.

**<u>Count II</u>**
**Civil RICO § 1962(a)**
**(One Stop Quotes Against Defendants Corey Shader, Andrew Shader, Adam Beeman, CSI, and BFI)**

198.    Plaintiffs re-allege the allegations set forth in paragraphs 1-157.

199.    This Count is against Defendants Corey Shader, Andrew Shader, Adam Beeman, CSI, and BFI (the "Medicare Scheme Defendants").

200.    Andrew Shader, Corey Shader, and Adam Beeman, by and through their wholly-owned investment vehicles, CSI and BFI, used the ill-gotten proceeds from the ICD Misappropriation Enterprise to fund the operations of Insurance Pipeline and Affordable Insurance.

201.    Each of Insurance Pipeline and Affordable Insurance is an enterprise engaged in and whose activities affect interstate commerce.

202.    The Medicare Scheme Defendants used and invested income that was derived from a pattern of racketeering activity, specifically the ICD Misappropriation Enterprise described herein.

203.    The racketeering activity described herein constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

204.    The revenue derived from the ICD Misappropriation Enterprise constitutes a significant portion of the total income of the Medicare Scheme Defendants.

205.    Without the ill-gotten proceeds derived from their racketeering enterprise, the Medicare Scheme Defendants would not have been able to continue funding the operations of Insurance Pipeline and Affordable Insurance.

206.     The ill-gotten proceeds derived from the ICD Misappropriation Enterprise were used to fund the day-to-day operations of Insurance Pipeline and Affordable Insurance, including their payroll, office expenses, and purchase of leads.

207.     Because of Insurance Pipeline and Affordable Insurance's constant access to the proceeds of the ICD Misappropriation Enterprise, they have been able to unfairly compete with One Stop Quotes in a manner that would not otherwise have been possible.

208.     As a direct and proximate result of the Medicare Scheme Defendants' racketeering activities and violations of 18 U.S.C. § 1962(a), One Stop Quotes has been injured in its business and property.  Specifically, the Medicare Scheme Defendants' investment of racketeering income into Insurance Pipeline and Affordable Insurance has provided them an unfair competitive advantage in the marketplace for marketing of Medicare insurance plans offered by private insurers.

209.     The Medicare Scheme Defendants substantially decreased One Stop Quotes' sales, profits, and local market share in the Medicare insurance marketing business by using racketeering proceeds to fund and operate their directly competing businesses, Insurance Pipeline and Affordable Insurance.

**Count III**
**Civil RICO Conspiracy, 18 U.S.C. § 1962(d)**
**(All Plaintiffs Against All Defendants)**

210.     Plaintiffs re-allege the allegations set forth in paragraphs 1-157 and 168-190.

211.     In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate the provisions of 18 U.S.C. § 1962(c) in that they knowingly agreed and conspired together and with others to conduct or participate, directly or indirectly, in the affairs of an enterprise through the pattern of racketeering activity described above.

212.    The frauds that were perpetrated, and the continuance of the scheme, could not have occurred without the consent and knowing connivance of Defendants together.

213.    As part of and in furtherance of their conspiracy, Defendants conspired in the commission of the many predicate acts described above, with the knowledge that they furthered that pattern of racketeering activity.  As part of and in furtherance of their conspiracy, Defendants agreed to and did commit at least two predicate acts of racketeering.  Further, each of Defendants' actions are attributable to the other.

214.    No Defendant has withdrawn, or otherwise dissociated itself, from the conspiracy at issue or the other conspirators.

215.    Plaintiffs have been injured in business or property as a result of Defendants' violations of 18 U.S.C. § 1962(d).

216.    As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs are entitled to treble damages, plus interest, costs, and attorneys' fees.

### DEMAND FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

- Awarding Plaintiffs general and/or compensatory damages in an amount to be determined at trial for all injuries suffered as a result of Defendants' wrongdoing;

- Awarding Plaintiffs punitive damages;

- Awarding Plaintiffs treble damages;

- Enjoining Defendants against their continuing conduct with respect to stealing ICD's business, interfering with ICD's contractual and business relationships, illicitly soliciting ICD's customers and prospective customers, and misappropriating ICD's confidential information and trade secrets as to prevent the ongoing harm being suffered by ICD as a result of Defendants' ongoing actions;

- Awarding Plaintiffs prejudgment and post judgment interest at the maximum rate allowable by law;

- Awarding Plaintiffs the cost of suit as incurred in this action and attorneys' fees; and

- Awarding Plaintiffs all other relief as may be appropriate, including any further and additional relief provided by 18 U.S.C. §§ 1962 & 1964.

## DEMAND FOR JURY TRIAL

ICD demands a trial by jury on all issues so triable.

Dated:  April 21, 2021

Respectfully submitted,

BOIES SCHILLER FLEXNER LLP

By:  */s/ Sigrid S. McCawley*
Sigrid S. McCawley, Esq.
Fla. Bar No. 129305
Carlos M. Sires, Esq.
Fla. Bar No. 319333
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile:  (954) 356-0022
Email: smccawley@bsfllp.com
Email: csires@bsfllp.com

David Boies, Esq.
(*Pro Hac Vice* Application Pending)
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300
Email: dboies@bsfllp.com

James Fox Miller, Esq.
Fla. Bar No. 95070
2435 Hollywood Boulevard
Hollywood, FL 33020
Telephone: (954) 924-0300
Facsimile: (914) 924-0311
Email: jmiller@bsfllp.com

*Attorneys for Plaintiffs*
