UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

ABS HEALTHCARE SERVICES, LLC,                CASE NO. 0:21-CV-60859-RKA
HEALTH OPTION ONE, LLC, and
ONE STOP QUOTES, INC.,

          Plaintiffs,

v.

ANDREW SHADER, COREY SHADER,
NATIONAL HEALTH SOLUTIONS, INC.,
INFINIX MEDIA LLC, PRODIGY
HEALTH GROUP LLC, ADAM BEEMAN,
JOY STORMONT, ALLIANCE MARKETING
CORPORATION, KRATOS INVESTMENTS LLC,
HEALTH TEAM ONE LLC, RICHARD RYSCIK,
SCOTT OFFUTT, BEEMAN'S FUTURE INC.,
CS MARKETING LLC, and C SHADER
INVESTMENTS LLC,

          Defendants.

_____/

## JOINT CONSOLIDATED MOTION TO DISMISS,
## ABSTAIN, COMPEL ARBITRATION AND/OR STAY

Benjamine Reid                          James A. Gale
Alan Grunspan                           Samuel A. Lewis
Clifton R. Gruhn                        David M. Stahl
CARLTON FIELDS, P.A.                    Jonathan E. Gale
2 MiamiCentral, Suite 1200              COZEN O'CONNOR
700 NW 1st Avenue                       Southeast Financial Center
Miami, Florida 33136                    200 South Biscayne Blvd., Suite 3000
Telephone:  305-530-0050                Miami, Florida 33131
                                        Telephone:  305-358-5001

Howard D. DuBosar
Harrison R. DuBosar                     Stephen Miller
WEISS SEROTA HELFMAN COLE               Peter M. Ryan
& BIERMAN                               Catherine Yun
1200 N. Federal Highway, Suite 312      COZEN O'CONNOR
Boca Raton, Florida 33432               One Liberty Place
Telephone:  561-835-2111                1650 Market Street, Suite 2800
                                        Philadelphia, PA 19103
                                        Telephone:  305-665-2130

Defendants[1], Andrew Shader, Corey Shader, National Health Solutions, Inc. ("NHS"), Infinix Media LLC, Prodigy Health Group LLC ("Prodigy"), Adam Beeman ("Beeman"), Joy Stormont ("Stormont"), Alliance Marketing Corporation ("AMC"), Kratos Investments LLC ("Kratos"), Health Team One LLC ("HTO"), Richard Ryscik ("Ryscik"), Scott Offutt, and Beeman's Future Inc. ("BFI"), CS Marketing LLC ("CSM"), and C Shader Investments LLC ("CSI") (collectively, "Defendants"), respectfully move for an Order:

1) dismissing the complaint for improper claim-splitting;

2) dismissing the complaint pursuant to Fed.R.Civ.P. 12(b)(1) under the jurisdictional limitations set forth in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983);

3) dismissing the complaint under the abstention doctrine of *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), pending the resolution of numerous, parallel state court actions and court-mandated arbitrations;

4) dismissing the complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6) and 9(b);

5) pursuant to 9 U.S.C. § 3 and §§ 682.02 and 682.03, Fla. Stat., compelling Plaintiffs, ABS Healthcare Services, LLC and Health Option One, LLC d/b/a Insurance Care Direct ("ICD") to arbitrate all claims and staying this action; and/or

6) staying this action pending the resolution of related arbitrations.

---

[1] Pursuant to this Court's Order [ECF No. 10], this motion is filed on behalf of all co-Defendants, even though the co-Defendants are represented by separate counsel.

## MEMORANDUM OF LAW

### I.      INTRODUCTION.

ICD's complaint must be dismissed, and the only question for this Court is which of the numerous grounds on which the decision to dismiss should rest.

First, ICD has engaged in improper claim-splitting mandating dismissal. ICD is currently involved in multiple litigations and arbitrations with the Defendants here regarding the same issues ICD alleges here. These prior state actions and arbitrations involve the same facts and claims that ICD must establish as predicates for its RICO claims.

Second, the parallels among the numerous state actions and arbitrations and this case implicate the *Rooker-Feldman* and *Colorado River* abstention doctrines. The Court should dismiss the complaint because ICD seeks to litigate issues that were previously decided in state courts.

Third, while Plaintiffs were apparently focused on filing a complaint so rife with scurrilous, sensational and unnecessary allegations that it was sure to attract media attention, they failed to plead allegations sufficient to support any of their claims. As such, Plaintiffs' complaint must be dismissed.

Finally, this action represents ICD's latest attempt to avoid the broad, mandatory and exclusive arbitration provisions in agreements that ICD drafted and required its agents to sign. Since ICD's claims against the Defendants are intertwined with ICD's claims against its former agents, ICD must arbitrate its claims, as numerous state trial and appellate courts have already ruled, as it relates to the majority of the Defendants (10 of the 15 named in this case). This Court should dismiss this action and require ICD to conclude the pending arbitrations. Alternatively, the Court should stay this action pending the conclusion of the various pending arbitrations.

## II.    FACTUAL BACKGROUND.

### A. ICD's Numerous State Court Lawsuits Asserting A Conspiracy To Compete In The Insurance Industry.

In an effort to avoid paying NHS and the Shaders over $20,000,000, ICD brought this case

and ten other lawsuits in state courts over the course of one year.[2] *See* Exhibit 1 (the "Related Case

Table"). As detailed in the Related Case Table, ICD first pursued claims against, *inter alia*, seven

of the current Defendants—Andrew Shader, Corey Shader, National Health Solutions, Inc.

("NHS"), Prodigy, Beeman, Stormont and Alliance Marketing Corporation ("AMC")—in

Broward County Circuit Court (the "Broward Action").[3] Less than a week later, ICD commenced

a similar action in Miami-Dade Circuit Court against, *inter alia*, Kratos, HTO and Ryscik (the

"Miami-Dade Action"). Each case alleges conspiracies against all of the defendants in both cases,

and similar allegations that the instant Defendants conspired to, *inter alia*, tortiously interfere with

ICD's agreements with eight former agents (the "Agent Agreements"). In both the Miami-Dade

Action and Broward Action, ICD alleges that Defendants violated non-competition and non-

disclosure agreements by conspiring with each other and ICD's former agents in a scheme to steal

ICD's business by setting up sham competing entities, interfering with ICD's Agent Agreements,

---

[2] With this Motion, Defendants have submitted a request that the Court take judicial notice of various related actions involving the parties and various agreements referenced in the complaint. "[T]he court may take into account facts that are subject to judicial notice and documents that are incorporated into the complaint by reference." *Almanza v. United Airlines, Inc.*, 162 F. Supp. 3d 1341, 1352 (S.D. Ga. 2016), *aff'd*, 851 F.3d 1060 (11th Cir. 2017) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)); Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *Boateng v. InterAmerican Univ., Inc.*, 210 F.3d 56, 60 (1st Cir. 2000) (court may treat documents from prior litigation in other courts as public records subject to judicial notice).

[3] The Broward Action was a pretextual action intended to justify ICD's failure to pay NHS and the Shaders millions of dollars owed pursuant to a contract. ICD sued the Shaders and NHS for, *inter alia*, allegedly breaching the January 19, 2019 Agreement for Payment of Fees, Compensation, and Residuals by and among ICD, the Shaders and NHS (the "January 19th Agreement") (a copy of the January 19th Agreement is attached as Exhibit 2).

causing ICD's former agents to illegally solicit ICD's customers and prospective customers, and causing ICD's former agents to misappropriate ICD's confidential information and trade secrets.

One week after filing the Miami-Dade Action, ICD brought eight separate lawsuits against each of its former agents referenced by name in the complaints in the Broward Action and the Miami-Dade Action, including James Hardill, Francis DeSola, Ryan Kelty, and Alex Geissler. ICD asserted nearly identical claims against each of the former agents, including claims that they breached their Agent Agreements by soliciting ICD's customers and prospective customers and misappropriated ICD's confidential information and trade secrets.  ICD alleged this conduct, in turn, constituted a conspiracy to compete in the insurance industry using ICD's proprietary information.

Each of the Agent Agreements provides in relevant part that:

> The Parties agree that ***any dispute arising out*** of or related in any way to the solicitation, negotiations, inception or ***performance of this [Agent] Agreement*** (whether the dispute is couched in terms of contractual, statutory or common law grounds) ***shall be*** ***exclusively*** ***resolved and construed in accordance with Commercial Arbitration Rules of the American Arbitration Association pursuant to the laws of the State of Florida governing arbitration.***

*Kratos Investments, LLC et al. v. ABS Healthcare Services, LLC, et al.,* --- So. 3d ---, 2021 WL 1009277, *2 (Fla. 3d DCA Mar. 17, 2021) (emphasis added).

### B.   Numerous State Courts Have Ordered ICD To Arbitrate; ICD Must Now Arbitrate With 10 Of The 15 Defendants Here.

In several of ICD's state court actions, its former agents—Geissler, Kelty, Hardill and DeSola—filed Motions to Compel Arbitration. *See* Exhibit 1 (Related Civil Case Nos. 6 and 8). In the actions involving Hardill and DeSola, the trial court issued Orders requiring that ICD submit its disputes with these former agents to the American Arbitration Association ("AAA") for binding arbitration. Exhibits 3 & 4 (Orders Compelling Arbitration).  ICD appealed those Orders to the

Florida Fourth District Court of Appeal, and on March 11, 2021, the Fourth District issued *per curiam* affirmances of the two orders compelling ICD to arbitrate. *ABS Healthcare Services, LLC v. Hardill,* 313 So.3d 1162 (Fla. 4th DCA 2021) and *ABS Healthcare Services, LLC v. Desola,* 313 So.3d 1163 (Fla. 4th DCA 2021).

ICD's former agents were not the only ones to enforce the broad, mandatory arbitration provisions in the Agent Agreements.  Kratos, HTO and Ryscik (and others) filed a Motion to Compel Arbitration in the Miami-Dade Action, and Prodigy, Beeman and Stormont, joined by the Shaders, NHS, and AMC, filed a similar Motion to Compel Arbitration in the Broward Action. On March 17, 2021, in the Miami-Dade Action, the Florida Third District Court of Appeal reversed the trial court's denial of the Motion to Compel Arbitration, and remanded with instructions to grant the Motion to Compel Arbitration as to ***all*** of ICD's claims against, *inter alia*, Kratos, HTO and Ryscik. *See Kratos Investments,* 2021 WL 1009277, *3.  And on April 12, 2021, in the Broward Action, Chief Judge Jack Tuter heard argument on the Amended Motion to Compel Arbitration and indicated from the bench that he felt compelled to follow the Third District Court of Appeal's decision in *Kratos Investments* and order arbitration.  Shortly after ICD filed this action, Judge Tuter issued his order compelling ICD to arbitrate all of its claims against Andrew Shader, Corey Shader, NHS, Prodigy, Beeman, Stormont and AMC. *ABS Healthcare Services, LLC v. Shader,* 2021 WL 2115257 (Fla.Cir.Ct.).

On May 4, 2021, ICD commenced an arbitration against, *inter alia,* Kratos, HTO and Ryscik by filing a demand with the AAA. Exhibit 1 (Related Arbitration Case No. 3).  In that arbitration, ICD claims that:

> [w]orking in concert [with ICD's former agents], [Kratos, HTO and Ryscik]
> have engaged in, and continue to engage in, a scheme to steal ICD's business.
> To carry out the scheme, [Kratos, HTO and Ryscik] have conspired, and

continue to conspire, with others, including Andrew Shader, Corey Shader, [NHS], and exclusive licensed agents of ICD…to steal ICD's business…."

Exhibit 5 (Demand for Arbitration), ¶ 20.

**C. This Action Is Merely ICD's Latest Effort To Avoid Arbitration.**

As discussed above and as is clear from the Related Case Table, ICD's state court cases and this case involve the same set of operative transactions and occurrences, underlying legal issues, alleged tortious interference with ICD agent contracts, and alleged misappropriation of ICD trade secrets. Indeed, the Broward Action and Miami-Dade Action were, and now arbitrators are, confronted with the following facts and issues, all of which are key in this RICO action:

- Whether the Shaders and NHS breached the non-compete clause in the Agreement for Payment of Fees, Compensation and Residuals (as amended). *See* Exhibit 1 (Related Civil Case No. 1), Counts I & V; Exhibit 6, Counts I & V;

- Whether Kratos, HTO, and Ryscik conspired (along with the Shaders and NHS) to breach ICD's "Exclusive Agent Agreements." *See* Exhibit 1 (Related Civil Case No. 2), Count I; Exhibit 7, Count I;

- Whether the Shaders, NHS, Infinix, Prodigy, Beeman, Stormont, and AMC tortiously interfered with ICD's alleged "Exclusive Agent Agreements," *see* Exhibit 1 (Related Civil Case No. 1), Count II; Exhibit 6, Count II; and whether Kratos, HTO, and Ryscik tortiously interfered with ICD's alleged "Exclusive Agent Agreements." *See* Exhibit 1 (Related Civil Case No. 2), Count II; Exhibit 7, Count II;

- Whether the Shaders, NHS, Infinix, Prodigy, Beeman, Stormont, and AMC tortiously interfered with ICD's business relationships with prospective customers, *see* Exhibit 1 (Related Civil Case No. 1), Count III; Exhibit 6, Count III; and whether Kratos, HTO, and Ryscik tortiously interfered with ICD's business relationships with prospective customers, *See* Exhibit 1 (Related Civil Case No. 2), Count III; Exhibit 7, Count III;

- Whether ICD has valid and protectable trade secrets. *See* Exhibit 1 (Related Civil Case No. 1), Count IV; Exhibit 6, Count IV; Exhibit 1(Related Civil Case No. 2), Counts IV & V; Exhibit 7, Counts IV & V; and

- Whether the Shaders, NHS, Infinix, Prodigy, Beeman, Stormont, and AMC misappropriated ICD trade secrets, *see* Exhibit 1 (Related Civil Case No. 1), Count IV; Exhibit 6, Count IV; and whether Kratos, HTO, and Ryscik conspired to misappropriate and misappropriated ICD trade secrets. *See* Exhibit 1 (Related Civil Case No. 2), Counts IV & V; Exhibit 7, Counts IV & V.

In addition, the California Superior Court and Florida arbitrators are currently adjudicating whether several allegedly "[e]xclusive" ICD agents stole ICD's business and trade secrets, and whether certain Agent Agreements are unlawful and unenforceable. Exhibit 1 (Related Civil Case No. 5 and Related Arbitration Case Nos. 7, 8, 11, 13).[4]

Moreover, as in its numerous prior state court cases, ICD repeatedly makes allegations regarding the purported agents and Agent Agreements.  For instance, Plaintiffs allege that:

- "[t]he Shaders and Beeman … had **former ICD agents** or people with knowledge of ICD's business operation and trade secrets serve as 'managers' of the businesses…." (Complaint ¶ 57) (emphasis added);

- "To carry out the scheme, the Defendants have conspired with others, including **exclusive licensed agents of ICD**, to steal ICD's business by, among other things, setting up sham, competing entities, interfering with [ICD's Agent Agreements], illicitly soliciting ICD's customers and prospective customers, and misappropriating ICD's confidential information and trade secrets." (*Id.* ¶ 58) (emphasis added);

- "Prodigy, in turn, contracts with **Ryan Kelty**[5]**, [a former] ICD agent**, to serve as manager for Prodigy." (*Id.* ¶ 69) (emphasis added);

- "Beeman, along with Kratos and [HTO], has facilitated the appointment of **numerous agents who have [Agent Agreements] with ICD** and has provided the vehicle and infrastructure through which **these agents have violated their obligations to ICD.**" (*Id.* ¶ 82) (emphasis added); and

- "Beeman, along with Ryscik, has engaged in a scheme to steal ICD's confidential [sic] and trade secrets by **staffing these businesses with former ICD agents**." (*Id.* ¶ 104) (emphasis added).

---

[4] *See also* Exhibit 1 (Related Civil Case No. 5); Exhibit 8 (Verified Complaint), at ¶ 4 (Brad Tierney "has not … used or disclosed any of Defendants' confidential information"); Exhibit 1 (Related Arbitration Case No. 7); Exhibit 9 (Arbitration Demand), at ¶ 2 (James Hardill seeks declaration that he did not misappropriate any trade secret information from ICD and/or that any information received was not a trade secret); Exhibit 1(Related Arbitration Case No. 9); Exhibit 10 (Arbitration Demand), at ¶ 2 (Francis Desola; same); Exhibit 1 (Related Arbitration Case No. 11); Exhibit 11 (Arbitration Demand), at ¶ 2 (Ryan Kelty; same); Exhibit 1 (Related Arbitration Case No. 13), Exhibit 12 (Arbitration Demand), at ¶ 2 (Alex Geissler; same).

[5] Kelty is one of the eight former agents that ICD sued in Broward Circuit Court and is party to one of the arbitrations pending before the AAA. Exhibit 1 (Related Arbitration Case No. 11).

ICD's entire theory of the case, including the so-called "ICD Misappropriation Enterprise," necessarily involves the former agents it has already sued, and with whom ICD is obligated to arbitrate.  The allegations above eliminate any question as to whether the claims are intertwined with ICD's former agents, which in turn, necessarily implicates the Agent Agreements.

### D.  The State and Federal Cases Are Parallel.

As is clear from the Related Case Table, ICD's state court complaints and this RICO case involve the same set of operative transactions and occurrences, the same underlying legal issues regarding alleged breaches of ICD contracts, alleged tortious interference with ICD agent contracts, and alleged misappropriation of ICD trade secrets, and substantially the same parties.

## III.   ARGUMENT.

### A.  The Court Should Dismiss This Action.

#### 1.  Legal Standard For Dismissal Under Rules 12(b)(1), (6) and 9(b).

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may be raised via facial or factual attack.  Defendants make a factual challenge to the Court's subject matter jurisdiction over Plaintiffs' claims here based on the jurisdictional limitations set forth in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).  " [A] factual attack challenge[s] the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings ... are considered."[6] *Moore & Co., P.A.*, 2020 WL 4505645, at *1.  Defendants also make a factual

---

[6] In contrast, "[i]n a facial challenge, a court is required only to determine if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction," *Moore & Co., P.A. v. Kallop*, No. 17-24181, 2020 WL 4505645, at *1 (S.D. Fla. Aug. 5, 2020) (internal citation omitted), and "the court must consider the allegations in the plaintiff's complaint as true," *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981).

challenge to the complaint under the abstention doctrine of *Colo. River Water Conservation District v. U.S.*, 424 U.S. 800 (1976).

Rule 12(b)(6) mandates dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). A complaint must be dismissed where, after accepting all reasonable inferences from the factual allegations, the court can grant no relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007) (plaintiff must plead "enough facts to state a claim to relief that is plausible on its face"); *Chandler v. Sec'y of Fla. Dep't of Transp.*, 695 F.3d 1194, 1199 (11th Cir. 2012). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Threadbare recitals of the elements of a claim, mere conclusory allegations, and speculation are insufficient to state a claim. *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. The Court need not accept as true legal conclusions couched as facts. *Id.*

A complaint alleging fraud "must state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). "[P]ursuant to Rule 9(b), a plaintiff [must] allege: '(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the [plaintiffs]; and (4) what the defendants gained by the alleged fraud.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010) (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380-81 (11th Cir. 1997)). In a case with multiple defendants, a plaintiff must set forth facts regarding *each* defendant's participation in the alleged fraud. *Id.*

## 2.   The Court Should Dismiss the Complaint for Improper Claim-Splitting.

ICD's complaint should be dismissed for improper claim-splitting. "The rule against claim-splitting requires a plaintiff to assert all of its causes of action arising from a common set of facts

in one lawsuit.  By spreading claims around in multiple lawsuits in other courts or before other judges, parties waste scarce judicial resources and undermine the efficient and comprehensive disposition of cases." *Vanover v. NCO Fin. Servs., Inc.*, 857 F.3d 833, 841 (11th Cir. 2017).  The Eleventh Circuit employs a two-part test to determine whether improper claim-splitting has occurred:  (1) whether the case involves the same parties and their privies[7]; and (2) whether the cases arise from the same transaction or series of transactions.[8]  *Id.* at 841-42.  Here, ICD's complaint readily satisfies both tests.  Courts in the Eleventh Circuit dismiss actions that improperly split claims. *Id.* at 836-37; *see also IOU Central, Inc.*, 2020 WL 8768632, at *4-6 (dismissing RICO complaint for improper claim-splitting despite addition of other defendants in federal action). The Court should reject plaintiffs' bald attempt to re-litigate their claims in a new forum and dismiss the complaint for improper claim-splitting.

The Related Case Table and related Exhibits establish that ICD's state court complaints and this RICO case involve the same set of operative transactions and occurrences, the same underlying legal issues regarding alleged breaches of ICD contracts, alleged tortious interference with ICD agent contracts, alleged misappropriation of ICD trade secrets, and substantially the same parties.[9]  The allegations currently being litigated in these state court and arbitration proceedings

---

[7] Privity "exists where the nonparty's interests were represented by the party in the original suit." *IOU Cent., Inc. v. Pezzano Contracting & Dev., LLC*, No. 19-CV-4882, 2020 WL 8768632, at *5 (N.D. Ga. Sept. 28, 2020) (quoting *Hart v. Yamaha-Parts Distribs., Inc.*, 787 F.2d 1468, 1472 (11th Cir. 1986)).  Here, ICD has alleged that defendants are agents of each other in the same conspiracy and are jointly and severally liable.  Such an allegation establishes privity. *IOU Cent., Inc.,* 2020 WL 8768632, at *5 (privity prong satisfied based on similar allegations).
[8] "Successive causes of action arise from the same transaction or series of transactions when the two actions are based on the same nucleus of operative facts." *Vanover*, 857 F.3d at 842.
[9] In the instant complaint, ICD alleges that the named individual defendants wholly own or control the three remaining entity defendants—Beeman's Future, Inc., CS Marketing LLC, and C Shader Investments LLC.  Thus, the state actions and this federal action involve substantially the same parties and their privies.

are intertwined with, substantially the same as, and will likely collaterally estop the maintenance of such allegations here.

Importantly, every ICD state court litigation—whether against the Defendants or former ICD agents—arises from the same conspiracy alleged here:  that Defendants conspired to steal ICD's business by setting up "illicit" competing businesses, tortiously interfering with the "Exclusive Agent Agreements," and by misappropriating ICD's trade secrets. *Compare* Exhibit 1, Related Case Table, Allegations, *with* Complaint ¶ 58.  Because ICD repeats the same allegations regarding the same transactions with the same parties it previously sued in state court (and with whom it is now arbitrating), the Court should dismiss the complaint for improper claim splitting.

### 3. The Court Lacks Jurisdiction Under The *Rooker-Feldman* Doctrine Because Plaintiffs Seek to Overturn Multiple State Court Orders.

"'The *Rooker-Feldman* doctrine is a limitation on the jurisdiction of inferior federal courts. This limitation is intended to prevent the federal courts from hearing what are essentially appeals from state court decisions, which may only be heard by the United States Supreme Court." *Weissbrod v. Broward Cty. Bd. of Supervisors*, 2021 WL 354199, at *1 (S.D. Fla. Feb. 1, 2021) (quoting *Target Media Partners v. Specialty Mktg. Corp.*, 881 F.3d 1279, 1284 (11th Cir. 2018)); *Mells v. Weizman*, 828 F. App'x 701, 703 (11th Cir. 2020) (citing *Lance v. Davis*, 546 U.S. 459, 466 (2006); *Rooker*, 263 U.S. at 415; *Feldman*, 460 U.S. at 482).

"The *Rooker-Feldman* doctrine applies to 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Fox*, 828 F. App'x at 640 (quoting *Nicholson v. Shafe*, 558 F.3d 1266, 1274 (11th Cir. 2009)).  "The doctrine applies not only to federal claims actually raised in the state court, but also to claims that were not raised in the state court but are inextricably intertwined with the state court's judgment." *Id.* (citing

*Casale v. Tillman*, 558 F.3d 1258, 1260 (11th Cir. 2009)).  "A claim is inextricably intertwined if it would effectively nullify the state-court judgment or if it succeeds only to the extent the state court wrongly decided the issues."  *Id.*

As a court in this District recently explained, *Rooker-Feldman* applies not only to final judgments, but "also precludes federal courts from reviewing non-final and interlocutory state court judgments."  *Weissbrod*, 2021 WL 354199, at *2 (rejecting argument that doctrine did not apply to "'non-final interlocutory' order") (quoting *Bosdorf v. Beach*, 79 F. Supp. 2d 1337, 1340 (S.D. Fla. 1999)).  "The crucial question in determining the applicability of *Rooker-Feldman* is whether the relief requested of the federal court would effectively reverse or void the state court's ruling."  *Id.* (internal quotation and citation omitted).  Thus, the doctrine applies to state court determinations regarding arbitrability of claims where a plaintiff seeks to pursue such claims in federal court in spite of a state court order compelling arbitration, and regardless of the labels used in the federal complaint.  *Parker Law Firm v. Travelers Indem. Co.*, 985 F.3d 579, 584 (8th Cir. 2021) ("By proceeding with the claims in the district court, appellants necessarily asked the federal court to review and reject the [state court's] ruling that claims concerning amounts owed under contracts must be resolved in arbitration."); *Rollins v. Waccamaw Rgn'l Trans. Auth.*, 2017 WL 5956669, at *4 (D.S.C. Nov. 7, 2017) ("Because the state court has already ordered arbitration of the claims raised here, this court lacks jurisdiction to further address the issue."), *adopted*, 2017 WL 5903448 (D.S.C. Nov. 30, 2017).

Here, the *Rooker-Feldman* doctrine requires the dismissal of Plaintiffs' complaint, which effectively asks this Court to review and reverse orders by numerous state courts compelling arbitration of the conspiracy theory and common nucleus of operative facts alleged.  Before Plaintiffs filed this case, Florida's Fourth District Court of Appeal affirmed *per curiam* orders

compelling arbitration, *see Hardill*, 313 So.3d 1162; *Desola*, 313 So.3d 1163, and Florida's Third District Court of Appeal ordered ICD to arbitrate its claims. *Kratos Investments*, 2021 WL 1009277.

Thus, multiple state trial and appellate courts have, in no uncertain terms, told Plaintiffs that their conspiracy theory arising from the creation and funding of businesses to compete in the insurance industry through the purported use of proprietary information must be pursued, if at all, in arbitration. Having lost in numerous state courts, Plaintiffs improperly seek to re-litigate the same operative facts and issues under a different rubric. *Stack*, 245 F. App'x at 922-24.

The complaint is an affront to multiple state trial and appellate court rulings compelling arbitration of these matters. Under the *Rooker-Feldman* doctrine, this Court lacks subject matter jurisdiction to entertain Plaintiffs' repeated attempts to circumvent consistent state court decisions.

**4.   The Court Should Abstain and Dismiss the Complaint.**

Under the *Colorado River* doctrine, the Supreme Court has directed lower courts to abstain, in circumstances such as this, from adjudicating an action in favor of parallel state court litigation. *Moorer v. Demopolis Waterworks & Sewer Bd.*, 374 F.3d 994, 997 (11th Cir. 2004). "The principles of this doctrine 'rest on considerations of [w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Id.* (citing *Colo. River*, 424 U.S. at 817 (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.,* 342 U.S. 180, 183 (1952)); *see also Johnson & Johnson Vision Care, Inc. v. Kenneth Crosby N.Y., LLC,* No. 09-874, 2010 WL 1030121, at *2 (M.D. Fla. Mar. 17, 2010) (abstaining where state court had compelled arbitration under the Federal Arbitration Act); *Tamar Diamonds, Inc. v. Splendid Diamonds, LLC*, No. 10-21470, 2010 WL 2350889, at *3 (S.D. Fla. June 11, 2010) (dismissing complaint and abstaining where parties were involved in prior industry arbitration and state court proceedings on enforceability of arbitral award).

### a. The State and Federal Cases Are Parallel.

Under *Colorado River*, the Court first determines whether there are actually parallel state and federal court actions. The parties, issues, and requests for relief need not be identical for the state and federal litigations to be parallel. The threshold test is satisfied where the "federal and state proceedings involve substantially the same parties and substantially the same issues." *Ambrosia Coal and Construction Co. v. Page's Morales,* 368 F.3d 1320, 1330 (11th Cir. 2004).

ICD's state court complaints and this case are parallel actions. The Related Case Table describes the civil cases plaintiffs have filed in the Circuit Courts of Broward County and Miami-Dade County since April 2020, along with additional related ongoing arbitration proceedings. As set forth in Section II.C, II.D. and the Related Case Table, these actions and the instant complaint are against the same parties; arise from the same common nucleus of operative transactions and occurrences; and, involve the same underlying legal issues regarding alleged breaches of ICD contracts, alleged tortious interference with ICD agent contracts, and alleged misappropriation of ICD trade secrets. Thus, the state court civil cases and arbitrations and this action are parallel.

### b. The *Colorado River* Factors Strongly Favor Abstention.

After the Court finds the state and federal actions are parallel, the Court weighs several factors to determine whether to abstain. *CCB, L.L.C. v. BankTrust*, No. 10-228, 2011 WL 13232376, at *2 (N.D. Fla. Jan. 3, 2011), *aff'd*, 438 F. App'x 833 (11th Cir. 2011) (abstaining from action pending parallel state court litigation). The factors are: (1) whether one of the courts has assumed *in rem* jurisdiction over property, (2) the inconvenience of the federal forum, (3) the potential for piecemeal litigation, (4) the order in which the fora obtained jurisdiction and the relative progress of the actions, (5) whether state or federal law will be applied, and (6) the adequacy of the state court to protect the parties' rights. *Ambrosia Coal*, 368 F.3d at 1331; *Moorer*,

374 F.3d at 997.  "The weight of each factor varies on a case-by-case basis, depending on the particularities of that case…. One factor alone can be the sole motivating reason for the abstention."  *Id.* (citing *Moses H. Cone Mem. Hosp. v. Mercury Constr. Co.,* 460 U.S. 1, 16 (1983)).  The "vexatious or reactive nature of either the federal or the state litigation may influence the decision whether to defer to a parallel state litigation under *Colorado River*."  *Ambrosia Coal*, 368 F.3d at 1331 (citing *Moses H. Cone Mem. Hosp.*, 460 U.S. at 17 n.20).  Here, the balance of factors, and Plaintiffs' strategic filing of this case to avoid adverse state court arbitration orders, warrant dismissal.

### i.  Neither the State Courts Nor This Court Assumed *In Rem* Jurisdiction, and This Forum Is Not Inconvenient (*Colorado River* Factors No. 1 & 2).

The first and second *Colorado River* factors are neutral.  The Broward County Circuit Court, the Miami-Dade County Circuit Court, and this Court have not assumed *in rem* jurisdiction over tangible[10] property, and this Court is no more or less proximate to the likely relevant evidence and witnesses than the Broward and Miami-Dade County Circuit Courts.

### ii.  There Is a High Likelihood of Piecemeal and Duplicative Litigation (*Colorado River* Factor No. 3).

"Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results." *Bosdorf*, 79 F. Supp. 2d at 1344 (abstaining where state and federal actions involved some of the same claims and "there [was] a strong likelihood that [the federal court would] duplicate the efforts of the state court, potentially reaching a different conclusion on identical facts").

---

[10] The state courts have assumed jurisdiction over intangible property, namely, the restrictive covenants in the Agent Cases, and the Broward Action. Restrictive covenants protect goodwill, an intangible property right.  Thus, the first factor arguably favors abstention.

This *Colorado River* factor strongly favors abstention.  There is a strong likelihood that the state courts and arbitrators, and this Court—if all proceed simultaneously—will duplicate efforts. The same parties, issues, and allegations are being litigated across the parallel state and federal actions.  Indeed, substantial portions of the RICO complaint appear to have been copied and pasted from ICD's prior state court pleadings. Proceeding with this litigation will needlessly expend judicial resources. The redundancy risks deciding the issues common to all of ICD's actions in a piecemeal fashion. In turn, the piecemeal determinations will lead to additional, otherwise unnecessary motion practice in all fora on preclusion questions.  The likelihood of conflicting decisions on issues and claims is also significant.  That is precisely what ICD wants, and the reason it filed this action.  ICD does not like the arbitrability and substantive determinations to date of the Broward and Miami-Dade County Circuit Courts or the California Superior Court.

### iii. The Vexatious and Reactive Nature of ICD's RICO Complaint.

This *Colorado River* factor also strongly favors abstention.  "Abstaining when litigation is reactive or vexatious furthers the important federal policy of prohibiting forum shopping." *Bosdorf*, 79 F. Supp. 2d at 1344; *id.* at 1346 (citing cases).  In *Bosdorf*, the court abstained from a RICO complaint, in part, because the plaintiffs filed the action in response to losing in state court. The court, after reviewing the history of the litigations, concluded that "it is difficult to conceive of the instant case as anything other than forum shopping and reactive litigation." *Id.*  In *Bosdorf*, plaintiffs filed only two prior state court actions, the second in response to an adverse ruling in the first.  After another loss, plaintiffs filed anew in federal court.  The *Bosdorf* Court admonished plaintiffs' forum-shopping:

> Plaintiffs voluntarily chose the state forum as their first choice and only sought to come to this forum after an adverse ruling by the state court. Plaintiffs should normally be required to select one forum and stay there. The fact that Plaintiffs had access to federal court, but chose to proceed in state court initially, weighs in favor of abstention. While a federal court has

> a "virtually unflagging obligation" to exercise jurisdiction over cases
> properly presented before it, this obligation becomes less compelling when
> an action is presented to that Court in an attempt to avoid adverse or
> unfavorable rulings dealt by other jurisdictions. (*Id.*)

This Court should reject ICD's RICO complaint for the same reasons. ICD has lost eight times in state court (*see* Exhibit 1, Related Case Table)[11]: Five arbitration actions are now pending (and soon, a sixth will be) as a direct result of these decisions compelling ICD to arbitrate its claims. *See* Related Arbitration Case Nos. 3, 7, 9, 11, 13; *see also* Related Civil Action No. 1 (May 4, 2021 order compelling arbitration).

ICD ignored these adverse rulings and filed this RICO action on April 21, 2021, after receiving those unfavorable state court decisions.

### iv. The Order in Which the Fora Obtained Jurisdiction (*Colorado River* Factor No. 4).

This factor considers the age of the parallel litigations and how far each has progressed, *Ambrosia Coal*, 368 F.3d at 1333, and also weighs in favor of abstention here. This case is the eleventh lawsuit ICD has filed against Defendants and ICD's alleged former agents about the same core issues. ICD filed the first ten cases in state court in April 2020. ICD filed this new complaint in April 2021 after things went badly in all the state court proceedings.

---

[11] As shown in the Related Case Table: (1) in Related Civil Case No. 1, the Broward Circuit Court granted defendants' motion to compel arbitration; (2) in Related Civil Case No. 2, the Miami-Dade Circuit Court, at the direction of the Third District Court of Appeal, granted defendants' motion to compel arbitration; (3) in Related Civil Case No. 4, the Broward Circuit Court granted defendant's motion to stay or abate proceedings; (4) in Related Civil Case No. 5, the Los Angeles County Superior Court entered a temporary restraining order against ICD, barring ICD from enforcing the restrictive provisions in its agent agreement); (5) in Related Civil Case No. 6, the Broward Circuit Court granted defendant's motion to compel arbitration, which order the Fourth District Court of Appeal upheld on appeal; and (6) in Related Civil Case No. 8, the Broward County Circuit Court granted defendant's motion to compel arbitration, which order the Fourth District Court of Appeal upheld on appeal.

The state court actions and arbitrations have progressed farther than this federal court action.  The state court judges presiding in six ICD litigations have ordered arbitrations, which are proceeding, and the California Superior Court action is in discovery.  This factor weighs heavily in favor of abstention.  *CCB, L.L.C.*, 2011 WL 13232376, at *2 (abstaining in RICO action in favor of prior-filed state court action); *Bosdorf*, 79 F. Supp. 2d at 1345 (same).

  **v.  Whether State or Federal Law Will Be Applied (*Colorado River* Factor No. 5).**

This *Colorado River* factor likewise favors abstention.  ICD's RICO claims are based on state law issues.  (e.g. Florida's commercial bribery statute, § 838.16, Complaint ¶ 186.)  Further, the legality of the disputed conduct turns on the application of Florida contract law, Florida tortious interference law, and Florida law on trade secrets and their misappropriation.

Federal and state courts have concurrent jurisdiction over RICO actions. That jurisdictional fact renders this *Colorado River* factor "less significant," *Bosdorf*, 79 F. Supp.2d at 1345.  But it *is* significant that plaintiffs could have, but did not, bring their RICO claims in state court, where they had already filed *ten* related actions.

  **vi.  The Adequacy of the State Courts to Protect the Parties' Rights (*Colorado River* Factor No. 6).**

This *Colorado River* factor favors abstention.  "Plaintiffs themselves apparently believed that the state forum would sufficiently protect their interest since they initially filed suit there instead of in federal court." *Bosdorf*, 79 F. Supp.2d at 1346. State courts have concurrent jurisdiction over RICO claims, and ICD could and should have filed all its claims for relief against Defendants when it filed its ten prior state court actions.  The Court should not reward ICD for forum-shopping and should dismiss this action. *See Melford v. Kahane and Associates*, No. 18-60881, 2018 WL 5044601, at *7 (S.D. Fla. Oct. 17, 2018) (abstaining and dismissing claim); *Teman v. Perry*, No. 19-20143, 2019 WL 1900469, at *2 (S.D. Fla. Apr. 29, 2019) (same); *Tamar*

*Diamonds, Inc. v. Splendid Diamonds, LLC*, No. 10-21470, 2010 WL 2350889, at *3 (S.D. Fla. June 11, 2010) (dismissing complaint where parties arbitrated and litigated in state court).

**B.  The Court Should Dismiss the Complaint for Failure to State Plausible RICO Claims or Satisfy Rule 9(b)'s Requirements to Plead Fraud with Particularity.**

**1.  ICD Fails to State a Plausible Claim Under 18 U.S.C. § 1962(c).**

To state a claim under 18 U.S.C. § 1962(c), "a civil plaintiff must establish that a defendant (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016).  Under 18 U.S.C. § 1964(c), "'[a] civil plaintiff must also show (1) the requisite injury to business or property, and (2) that such injury was by reason of the substantive RICO violation.'" *Florida Beauty Flora Inc. v. Pro Intermodal L.L.C.*, No. 20-CV-20966, 2020 WL 4003494, at *10 (S.D. Fla. July 15, 2020).  Here, ICD fails to allege actionable conduct under RICO or that such conduct constitutes a pattern of racketeering.  ICD also fails to allege that any damage to its business or property was the proximate result of the predicate acts it attributes to plaintiffs.

**a.  ICD Fails to Plausibly Allege Any Predicate Act.**

ICD alleges three RICO predicate acts under 18 U.S.C. § 1961: (1) mail and wire fraud, 18 U.S.C. §§ 1341 & 1343, (2) theft of trade secrets, 18 U.S.C. § 1832, and (3) commercial bribery, Fla. Stat. § 838.16. ICD fails to plausibly allege any of these predicate acts.

**i.  ICD Has Failed to Allege Mail or Wire Fraud.**

ICD has failed to allege any plausible scheme to defraud and fails to plead circumstances of the purported fraud with the particularity required under Rule 9(b).  "Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another … and (2) uses the mails or wires in furtherance of that scheme." *Am. Dental Ass'n*, 605 F.3d at 1290.  "A scheme to defraud requires proof of material misrepresentations, or the omission or concealment of material

facts, reasonably calculated to deceive persons of ordinary prudence." *United States v. Hasson*, 333 F.3d 1264, 1270-71 (11th Cir. 2003).

The Eleventh Circuit requires a plaintiff asserting fraud to plead with particularity under Rule 9(b) of the Federal Rules of Civil Procedure. *Am. Dental Ass'n*, 605 F.3d at 1290-91. "The 'particularity' requirement serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *West Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 Fed. App'x 81, 86 (11th Cir. 2008). "When a plaintiff does not specifically plead the minimum elements of their allegation, it enables them to learn the complaint's bare essentials through discovery and may needlessly harm a defendant's goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, [grounded on] baseless allegations used to extract settlements." *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1313 n.24 (11th Cir. 2002).

Here, the complaint makes no allegations ***at all***, let alone any allegations that would satisfy Rule 9(b), regarding any Defendant's use of the mails in connection with the alleged fraud. Thus, ICD has failed to allege mail fraud as a predicate act.

Plaintiffs have likewise failed to allege a plausible wire fraud scheme. The complaint alleges one highly dubious "misrepresentation" in paragraph 46, which is repeated seven times (¶¶ 48, 49, 50, 66, 107, 170, and 171) to create the illusion that the Shaders made the same statement on other, unspecified occasions. Each of these allegations centers on the unfounded assertion that the Shaders were leaving the insurance industry.

The "misrepresentation," however, is contradicted by the contract ICD claims it was fraudulently induced to enter—a contract that ICD tellingly fails to attach to the complaint. The

contract expressly contemplates Corey Shader remaining in "the insurance business."[12]  *See* Exhibit 2 (January 19th Agreement).  Likewise, ICD's complaint belies any suggestion that ICD was fraudulently induced into believing that the Shaders were leaving the insurance business.  In paragraph 54, ICD alleges that the January 19th Agreement was amended to provide:

> [T]he ICD parties now agree that [Andrew Shader, Corey Shader, and NHS], and their affiliated [AMC], may only offer, sell, and bill for Wellness, Lab and Dental plans through downline/agents identified in "Exhibit C" to the Agreement.

*See* Exhibit 6.  Additionally, paragraph 55 alleges that "the Shaders and NHS were permitted to market other insurance plans, but only after first offering and selling ICD core and add-on products." *Id.*

"The gravamen [of a wire fraud claim] is the scheme to defraud," *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008), but here, ICD's complaint alleges that the parties to the January 19th Agreement understood that the Shaders and NHS would still be involved in the insurance business.  The alleged misrepresentation—and any suggestion that plaintiffs were actually misled—is facially implausible based on ICD's own complaint. *Am. Dental Ass'n*, 605 F.3d at 1292 ("We have held that a plaintiff must allege that some kind of deceptive conduct occurred in order to plead a RICO violation predicated on mail fraud.").[13]

---

[12] Paragraph 2 of the January 19th Agreement specifically addresses the payment of "New Compensation" to Corey Shader for "each ***new*** membership program (***including insurance and health plans***) ('Membership Plan') enrollment, which inures to the monetary benefit of the ICD parties, individually or jointly, that originates and becomes effective ***after the Effective Date*** which was enrolled by, or resulted from, in whole or in part, the marketing efforts of, any agents or sales people managed by, or affiliated with (currently or in the past) Corey Shader." Exhibit 2 (January 19th Agreement), ¶ 2 (emphasis added).

[13] The alleged misrepresentation fails even to state a basis for breach of contract, which is how ICD pleaded its Broward County Circuit Court complaint before that court ordered ICD to arbitrate its contract, tortious interference, and trade secret claims. Exhibit 6 (Complaint). The January 19th Agreement includes a merger clause. Exhibit 2, at ¶ 10(b). The alleged statement that the Shaders were exiting the insurance business—when the parties written agreement clearly and expressly states that they are not—is merged into the parties' written agreement and of no effect. *Duval Motors Co. v. Rogers*, 73 So. 3d 261, 265 (Fla. Dist. Ct. App. 2011).

ICD's attempt to leverage the alleged November 2018 misrepresentation by repetition fails to satisfy the who, what, where, when, how requirement of Rule 9(b) for fraud allegations. Repeating the "what" does not magically supply the missing who, where, when, or how.

Nor does ICD satisfy Rule 9(b) with regard to its other generalized allegations of fraud. ICD alleges that Adam Beeman forged a dead agent's signature on "insurance appointment paperwork" and that a non-defendant agent then "used" the credentials. Complaint ¶¶ 140, 173. Forgery is not a RICO predicate act, 18 U.S.C. § 1861(1), and ICD fails to allege any use of the mail or wire communication or any circumstances of the alleged forgery, such as when it occurred or to whom the "paperwork" was submitted. *Danping Li v. Gelormino*, No. 18-cv-442, 2019 WL 1957539, at *6 (D. Conn. May 2, 2019) (plaintiff failed to allege use of the mails and circumstances surrounding the statements).

ICD also alleges that Mr. Beeman misrepresented the ownership structure of Kratos and HTO to "various" and "numerous insurance regulators" "throughout the country."  Complaint ¶¶ 105; 172.  ICD identifies the Florida Department of Financial Services' Division of Insurance Agent and Agency Services as a recipient of false information, but not when, the specific circumstances of what the alleged misrepresentation was, or whether it was sent by mail or by wire.  ICD fails to identify the "various" and "numerous" other "insurance regulators" "throughout the country," what was sent to them, when, and how.  These allegations fail under Rule 9(b). *Almanza v. United Airlines, Inc.*, 162 F. Supp. 3d 1341, 1357 (S.D. Ga. 2016), *aff'd*, 851 F.3d 1060 (11th Cir. 2017).

Finally, ICD makes a conclusory allegation related to the defendants' electronic communications, and the Court should disregard it. *Iqbal*, 556 U.S. at 678.  ICD alleges that "[a]s part of their scheme to defraud ICD and to steal its trade secrets, customers, and business,

Defendants exchanged numerous electronic communications, including text messages, across state lines, in furtherance of their fraudulent scheme … to coordinate the Enterprise and to seek to cover their tracks." Complaint ¶ 174. ICD provides no more specific Rule 9(b) information to defendants or the Court than that defendants texted each other a lot as part of their allegedly illegal scheme. The allegation fails to identify a misrepresentation or anyone that was misled. *Am. Dental Ass'n*, 605 F.3d at 1292 ("If the specific misrepresentations do not exist, it follows that the complaint has not alleged a right to relief that is 'plausible on its face.'").  The allegation also impermissibly lumps together all 15 Defendants. *Ambrosia Coal & Const. Co.*, 482 F.3d at 1316-17 (dismissing RICO claims for failure to plead specific claims against each defendant).  The complaint fails to allege any plausible claim for mail or wire fraud.

### ii.   ICD Fails to Identify Any Protectable Trade Secrets or to Adequately Allege That Any Defendant Stole Them.

ICD's allegations of trade secret theft under 18 U.S.C. § 1832 are vague, speculative, and conclusory.  Section 1832 prohibits the theft of a trade secret with the intent to convert the secret to the economic benefit of anyone other than the owner.  Information is a trade secret if the owner "has taken reasonable measures to keep such information secret," and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

Here, ICD fails to plausibly allege any valid and protectable trade secrets.  In one sentence in paragraph 176 of the complaint, ICD lists 9 purported trade secrets, without explanation or specificity: "(1) ICD's business model, (2) ICD's marketing process, (3) ICD's onboarding, training, and licensure techniques, (4) ICD prequalification process, (5) ICD's product offering methodology, (6) ICD's quality assurance protocols, (7) ICD's sales training process, (8) ICD's

commission advance model, (9) ICD's customer names and information; and (10) ICD provider relationships, among others."  Such vague and categorical allegations fail to sufficiently allege a trade secret. *DynCorp Int'l v. AAR Airlift Grp., Inc.*, 664 F. App'x 844, 849 (11th Cir. 2016) (complaint must do more than "identify broad categories of information, such as financial and technical data"); *DeCurtis LLC v. Carnival Corp.*, No. 20-CV-22945, 2021 WL 1968327, at *7-8 (S.D. Fla. Jan. 6, 2021), *report and recommendation adopted as modified*, 2021 WL 1540518, at *2 (S.D. Fla. Apr. 20, 2021) (dismissing with prejudice civil claim under § 1832 for alleging general categories as "trade secrets," such as "software," "testing plans," and "operating procedures").

ICD never alleges:  (1) that it took reasonable steps (or what those steps were) to keep secret any of these generalized aspects of its business; (2) how or whether this information is valuable; and (3) how defendants came to know this information (other than a vague reference to "Defendants['] … prior work for ICD." Complaint ¶ 175).  Even this allegation is confusing, exaggerated, and makes little sense, because 12 of the 15 defendants never "worked for ICD."

ICD fails even to identify Defendants' intent in stealing the alleged trade secrets.  In paragraph 175, ICD alleges that Defendants stole ICD's trade secrets "in order to establish their own competing businesses."  Two paragraphs later, ICD alleges that Defendants created the competing businesses in order "to … steal ICD's trade secrets." Complaint ¶ 177.

ICD alleges in conclusory fashion—30 times in a 40-page pleading—that Defendants schemed to steal ICD's trade secrets,[14] but repetition of a legal conclusion is insufficient to state a claim.  ICD fails to allege theft of trade secrets as a plausible RICO predicate act. *DeCurtis*, 2021

---

[14]  Complaint ¶¶ 1, 3, 45, 58, 62, 67, 71, 99, 104, 106, 107, 110, 114, 117, 119, 164, 167, 169, 174, 175 (twice), 176, 177, 179, 180, 181, 186, 192, 196 & Demand for Relief.

WL 1968327, at *5 ("A true trade secret plaintiff ought to be able to identify, up front, and with specificity the particulars of the trade secrets without any discovery."); *Danping Li v. Gelormino*, No. 18-442, 2019 WL 1957539, at *6 (D. Conn. May 2, 2019) (dismissing RICO action predicated on theft of trade secrets for failure to provide any information about the trade secrets); *American Registry, LLC*, 2013 WL 6332971, at *3-4 (where plaintiff sued defendants for creating competing business, dismissing misappropriation of trade secrets claim because plaintiff only asserted broad categories of "trade secrets," and the other allegations of the claim lacked adequate factual support).

### iii. The Court Should Reject ICD's Attempt to Criminalize Its Tortious Interference With Contract Claims.

ICD asserts, as its final RICO predicate act, a "Commercial Bribery" claim under Florida Statutes § 838.16, a third-degree felony.[15]  In short, ICD asks the Court to re-cast as felonies the common law tortious interference claims it unsuccessfully filed last year against Defendants and other non-parties.  Notably, the Broward and Miami-Dade Circuit Courts ordered ICD to arbitrate its tortious interference claims, and the California Superior Court temporarily enjoined ICD from enforcing its agent agreement as a likely illegal restraint of trade.  Exhibit 1 (Related Civil Cases 1, 2, 5, 6 & 8).  ICD asks this Court to ignore the orders of those courts.

The Court should decline ICD's invitation to criminalize its common law tort and breach of contract claims.  In *Carr v. Tillery*, 591 F.3d 909 (7th Cir. 2010), the Seventh Circuit affirmed

---

[15] The plain language of § 838.16 and its companion statute, § 838.15, appear to criminalize an indefinitely broad range of transactions involving an agent or employee.  In 1995, the Florida Supreme Court invalidated § 838.15 as unconstitutionally vague, arbitrary, and overbroad.  *Roque v. State,* 664 So.2d 928, 929-30 (Fla. 1995); *id.* at 930 (finding that § 838.15 "could be used … to prosecute, as a crime, the most insignificant of transgressions or, at worst, to misuse the judicial process").

the dismissal of a RICO action on this ground, holding that the complaint failed to state a RICO

claim because the plaintiff had dressed up a contract dispute with RICO legal conclusions:

> [The] allegations amount merely to a breach of contract claim, which cannot
> be transmogrified into a RICO claim by the facile device of charging that
> the breach was fraudulent, indeed criminal. RICO is not a proper vehicle for
> levering a breach of contract suit between citizens of the same state into
> federal court, and under a statute that entitles a successful plaintiff to treble
> damages and attorneys' fees…. For the most part the complaint simply
> renames breach of contract fraud or crime in an effort to satisfy the
> requirement of establishing "predicate acts" required for a RICO claim.

*Id.* at 918.  Here, ICD has invoked a seldom-used (and likely unconstitutional) Florida statute to

rescue common law tortious interference claims that have not panned out as planned in state courts.

"RICO has not federalized every state common-law cause of action available to remedy business

deals gone sour." *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992).  ICD's

complaint states no facts sufficient to warrant a finding of felony commercial bribery.

### b. ICD Fails to Allege an Actionable Continuing Pattern of Racketeering Activity Under 18 U.S.C. § 1961(5).

ICD alleges a closed-end scheme that falls far short of the minimum that the Eleventh

Circuit requires for an actionable, continuing pattern of racketeering activity.  "To successfully

allege a pattern of racketeering activity, plaintiffs must charge that: (1) the defendants committed

two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one

another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature." *Jackson

v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004).  "It is by now well established

that in order to prove a 'pattern of racketeering' it is not sufficient to simply establish two isolated

predicate acts.  RICO targets *ongoing* criminal activity, rather than sporadic, isolated criminal

acts." *Id.*

"Continuity is both a closed- and open-ended concept, referring either to a closed period

of repeated conduct, or to past conduct that by its nature projects into the future with a threat of

26

repetition." *Id.* at 1265 (quoting *H.J., Inc. v. NW Bell Tel. Co.*, 492 U.S. 229, 241 (1989)).  "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time.  Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement[.]" *H.J., Inc.*, 492 U.S. at 242; *see also Jackson*, 372 F.3d at 1265.

Here, the alleged scheme began "in or around November 2018" at "the same time [Andrew Shader, Corey Shader, and NHS] were negotiating a new contract with ICD" and "fraudulent represented to ICD that they wanted to leave the insurance business." Complaint ¶¶ 45-46.  The parties entered into the January 19th Agreement.  *Id.* ¶¶ 51, 54.  Plaintiffs allege that, instead of complying with the agreement, defendants in 2019 began "interfering with the ICD Exclusive Agent Agreements, illicitly soliciting ICD's customers and prospective customers, and misappropriating ICD's confidential information and trade secrets." *Id.* ¶ 58.  Plaintiffs refer to text messages to suggest that the alleged scheme to "illicitly compete with ICD and steal ICD's proprietary trade secrets, business model, agents and customer base" was completed by March 2019 and that the "illicit competing businesses staffed with former ICD agent[s]" had long been operating by July, August, and October 2019, *id.* ¶¶ 71, 96-97, 99, 102, 115-116, 131, 137-38.  ICD's final, conclusory, and speculative allegation of "confidential and proprietary" information theft are two December 16, 2019 text messages that ICD asserts refer to sales data that "Defendants … stole … from ICD's call centers." *Id.* ¶ 142-44.  ICD filed its first civil action in Broward Circuit Court in early 2020.  Exhibit 1 (Related Civil Case No. 1).

Under the most generous view of the Complaint, Defendants committed every alleged predicate act in Plaintiffs' alleged scheme in a *thirteen-month* period, between November 2018 and December 2019.  The dubious, alleged lie to ICD about "leaving the insurance business," the

alleged theft of ICD's trade secrets, and the alleged bribery of ICD agents all occurred in an even shorter *five-month* period.  The alleged goal of the scheme was completed by March 2019 when the "illicit competing businesses" were operating.

These brief, compressed events are not a "continuing pattern."  In *Jackson*, the Eleventh Circuit held that a nine-month period of alleged racketeering activity failed to state a continuing pattern under 18 U.S.C. § 1961(5). *Jackson,* 372 F.3d at 1266; *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1216-19 (11th Cir. 2020) ("We measure a 'substantial period of time' in years, not in weeks"[;] nine months is insufficient to state close-ended continuity).  Here, the predicate acts were allegedly committed in a far shorter, clearly insufficient, period. *Aldridge v. Lily-Tulip, Inc. Salary Ret. Plan Benefits Comm.*, 953 F.2d 587, 593 (11th Cir.1992).  Even assuming the more generous thirteen-month period, numerous courts have refused to consider comparable periods adequate to state a continuing pattern of racketeering.[16]  *Grace Int'l Assembly of God v. Festa*, 797 F. App'x 603, 605 (2d Cir. 2019) ("Since the Supreme Court decided *H.J. Inc.*, we have never found predicate acts spanning less than two years to be sufficient to constitute closed-ended continuity.").  When, as here, there is only a single alleged scheme, courts have rejected the

---

[16] *See, e.g., Efron v. Embassy Suites (P. R.), Inc.*, 223 F.3d 12 (1st Cir. 2000) (no closed-ended continuity where predicate acts occurred over 21-month period); *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (Second Circuit "has never held a period of less than two years to constitute a 'substantial period of time'"); *Capital Corp. v. Tech. Fin. Group, Inc.*, 67 F.3d 463, 467-68 (2d Cir. 1995) (courts of appeals have consistently considered 11 months insufficiently "substantial"); *Hughes v. Consol-Pennsylvania Coal Co.*, 945 F.2d 594, 611 (3d Cir. 1991) ("[T]welve months is not a substantial period of time."); *Menasco v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989) (no continuity when predicate acts with a single goal occurred over a one-year period); *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994) (17-month period insufficient to show continuity); *J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815, 821 (7th Cir. 1991) (13 months not a substantial period of time); *Wisdom v. First Midwest Bank of Poplar Bluff*, 167 F.3d 402, 407 (8th Cir. 1999) (10-month period "too short" to constitute closed-ended continuity); *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 366-67 (9th Cir. 1992) ("We have found no case in which a court [of appeals] has held the [continuity] requirement to be satisfied by a pattern of activity lasting less than a year.").

assertion of even longer periods. *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir.1995) (predicate acts over three-year period insufficient to allege pattern of racketeering when complaint alleged a single scheme with a single goal).

Nor do plaintiffs satisfactorily allege an open-ended pattern of racketeering activity. Plaintiffs conclusorily allege that defendants' racketeering acts "were a regular way of conducting their ongoing business" and "pose a threat of continuing criminal activity as Defendants continue to establish new businesses that rely on ICD's trade secrets and confidential information." Complaint ¶¶ 194-95. Plaintiffs, however, cannot show open-ended continuity with unsupported allegations that Defendants' *prior* conduct—in allegedly stealing trade secrets and interfering with ICD agents in 2019—will cause *future* economic harm to plaintiffs. *Florida Beauty Flora Inc. v. Pro Intermodal LLC*, No. 20-CV-20966, 2020 WL 4003494, *11 (S.D. Fla. July 15, 2020).[17]

Plaintiffs have failed to allege a continuing pattern of racketeering activity. The Court should accordingly dismiss Counts I, II, and III.

### c. ICD Fails to Show That Its Alleged Injuries Were Plausibly and Proximately Caused by the Predicate Acts It Alleges.

ICD contends its business was damaged as result of the alleged scheme, but there is a disconnect. "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). ICD alleges that it suffered a "substantial reduction in business"

---

[17] *Nw. Osteoscreening, Inc. v. Mountain View Hosp., LLC*, No. 4:13-cv-00414, 2014 WL 4955673, at *6 (D. Idaho Oct. 2, 2014) (plaintiffs failed to plead a pattern of racketeering activity because "the theft or fraud ceases once the trade secret is obtained"); *Brake Parts, Inc. v. Lewis*, No. 09-CV-132, 2010 WL 3470198, at *8 (E.D. Ky. Aug. 31, 2010) (plaintiff failed to satisfy the continuity requirement because once defendants stole plaintiff's trade secrets, the scheme ended); *Binary Semantics Ltd. v. Minitab, Inc.*, No. 4:07-CV-1750, 2008 WL 763575, at *4 (M.D. Pa. Mar. 20, 2008) ("[T]he theft of trade secrets necessarily implies that they will be used. Therefore, under plaintiff's theory, every misappropriation of trade secrets could result in a RICO claim. This would surely expand the scope of the statute beyond what it was intended to reach.").

and "lost customers and sales" in 2019 and 2020 as a result of defendants' wire fraud, trade secret theft, and commercial bribery.  Complaint ¶¶ 154-57.   ICD fails to identify a proximate connection—and none is evident—between these predicate acts and its alleged "lost customers and sales."  This pleading failure is fatal to Plaintiffs' claims.

In *Anza*, the Supreme Court identified five premises underlying the RICO proximate cause inquiry:  (1) "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action"; (2) whether the alleged damages "could have resulted from factors other than [defendants'] alleged acts of fraud"; (3) "any appreciable risk of duplicative recoveries"; (4) "the speculative nature of the proceedings that would follow if [plaintiffs] were permitted to maintain [their] claim"; and (5) whether "the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims." *Anza,* 457 U.S. at 458-60; *see also Funding Metrics LLC v. Decision One Debt Relief LLC*, No. 18-CV-81061, 2019 WL 3759111, at *3 (S.D. Fla. August 9, 2019).  Here, each of the *Anza* factors supports dismissal.

The first and fourth factors—the difficulty ascertaining damages caused by some remote action and the likely speculative nature of the proceedings if ICD is permitted to pursue its RICO claim—strongly support dismissal.  ICD alleges that it lost business because Defendants "illicitly solicited ICD's customers and prospective customers." Complaint ¶¶ 58, 156.  But ICD has not alleged that Defendants actually "stole" any current customers; only that Defendants "solicited" current customers.  A current ICD customer has either purchased insurance or is in the process of doing so.  If a current ICD customer decided to change their insurance coverage, that decision is independent of any alleged lie by Defendants to ICD about "transitioning out" of the insurance business, or theft of ICD trade secrets, or bribery of former ICD agents.

The connection between Defendants' commission of these predicate acts and ICD's alleged loss of "prospective" customers is even more speculative.  The Complaint alleges that "prospective customers" are so-called "leads."  Complaint ¶ 36.  Leads are "the names of individuals who have expressed a desire to obtain health insurance."  *Id.*  ICD alleges that it contracts with "insurance agencies and insurance agents" that operate "call centers and actually make the sales calls to prospective customers."  *Id.* ¶¶ 35, 38.  A prospective customer lead is a purchased name and a telephone number.  ICD does not allege that Defendants "stole" customer leads that ICD purchased.  It alleges that Defendants bribed former ICD agents to work for them (using *Defendants'* purchased or developed leads, not ICD's leads).  In fact, ICD lost no "prospective" customers unless it contends that *every* "prospective" customer lead is a potential ICD customer and *every* potential customer who ultimately purchases insurance through another seller is an instance of damage to ICD.  Such an assertion is obviously false.

In fact, ICD's alleged damages, if any, could have resulted from factors other than Defendants' conduct—the second *Anza* factor.  "Businesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of [ICD's] lost sales were the product of [defendants' wire fraud, trade secret theft, or commercial bribery]."  *Anza*, 547 U.S. at 459.  ICD alleges that it lost sales and customers because Defendants bribed former ICD agents to violate terms of their agent agreements. Complaint ¶ 186.  But ICD ignores intervening alternative causes, independent decisions, and actors.  The alleged former agents—none party to this action—made independent decisions regarding when and with whom they wanted to work. *Funding Metrics*, 2019 WL 3759111, at *4 ("Because, in short, the merchants at all times retained the power either to remain with FM or, as the case may be, to breach, their intervening actions are precisely the sort of 'independent factors' that, as *Anza* instructs, break the causal chain.").  The

customer "leads" these independent agents contacted likewise made independent decisions about when and from whom to buy insurance.  "[T]he less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors."  *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 269 (1992).

The third *Anza* factor, the risk of duplicative recoveries, is acutely present here.  As described in Exhibit 1 and in the appendix to Defendants' Joint Request for Judicial Notice, ICD filed this federal RICO action only after (i) filing numerous state court actions against Defendants and alleged former ICD agents asserting common law claims for breach of contract, tortious interference with contract, and trade secret misappropriation; and (ii) being ordered to arbitration. Those actions are pending, and ICD is pursuing claims based on the same set of operative transactions and facts it alleges are the basis for RICO treble damages here.  In *Funding Metrics*, the Court found this *Anza* factor called for dismissal because:

> Whatever happens here, FM will retain the right to bring indisputably cognizable breach-of-contract claims against the merchants directly. Allowing it to proceed against DDR, also, leaves open the possibility that, when all is said and done, FM's RICO claims will have left it (unduly) enriched by "duplicative recoveries."

2019 WL 3759111, at *4.  Here, ICD has *already* filed lawsuits against the former agents it contends Defendants "bribed." It is fair to say that duplicative recovery is part of ICD's plan.

The last *Anza* factor—whether more immediate victims of the alleged RICO violation can be expected to pursue their own claims—also supports dismissal.  ICD alleges that Adam Beeman forged a signature on "insurance appointment paperwork" and misrepresented the ownership of Kratos and Health Team to "numerous insurance regulators." Complaint ¶¶ 140, 105.  It is not clear how ICD was directly damaged—or if it even could be damaged—by this alleged conduct. Assuming these allegations are true—they are not—and adequately pleaded—they are not—the immediate victims are insurance regulators, who are well-equipped to address their own claims.

All of the *Anza* factors point to dismissal. Because ICD's alleged injury was not proximately caused by any of the RICO violations it alleges, the Court should dismiss Counts I, II, and III. *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1349 (11th Cir. 2016) (complaint "fails in the first instance because it does not adequately plead that the plaintiffs suffered injury as a result of Spirit's purported mail and wire fraud").

### 2. One Stop Quotes Fails to State a Plausible Claim Under § 1962(a).

Plaintiff fails to state a claim under 18 U.S.C. § 1962(a). Plaintiff alleges that (i) it "markets Medicare insurance coverage," (ii) it was injured by defendants' "investment of racketeering income into Insurance Pipeline and Affordable Insurance," and (iii) such conduct creates "an unfair competitive advantage." Complaint ¶¶ 13, 208.

The Court should dismiss Count II for the reasons it should dismiss Count I. One Stop Quotes fails to allege the commission of any RICO predicate act or that defendants engaged in an pattern of racketeering activity. *Almanza v. United Airlines, Inc.*, 162 F. Supp. 3d 1341, 1358 (S.D. Ga. 2016) (dismissing § 1962(a) claim for failure to sufficiently plead predicate acts); *Black Diamond Land Mgmt., LLC v. Twin Pines Coal Co., Inc.,* No. 14-CV-2333, 2016 WL 3617974, at *9 (N.D. Ala. July 6, 2016) (§ 1962(a) plaintiff must establish pattern of racketeering activity). By all appearances, One Stop Quotes is trying to use a statute designed to disrupt organized crime to disrupt lawful competition. One Stop Quotes does not allege how Insurance Pipeline and Affordable Insurance have an "unfair competitive advantage," other than having money for "day-to-day operations," "payroll, office expenses, and purchase of leads." *Id.* ¶ 206.

Nor has One Stop Quotes alleged that its injuries—decreased "sales, profits, and local market share"—were proximately caused by Defendants' investment in Insurance Pipeline and Affordable Insurance. The *Anza* factors support dismissal of Count II. There are numerous intervening reasons—such as competition—that Plaintiff might have lost sales, profits, and market

33

share, other than defendants' alleged purchase of office supplies and leads for Insurance Pipeline and Affordable Insurance. A prospective Medicare insurance customer who decides not to purchase through One Stop Quotes makes an independent decision that has no connection whatsoever to Insurance Pipeline's or Affordable Insurance's ability to make payroll. One Stop Quotes does not allege, moreover, that Insurance Pipeline and Affordable Insurance are its only competitors. A court attempting to determine damages would have to determine what portion, if any, of One Stop Quotes' alleged lost "sales, profits, and local market share," Complaint ¶ 209, was due to unrelated market factors, unnamed competitors, and unidentified competing products. The allegation that Insurance Pipeline's and Affordable Insurance's ability to compete entitles One Stop Quotes to RICO treble damages is based on conclusory speculation. "The element of proximate causation … is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation. It has particular resonance when applied to claims brought by economic competitors, which, if left unchecked, could blur the line between RICO and the antitrust laws." *Anza*, 547 U.S. at 460.

Because One Stop Quotes has failed to allege that defendants engaged in a pattern of RICO predicate acts, or that alleged income derived from those acts was invested in a manner that proximately caused injury to One Stop Quotes, the Court should dismiss Count II.

### 3.  ICD Fails to State a Claim Under § 1962(d).

Plaintiffs' claim of a RICO conspiracy under 18 U.S.C. § 1962(d), which is based entirely on ICD's allegations in Count I of a violation of § 1962(c), Complaint ¶ 211, should be dismissed for the same reasons. Plaintiffs fail to allege RICO predicate acts, fail to allege a pattern of racketeering activity, and fail to allege that their injuries were proximately caused by defendants'

commission of RICO predicate acts.[18]   "Where a plaintiff fails to state a RICO claim and the conspiracy count does not contain additional allegations, the conspiracy claim necessarily fails.'" *Wade Park Land Holdings*, No. 3:20-CV-176-TCB, 2021 WL 728185, at *7 (N.D. Ga. Feb. 24, 2021); *In re Takata Airbag Prod. Liab. Litig.,* No. 14-CV-24009, 2021 WL 908552, at *10 (S.D. Fla. Mar. 9, 2021); *Jackson*, 372 F.3d at 1269 (affirming dismissal of RICO conspiracy claim that "adds nothing" to allegations supporting rejected § 1962(c) claim); *Beck v. Prupis*, 529 U.S. 494, 505-07 (2000) (plaintiff pursuing civil RICO conspiracy claim must allege injury stemming from an overt act that constitutes racketeering activity or is otherwise wrongful under the RICO statute). The Court should dismiss Count III.

### C.   As an Alternative, ICD's Claims Against Defendants Must Be Arbitrated.

#### 1.   Federal and Florida Law Highly Favor Arbitration.

The Agent Agreements expressly provide that they are subject to "the laws of the State of Florida governing arbitration." *Kratos Investments*, 2021 WL 1009277.  However, the result is the same regardless of whether the federal or Florida law is applied.[19]   Consistent with the FAA, Florida expressed a strong preference in favor of arbitration when it enacted the Revised Florida Arbitration Code ("FAC"), §682.01, *et seq.*, Fla.Stat.  The "Florida Supreme Court has held that 'arbitration is a favored means of dispute resolution….'" *Prudential Sec., Inc. v. Katz,* 807 So. 2d 173, 174 (Fla. 3d DCA 2002), *quoting Roe v. Amica Mut. Ins. Co.,* 533 So. 2d 279, 281 (Fla. 1988).

---

[18] One Stop Quotes is included as a claimant under Count III, although nothing in the Complaint shows that One Stop Quotes was directly injured as a result of ICD's § 1962(c) allegations.

[19] This view applies to the interpretation of an arbitration provision regardless of whether it is interpreted under Florida or federal law. The Federal Arbitration Act ("FAA") governs the enforcement, interpretation, and validity of arbitration clauses in commercial contracts, *see Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1981), creating a strong presumption in favor of arbitration, *see Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985); *Musnick v. King Motor Co. of Ft. Lauderdale*, 325 F.3d 1255, 1258 (11th Cir. 2003).

## 2.   Defendants Are Entitled To Compel Arbitration Under the Agent Agreements.

Binding precedent recognizes that there are circumstances under which a non-signatory to a contract may enforce an arbitration provision. *Arthur Andersen LLC v. Carlisle,* 556 U.S. 624, 631(2009); *see also Lawson v. Life of the South Ins. Co.,* 648 F.3d 1166, 1170 (11th Cir. 2011). In this context, "[t]he scope, validity, and enforceability of arbitration agreements, including the right of non-signatories to compel arbitration, is governed by state contract law." *Physician Consortium Services, LLC v. Molina Healthcare, Inc.,* 414 Fed.Appx. 240, 242 (11th Cir. 2011). Thus, in the instant case, Florida law applies.

Here, compelling arbitration is appropriate on equitable estoppel grounds.[20]  "The doctrine of equitable estoppel on the basis of intertwined claims … applies when a *signatory* to a contract containing the arbitration clause raises allegations of substantially interdependent and concerted misconduct by both a non-signatory and one or more of the signatories to the agreement."[21] *Kratos Investments,* 2021 WL 1009277, \*2.  As the Third District Court of Appeal has already made clear to ICD, its claims against Kratos, HTO and Ryscik are intertwined with ICD's former agents, and therefore, Kratos, HTO and Rsycik are entitled to require that ICD arbitrate its claims against them. *Id.* ("Thus, we conclude ICD is estopped from avoiding arbitration.").

ICD's RICO claims are premised on the same allegations of inextricably intertwined concerted conduct between Defendants and ICD's former agents who are signatories to the Agent Agreements containing mandatory arbitration provisions.  For example, as the Third District Court

---

[20] Florida law recognizes a number of grounds under which a non-signatory may compel arbitration. *Heller v. Blue Aerospace, LLC,* 112 So. 3d 635, 637 (Fla. 4th DCA 2013) (non-signatory may compel arbitration on equitable estoppel or agency grounds); *Mendez v. Hampton Court Nursing Ctr., LLC,* 203 So. 3d 146, 149 (Fla. 2016) (non-signatory may compel arbitration as third party beneficiary).

[21] "Equitable estoppel is also warranted when each of the signatory's claims against a non-signatory make reference to or presume the existence of a written agreement." *Physician Consortium Servs., LLC v. Molina Healthcare, Inc.,* 414 F. App'x 240, 242 (11th Cir. 2011).

of Appeal noted, ICD's prior litigation involving Kratos, HTO and Ryscik included claims that they "conspired with ICD agents in a scheme to steal ICD's business by setting up sham competing entities, interfering with the ICD Exclusive Agent Agreements, illicitly soliciting ICD's customers and prospective customers, and misappropriating ICD's confidential information and trade secrets." *Id.* at *1. Now that ICD has been ordered to arbitrate these claims, ICD has asserted the same claims in arbitration. Exhibit 1 (Related Arbitration Case No. 3). Now, ICD *also* asserts these same claims *here*:

> To carry out the scheme, the Defendants have conspired with others, including exclusive licensed agents of ICD, to steal ICD's business by, among other things, setting up sham, competing entities, interfering with [ICD's Agent Agreements], illicitly soliciting ICD's customers and prospective customers, and misappropriating ICD's confidential information and trade secrets.

Complaint ¶ 58. ICD's allegations also reference former agents like Ryan Kelty, *id.* ¶ 69, with whom ICD is currently arbitrating the issues of, *inter alia,* whether he breached his Agent Agreement or misappropriated any of ICD's alleged trade secrets. Indeed, the entire "ICD Misappropriation Enterprise" involves the same allegations of misappropriation that ICD raised in each of the eight actions against its former agents, the four former agent actions now in arbitration, and the ten Defendants here who obtained orders compelling ICD to arbitrate.

ICD's Complaint leaves no doubt that it has raised "allegations of substantially interdependent and concerted misconduct by both a non-signatory [Defendants] and one or more of the signatories [ICD's former agents] to the agreement [the Agent Agreements]." *Kratos Investments,* 2021 WL 1009277, *2. Since the grounds for equitable estoppel recognized by Florida courts are present, if the Court does not dismiss the instant action, the Court should require that ICD arbitrate its claims.[22]

---

[22] ICD is also arbitrating with its former agents referenced in the Complaint. Exhibit 1. These arbitrations, which involve questions of whether ICD's former agents breached the Agent

### 3.   ICD Has Been Ordered To Arbitrate With Ten Of The Fifteen Defendants.

Three state courts—the Miami-Dade and Broward Circuit Courts, and the Third District Court of Appeal—have determined that ICD's allegations against Kratos, HTO and Ryscik (in the Miami-Dade Action), and against the Shaders, NHS, AMC, Prodigy, Beeman and Stormont (in the Broward Action), are sufficiently intertwined with ICD's former agents and the Agent Agreements so as to permit these non-signatories to enforce the broad, mandatory arbitration provision in the Agent Agreements and compel ICD to arbitrate its claims against them. *Kratos Investments*, 2021 WL 1009277, at \*2-\*3; *Shader,* 2021 WL 2115257, at \*3.  Having fully litigated and lost the issue of whether the ten Defendants here have a right as non-signatories to compel ICD to arbitrate its claims, ICD may not relitigate the issue here.[23]

The orders in the Broward Action and Miami-Dade Action requiring that ICD arbitrate its claims take on special significance in this action.  Here, ICD alleges a conspiracy and enterprise predicated on misappropriation of confidential information and trade secrets. Complaint ¶¶ 2-3, 58, 211. ICD even refers to the enterprise as the "ICD Misappropriation Enterprise." *Id.* ¶¶ 2-3.

---

Agreement or misappropriated ICD's alleged trade secrets, will have a direct impact on this action. *To allow ICD to proceed otherwise will render the arbitration proceedings meaningless.*  Indeed, "the rationale behind allowing a non-party to an arbitration agreement to use equitable estoppel to compel a party to arbitration is that otherwise the arbitration proceedings [between the two signatories] would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted." *Marcus v. Fla. Bagels, LLC,* 112 So. 3d 631, 634 (Fla. 4th DCA 2010).

[23] The state courts' orders compelling arbitration must be given preclusive effect in federal court because the orders compelling arbitration is given preclusive effect under Florida law, and the federal courts must give the same full faith and credit to a state court orders as the state would give those orders. *See Merrill Lynch, Pierce, Fenner & Smith v. Haydu*, 637 F.2d 391, 397–99 (5th Cir. 1981) (applying Florida law); *see also Ultracashmere House, Ltd. v. Meyer*, 664 F.2d 1176, 1184 (11th Cir.1981) (applying Alabama law); *Southeast Resource Recovery Facility Auth. v. Montenay Int'l Corp.*, 973 F.2d 711, 714 (9th Cir.1992) (applying California law, which like Florida, allows for immediate appeal of orders determining arbitrability of claims); *Towers, Perrin, Forster & Crosby, Inc. v. Brown*, 732 F.2d 345, 350 (3d Cir. 1984) (same).  Thus, this Court must give preclusive effective to the decisions in *Kratos Investments,* 2021 WL 1009277, \*3 and *Shader,* 2021 WL 2115257.

**However, the predicate acts that ICD alleges involve the same issues that ICD has been ordered to resolve in arbitration.**  As the Eleventh Circuit has noted, "[a]n arbitration decision can have res judicata or collateral estoppel effect…." *Greenblatt v. Drexel Burnham Lambert, Inc.,* 763 F.2d 1352, 1360 (11th Cir. 1985).  Where the "predicate acts alleged in [a] RICO claim are essentially an amalgamation of [the plaintiff's] contractual [and] state law … claims … [and] are the same allegations that were presented to and necessarily decided by the arbitration panel," collateral estoppel applies. *Id.* at 1361.  Thus, the arbitrations that ICD has been ordered to conduct with ten Defendants here may bar ICD from proving any predicate act to support a RICO violation.

### D. Alternatively, the Court Should Stay This Action Pending the Conclusion of the Arbitrations.

If this Court denies Defendants' motion to dismiss or to compel arbitration, Defendants respectfully request that this action be stayed pursuant to 9 U.S.C. § 3 pending the conclusion of the arbitration proceedings between ICD and the Agents, and the arbitration proceedings between ICD and the ten Defendants.

Section 3 of the FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration . . . the court . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .

The FAA provides, "without exception, that whenever suit is brought on an arbitrable claim, the Court 'shall' upon application stay the litigation until arbitration has been concluded."[24] *VVG Real Estate Investments v. Underwriters at Lloyd's, London,* 317 F. Supp.3d 1199, 1203 (S.D. Fla. 2018); *Revelex Corp. v. World Travel Holdings, Inc.*, 2007 WL 1296457, at *5 (S.D. Fla. May 1,

---

[24] Similarly, Florida courts recognize that where the outcome of an arbitration may impact an issue in a civil action, that action should be stayed. *Hessen v. Schimmel,* 182 So. 3d 1, 2 (Fla. 3d DCA 2015).

2007) ("suit against a nonsignatory that is based upon the same operative facts and is inherently inseparable from the claims against a signatory should be stayed pending completion of the arbitration"; "[e]ven if the Court were to deny motion to compel arbitration, the court would certainly stay this litigation").

Here, ICD has been ordered to arbitrate its claims against 10 of the Defendants. The alleged predicate acts that ICD must prove to establish a RICO violation in connection with the alleged "ICD Misappropriation Enterprise" are issues that will be decided in arbitration. Given the significant impact that the arbitrations are likely to have on this action, the Court should stay this proceeding under the FAA to allow these issues to be resolved in arbitration.

## IV.   CONCLUSION.

Defendants respectfully request that this Court dismiss the action in its entirety, or in the alternative, require ICD to arbitrate its claims against Defendants as it was previously ordered to do, and stay this action pending the resolution of those arbitrations.

## **REQUEST FOR HEARING**

Pursuant to Local Rule 7.1(b)(2), Defendants respectfully request that this Court hear oral argument on this Motion. Given the number of parties involved, the history of litigation between the parties, and the nature and complexity of some of the issues raised, Defendants respectfully believe that a hearing will afford the parties an opportunity to address any questions the Court may have. Defendants respectfully believe that one and a half hours should be sufficient.

Dated: June 4, 2021                         Respectfully submitted,

    /s/ Benjamine Reid                          /s/ James A. Gale
By:_____         By:_____
    Benjamine Reid / Fla. Bar No. 183522        James A. Gale / Fla. Bar No. 371726
    E-mail:  bried@carltonfields.com            E-mail:  jgale@cozen.com
    Alan Grunspan / Fla. Bar No. 451150         Samuel A. Lewis / Fla. Bar No. 55360
    E-mail:  agrunspan@carltonfields.com        E-mail:  slewis@cozen.com
    Clifton R. Gruhn / Fla. Bar No. 72542       David M. Stahl / Fla. Bar No. 84713
    E-mail:  cgruhn@carltonfields.com           E-mail:  dstahl@cozen.com
    CARLTON FIELDS, P.A.                         Jonathan E. Gale / Fla Bar No. 106938
    2 MiamiCentral, Suite 1200                  E-Mail:  jegale@cozen.com
    700 NW 1ˢᵗ Avenue                            COZEN O'CONNOR
    Miami, Florida 33136                        Southeast Financial Center
    Telephone:  305-530-0050                    200 South Biscayne Blvd., Suite 3000
                                                Miami, Florida 33131
    ***Counsel for Andrew Shader, Corey***      Telephone:  305-358-5001
    ***Shader, National Health Solutions, Inc.,***
    ***Alliance Marketing Corporation***        Stephen Miller, *Adm. Pro Hac to be filed*
                                                E-mail:  samiller@cozen.com
                                                Peter M. Ryan, *Adm. Pro Hac to be filed*
    */s/* Howard D. DuBosar                     E-mail:  pryan@cozen.com
By:_____                     Catherine Yun, *Adm. Pro Hac to be filed*
    Howard D. DuBosar / Fla. Bar No. 729108     E-mail:  cyun@cozen.com
    E-mail:  hdubosar@wsh-law.com               **COZEN O'CONNOR**
    Harrison R. DuBosar / Fla. Bar             One Liberty Place
        No. 1002241                             1650 Market Street, Suite 2800
    E-mail:  HRDuBosar@wsh-law.com              Philadelphia, PA 19103
    WEISS SEROTA HELFMAN COLE                   Telephone:  305-665-2130
        & BIERMAN
    1200 N. Federal Highway, Suite 312          ***Counsel for Prodigy Health Group LLC, Adam***
    Boca Raton, Florida 33432                   ***Beeeman, Joy Stormont, Kratos Investments***
    Telephone:  561-835-2111                    ***LLC, Health Team One LLC, Richard Ryscik,***
    ***Counsel for Infinix Media LLC,***        ***Beeman's Future Inc., and C Shader***
    ***Scott Offutt and CS Marketing LLC***     ***Investments LLC***