Exhibit 2

## AGREEMENT FOR PAYMENT OF FEES, COMPENSATION AND RESIDUALS

This Agreement for Payment of Fees, Compensation, and Residuals ("Agreement") is effective as of January 19, 2019 ("Effective Date") by and among Andrew Shader, Corey Shader, National Health Solutions, Inc. ("NHS") (collectively, the "NHS Parties") and ABS Healthcare Services, LLC. ("ABS") and Health Option One, LLC ("HOO"), each doing business as Insurance Care Direct (collectively, the "ICD Parties").

WHEREAS, Andrew Shader and HOO have entered into the Independent Agent or Agency of Record Agreement (including all schedules, exhibits, and addenda thereto) effective as of November 25, 2013 ("Shader Independent Agent Agreement").

WHEREAS, Andrew Shader and ABS have entered into the Independent Marketer Agreement (including all schedules, exhibits, and addenda thereto) effective as of November 25, 2013 ("Shader Independent Marketing Agreement").

WHEREAS, National Health Solutions Inc. and HOO have entered into the Independent Agent or Agency of Record Agreement (including all schedules, exhibits, and addenda thereto) effective as of March 12, 2014 ("NHS Independent Agent Agreement").

WHEREAS, National Health Solutions and ABS have entered into the Independent Marketer Agreement (including all schedules, exhibits, and addenda thereto) effective as of March 12, 2014, ("NHS Independent Marketing Agreement").

NOW, THEREFORE, the Parties agree that as of the Effective Date of this Agreement:

1. Termination of Existing Service Agreements; Continuation of Payment of Fees and Commissions.

    a. The Shader Independent Agent Agreement, the Shader Independent Marketing Agreement, the NHS Independent Agent Agreement and the NHS Independent Marketing Agreement are hereby terminated. This termination provision shall survive termination of this Agreement for any reason. Notwithstanding the foregoing termination, HOO agrees that it shall continue, in the same frequency manner and amount as before this Agreement, to pay Andrew Shader and/or NHS all compensation and all other fees which would have otherwise hereafter become due to either Andrew Shader and/or NHS if the Shader Independent Agent Agreement, the Shader Independent Marketing Agreement, the NHS Independent Agent Agreement and the NHS Independent Marketing Agreement (which are each hereby incorporated in this Agreement) had not been herein terminated. The fees and compensation so due to continue are identified in Exhibit A, provided herewith and deemed attached hereto. Exhibit B, provided herewith and deemed attached hereto, contains a list of writing numbers and products for which compensation shall continue to be paid in accordance with this Section 1. (It is acknowledged that the contents of exhibit A and exhibit B may be incomplete and are subject to additions).

It is the express intention and agreement of the Parties under this Agreement that, subject to the terms of this Agreement, the NHS Parties, individually or severally, as the case may be, shall continue to receive, under the same computation formula as they have in the past, unabated and unchanged, any and all remunerations, including compensation and fees, from the ICD Parties, individually or severally, as the case may be, related to all health membership plans currently existing and in force, that any NHS Party has been receiving from any ICD Party prior to this Agreement. Nothing in this Agreement is otherwise intended, or should be construed, to affect, limit, diminish or abrogate the NHS Parties rights to such payments. The ICD Parties are responsible for all payments due hereunder to the NHS Parties regardless of assignment, restriction on payment obligations or any other impediment to payment encountered by ICD Parties.

If any of the NHS Parties, as applicable, believes that an error has been made by any of the applicable ICD Parties in calculating the compensation or fees which are due to the NHS Party under this Agreement, then upon notification to the ICD Party of this error from the NHS Party, the ICD Party shall, within forty-five (45) days thereof, have diligently investigated such claimed error and report its findings, with detailed supporting documentation thereof, to the NHS Parties. If an error has been made in calculating the compensation or fees due, the ICD Party shall forthwith tender the additional amounts due to the NHS Party. Any continued dispute which cannot be resolved through amicable negotiation within 30 days thereafter shall be subject to resolution by a court of law unless otherwise agreed to by the Parties in writing.

b. The Parties agree that there is currently due and owing to the NHS Parties, jointly or severally, from the ICD Parties, for past compensation payment error shortfalls from the ICD Parties to the NHS Parties, at least six hundred and four thousand dollars ($604,000.00). Nothing in this Agreement affects or limits the NHS Parties' entitlement to these funds, and nothing in this Agreement affects or limits the ICD Parties' responsibility to timely pay the NHS Parties these funds. The ICD Parties agree to pay at least half of the due amount, (at least three hundred and two thousand dollars ($302,000.00) to the NHS Parties within four months of the Effective Date of this Agreement, and to pay, in full, the remaining balance to the NHS Parties (at least three hundred and two thousand dollars ($302,000.00) within ten months of the Effective Date of this Agreement.

2. Payment of New Compensation.

a. As additional and material consideration for this Agreement, HOO and/or ABS, as applicable, agrees that it shall timely and regularly pay ongoing and continuing monthly compensation [monies, funding, funds, amounts due on new business] to Corey Shader (or, at his discretion, shall pay to his designee or assignee) for each new membership program (including insurance and health plans) ("Membership Plan") enrollment, which inures to the monetary benefit of the ICD parties, individually or jointly, that originates and becomes effective after the Effective Date which was enrolled by, or resulted from, in whole or in part, the marketing efforts of, any agents or sales people managed by, or affiliated with (currently

or in the past), Corey Shader, as set forth in Exhibit C, attached hereto or delivered herewith. This compensation to Corey Shader shall be twelve dollars ($12.00) per month, for each such Membership Plan, for as long as such Membership Plan remains in force. (By way of example, if a particular Membership Plan subject to this paragraph were to remain in force for 24 months, the total compensation due to Corey Shader would be $288; $12.00 x 24 months). This ongoing, continuing and regular monthly compensation ($12.00 per month) shall also be paid to Corey Shader by the ICD parties for all new Membership Plan enrollments established after the Effective Date of this Agreement which were procured through the efforts of, or in connection with, new agents or new agencies marketing such Membership Plans, who are, were or become associated or affiliated, in any manner, with Corey Shader, or who are associated or affiliated with a downline of those agents or agencies set forth in Exhibit C, provided herewith and deemed attached hereto. (The terms "associated" and "affiliated" as used in this paragraph are to be construed broadly for the benefit of Corey Shader). ("Downline" means generations of agents or agencies tied by a compensation sharing agreement, with respect to a Membership Plan(s) purchased by a consumer and for which the agent or agency is due compensation, to an existing agent or agency). The Parties will update Exhibit C as necessary in an effort to ensure that it contains a current list of all agents and agencies generating compensation due Corey Shader under this Section 2. The compensation due under this Section 2 shall be paid to Corey Shader by the owing ICD Party on a regular weekly basis. Compensation due under this paragraph for each applicable Membership Plan enrollment submitted to the ICD Parties, individually or jointly, between Tuesday and the following Monday will be paid out to Corey Shader by the owing ICD Party on or before the next following Friday. The ICD Parties are responsible for all payments due hereunder to Corey Shader regardless of assignment, restriction on payment obligations or any other impediment to payment encountered by ICD Parties.

As used herein, the term "Health Membership Plan" includes, but is not limited to, group membership insurance plans, discount medical and health plans, and any other health related subscription in which a consumer pays a fee and receives insurance or insurance related benefits as a result thereof.

b.  If the consumer cancels or charges back ("charge back") for any reason, the amount paid on that premium shall be deducted from Corey Shader's compensation. Based on chargebacks Corey Shader may accrue a debit balance and monies may remain due and owing HOO or ABS, as applicable, or the carrier providing coverage. HOO or ABS may offset any negative balance owed by Corey Shader to HOO or ABS or the carriers against compensation that is or may become due to Corey Shader for any business written by Corey Shader under this Agreement.

c. If Corey Shader believes that an error has been made by HOO or ABS, in calculating the compensation due Corey Shader under this Agreement, then upon notification of this error to HOO or ABS, as applicable, from Corey Shader, ABS or HOO shall diligently investigate such claimed error and report its findings, with detailed supporting financial documentation thereof, to Corey Shader within forty-five days of such notification. If an error has been made in calculating the compensation due, ABS or HOO shall then forthwith tender the additional compensation due to Corey Shader. Upon request, Corey Shader shall be timely

entitled to copy, inspect and examine all records and computer files of the ICD Parties with respect to calculating and determining the amount of compensation to which he is due. Any continued dispute which cannot be resolved through amicable negotiation shall be subject to resolution by a court of law, unless otherwise agreed to by the parties in writing.

3. Representations and Warranties of NHS Parties.

> Each of the NHS Parties represents and warrants that, to their knowledge, it is (i) not presently subject to any federal or state orders or investigations regarding its current substantial business activities that would preclude them from doing business in any lawful manner or that would materially risk or effect the ICD Parties carrier relationships or any licenses it carries; and (ii) the NHS Parties are not subject to a prosecution by any insurance or similar regulatory authority that would materially and permanently risk or effect the ICD Parties carrier relationships or any licenses it carries. The parties agree that routine government inquiries and investigations, such as those that forward or involve consumer inquiries, complaints and refund demands, or those that audit or inquire to review compliance practices of the companies or their licensees, are not within the scope of this section. This section is intended to provide notification to the parties only of investigations or actions that could materially and substantially limit the ability of the Parties to lawfully continue to do business together, irrespective of any ongoing payment obligations between the Parties. (As an example of such, a TRO entered by a Court at the request of the FTC against a party.) If any of the NHS parties becomes aware that it is subject to such, they will promptly provide notice to the ICD Parties of the action or proceeding (unless such notice is prohibited in writing by the governmental or regulatory authority).

> a. Each of the NHS Parties will endeavor to conduct their respective business and marketing activities, regardless of whether directly related to the ICD Parties, in substantial compliance with applicable federal and state laws and regulations, including but not limited to any laws, rules, or regulations of the Federal Trade Commission, state attorneys general, insurance commissioners, or any other controlling federal or state consumer protection or regulatory authorities.

> c. The NHS Parties will indemnify and defend the ICD Parties for reasonable defense costs and fines, up to one million dollars ($1,000,000.00), which the ICD Parties incur as a result of governmental investigations or claims that are filed against them which are directly related to the NHS Parties' deliberate actions and which costs and fines are reasonably expected to exceed $50,000. The ICD Parties will provide written notice of any claim under this section to the NHS Parties in writing and within 5 business days of the ICD Parties' receipt of such investigative demand or claim. Any claim by the ICD Parties to the NHS Parties under this paragraph shall be accompanied by the full claim statement or investigation notification papers, and supporting materials, received by the ICD Parties. All requests for payment under this paragraph shall be accompanied by detailed documentation and bills supporting the amount claimed. The NHS Parties, in the

event of such indemnification, shall be entitled to retain their own counsel, at their own and separate expense, with respect to the investigation or claim and cooperate formally or informally, in the matter upon agreement of the NHS parties and the ICD Parties and subject to a joint defense agreement, if deemed appropriate and agreed to by NHS parties and the ICD Parties. The NHS Parties obligation under this section to indemnify and defend shall end one (1) year after termination after this Agreement.

d. Each of the NHS Parties, to the best of their knowledge, maintains all necessary permits, licenses, authorizations, or other registrations required, if any, to receive residual payments under this Agreement. However, as a condition precedent to any claimed breach hereof, the NHS Parties shall be entitled to written notice of the alleged breach of this subparagraph and shall be permitted a reasonable time to cure, commensurate with the timetables and procedures of the issuing authorities, by obtaining or renewing such required permits, licenses, authorizations, or other registrations if they are determined to be lacking.

e. Unless directly required by law, the ICD Parties will undertake no act or omission, nor will they participate in any act or omission, to initiate or facilitate any governmental investigation or prosecution, whether federal, state, local, administrative or regulatory, concerning or involving, the NHS Parties, individually or severally. The ICD Parties will also not recommend, encourage or instruct any other person or entity to undertake any act or omission, or to participate in any act or omission, to initiate or facilitate any governmental investigation or prosecution, whether federal, state, local, administrative or regulatory, concerning or involving, the NHS Parties, individually or severally. The ICD Parties acknowledge and affirm that they are aware of no governmental investigation or prosecution, whether federal, state, local, administrative or regulatory, concerning or involving, the NHS Parties, individually or severally. If any of the ICD Parties becomes aware that any of the NHS Parties is, or may, be subject to any such governmental investigation or prosecution, the ICD Parties will promptly provide express notice to the NHS Parties of the investigation or prosecution unless otherwise prohibited by the government agency pursuing the investigations or prosecution by law.

f. All payments due to the NHS parties under this Agreement shall continue unabated unless such payments are formally and directly precluded by law or final legal authority.

4. Termination. This Agreement will terminate, and the payment obligations of ABS and HOO shall cease to exist, if (a) the NHS Parties materially and knowingly breach any provision contained in Section 5 of this Agreement or (b) there are no more in-force members for which compensation or fees are due under this Agreement.

5. Non-Competition, Non-Solicitation. For the period commencing on the Effective Date and ending three (3) years thereafter, none of the NHS Parties will knowingly, (a) encourage any person known by them to be a then current active customer or member, or known by

them to be a then prospective customer or member in current and active negotiation for a Membership Plan (collectively, "Members") with the ICD Parties, that such Member should change to the health insurance program or health products or services of a company other than those provided by the ICD Parties or their current carriers or discount plans, or (b) solicit or contract with any independent marketer known by them to be then currently producing significant sales for either of the ICD Parties, for the purpose of attracting such independent marketer to work with any of the NHS Parties, or any known significant competitor of ABS or HOO, in a field which directly and materially then competes with the ICD parties. However, as a condition precedent, before the NHS Parties can be deemed to be in breach of this paragraph, they must be provided written notice of the claimed breach hereunder, and be given a reasonable opportunity to investigate same and cure.

This paragraph (5) does not apply to independent marketers or agents used by either of the ICD parties in connection with Medicare products, including, but not limited to, "Medicare advantage" or Medicare supplements. It is agreed by the Parties that this Agreement does not apply to Infinix Media, Inc. ("Infinix") or to its business activities, with the exception of the provisions of this Section 5 solely with respect to the sale of health care plans (the "Plan Exception"). The Plan Exception will terminate and no longer be applicable to Infinix upon the sale of a majority or controlling interest of its ownership.

6. Non-Disparagement.  No party to this Agreement shall, at any time, for any reason, say, convey, publish (in any media) or cause to be published (in any media), disseminate, or do anything that casts, or may cast, any other party to this Agreement in an unfavorable light, to any degree, or disparage or injure any business reputation of such other party or the other party's relationship with existing or potential suppliers, vendors, customers, employees, contractors or investors or the business community in general, unless such act is required by law, regulation, ordinance, court order or other legal process, in which case such party may engage in such act only to the minimal extent necessary, in the reasonable opinion of counsel, to comply with such law, regulation, ordinance, court order or other legal process.

7. Confidentiality.  Each of the Parties agrees that all proprietary or confidential information (including, without limitation, the existence and terms of this Agreement and the identities of and information pertaining to customers or members of the Parties or any of their carriers or product providers) communicated to them by the other Parties will be held in strict confidence and not shared, disclosed, or used for any purpose not specifically allowed in this Agreement or required by law.

8. Remedies.  Each of the Parties acknowledges that a knowing and material violation of any provision of Section 3, 5, 6 or 7 of this Agreement may result in immediate and irreparable damage to ABS or HOO or the NHS Parties and that in the event of such violation or threatened violation, the party claiming said violation shall, without posting a bond, in addition to any other right, relief or remedy available to it at law, be entitled to equitable relief restraining any such violation. The provisions of Section 3, 5, 6 and 7 shall survive the termination of this Agreement for any reason.

9. **Indemnification.** The NHS Parties and the ICD Parties shall indemnify, defend, and hold harmless the other parties and its or their affiliates, officers, directors, members, shareholders, insurers, employees and parents, from and against any and all bona fide third-party claims, suits, liabilities, losses, damages of whatever nature, fines, penalties, forfeitures, judgments (including all reasonable costs, expenses and attorney's fees) (collectively, "Claims") arising directly from or in connection with (a) a material breach of this Agreement by the indemnifying party; (b) the negligence or intentional misconduct of the indemnifying party; (c) a material violation of any laws in the performance of such party's obligations hereunder; or (d) a material breach of such party's representations, warranties, covenants or agreements hereunder.

10. **General Terms.**

   a. **Jurisdiction and Venue.** This Agreement and the relationship of the Parties shall be governed by the laws of the State of Florida applicable to agreements executed and performed within the State of Florida and without giving effect to any statutes or rules relating to the conflict of laws. The parties agree and acknowledge that in the negotiating and executing of this Agreement and in the performance of this Agreement, they are purposefully availing themselves of the benefits and laws of the State of Florida as to any dispute arising out of or related to the inception or performance of this Agreement. The parties hereby waive their right to contest the exercise of personal jurisdiction over them in the State of Florida. The Parties further agree that exclusive venue for any claim arising under this Agreement shall lie in Broward County, Florida. Either Party may, subject to the venue allowed herein, pursue its equitable remedies, including specific performance, injunctions and restraining orders in any court of competent jurisdiction.

   b. **Entire Agreement.** Both Parties agree that this Agreement, including all schedules, exhibits and addenda hereto, is the complete and exclusive statement of the mutual understanding of the parties and supersedes and cancels all previous and contemporaneous written and oral agreements, communications and other understandings relating to the subject matter of this Agreement, and that all waivers, amendments and modifications must be in a writing signed by both parties, except as otherwise provided herein. To the extent of any conflict or inconsistency between the provisions in the body of this Agreement and any exhibit or addendum hereto, the terms of such exhibit or addendum shall prevail.

   c. **Waiver/Modification.** No waiver or modification of this Agreement shall be effective unless in writing, expressing by its terms an intention to modify this Agreement, and signed by duly authorized representatives of all parties hereto.

   d. **Severability.** If any provision of this Agreement is found to be unenforceable or invalid, that provision will be modified, limited or eliminated to the minimum extent necessary so that the provision will be acceptable and this Agreement will otherwise remain in full force and effect and enforceable.

e.   Binding Effect. This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors and assigns.

f.   Assignment. No party may assign this Agreement without the prior written consent of the other parties, not to be unreasonably withheld.

g.   Captions. The headings and captions used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

h.   Force Majeure. Each party shall be excused from performance for any period during which, and to the extent that, it is prevented from performing any obligation or service, in whole or in part, as a result of a cause beyond its reasonable control and without its fault or negligence, including, but not limited to, acts of God, acts of war, epidemics, fire, communication line failures, power failures, earthquakes, floods, blizzard, or other natural disasters (but excluding failure caused by a party's financial condition or any internal labor problems (including strikes, lockouts, work stoppages or slowdowns, or the threat thereof)) (a "Force Majeure Event"). Delays in performing obligations due to a Force Majeure Event shall automatically extend the deadline for performing such obligations for a period equal to the duration of such Force Majeure Event. Except as otherwise agreed upon by the parties in writing, in the event such non-performance continues for a period of thirty (30) days or more, either party may terminate this Agreement by giving written notice thereof to the other party. Upon the occurrence of any Force Majeure Event, the affected party shall give the other party written notice thereof as soon as reasonably practicable of its failure of performance, describing the cause and effect of such failure, and the anticipated duration of its inability to perform.

i.   Counterparts. This Agreement may be executed simultaneously in several counterparts, each of which shall be original, and all of which shall constitute but one and the same instrument. A facsimile signature shall be considered the same as an original signature.

j.   Construance. This Agreement has been negotiated at arm's length by the parties and shall not be construed against the drafting party.

AGREED TO BY:

Andrew Shader

Date: ___1 / 19 / 19___

ABS Healthcare Services, LLC

By: _____, Manager

Date: ___1-21-19___

Corey Shader

Date: 1/19/19

Health Option One, LLC

By: _____, Manager

Date: 1-21-19

National Health Solutions, Inc.

By: _____, Pres.

Andrew Shader

Date: 1/19/19

Exhibit A – In-Force Members

[ATTACHED EXCEL FILE]

Exhibit B – List of Products for Commission Payments

[ATTACHED EXCEL FILE]

Exhibit C – List of Agents

[ATTACHED EXCEL FILE]

**From:** Seth Cohen
**Sent:** Tuesday, January 29, 2019 6:43 PM
**To:** Andrew Shader <<u>andrews@nhsins.com</u>>
**Cc:** Corey Shader <<u>cshader@nstarhealth.com</u>>
**Subject:** Re: Addition to agreement

I confirm

Sent from my iPhone

On Jan 29, 2019, at 6:38 PM, Andrew Shader <andrews@nhsins.com> wrote:

> Seth,
>
> This is the final version you and Corey agreed on.  Please approve.
>
>> *Notwithstanding any language to the contrary in the "Agreement for Payment of Fees, Compensation, and Residuals", ("Agreement") (executed by the NHS Parties on January 19, 2019), the ICD Parties now agree that the NHS Parties, and their affiliated Alliance Marketing Corp, may only offer, sell and bill for Wellness, Lab and Dental plans through downlines/agents identified in "Exhibit C" to the Agreement. The NHS parties have been made aware that such downline/agents should first offer and sell ICD Party core and add-on products prior to offering any other product. This paragraph shall take precedence over any contrary or conflicting terms set forth in the Agreement*
>
> --
>
> Andrew Shader
>
>
> 2425 East Commercial Blvd
>
> #300 Fort Lauderdale, FL 33308
>
> Direct: (954) 214-6439

---

This email has been scanned for spam and viruses. Click here to report this email as spam.