UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

ABS HEALTHCARE SERVICES, LLC                    CASE NO. 0:21-cv-60859-RKA
HEALTH OPTION ONE, LLC, and
ONE STOP QUOTES, INC.

    Plaintiffs,

v.

ANDREW SHADER, COREY SHADER,
NATIONAL HEALTH SOLUTIONS, INC.,
INFINIX MEDIA LLC, PRODIGY
HEALTH GROUP LLC, ADAM BEEMAN,
JOY STORMONT, ALLIANCE MARKETING
CORPORATION, KRATOS INVESTMENTS LLC,
HEALTH TEAM ONE LLC, RICHARD RYSCIK
SCOTT OFFUTT, BEEMAN'S FUTURE INC.,
CS MARKETING LLC, and C SHADER
INVESTMENTS LLC,

    Defendants.

_____/

**DEFENDANTS' JOINT MOTION TO TEMPORARILY LIFT STAY**
**AND FOR IMPOSITION OF SANCTIONS**
**PURSUANT TO THE COURT'S INHERENT AUTHORITY**

Defendants jointly move the Court to temporarily lift the stay, and for the imposition of sanctions against Plaintiffs and their counsel pursuant to the Court's inherent authority.   As discussed below, Plaintiffs, ABS Healthcare Services, LLC ("ABS") and Health Option One, LLC ("HOO") (collectively, "ICD"), and One Stop Quotes, Inc. (collectively, "Plaintiffs"), their principal, Seth Cohen, and their counsel have filed this action vexatiously and in bad faith solely to disparage Defendants, abusing the judicial process and forcing Defendants to incur unnecessary fees and costs, resulting in reputational harm to Defendants. *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990) ("The mere assertion of a RICO claim consequently has an almost inevitable stigmatizing effect on those named as defendants. In fairness to innocent parties, courts should strive to flush out frivolous RICO allegations at an early stage of the litigation."). Accordingly, this action should be dismissed, with prejudice, and Defendants should be awarded their attorneys' fees and costs incurred in defending against this bad faith action.

## I.   <u>INTRODUCTION</u>

Plaintiffs filed this action solely for an improper purpose—to thwart competition, and to harass and disparage Defendants—with absolutely no intention of having this action proceed past even the pleading stage, let alone to trial.  Rather, Plaintiffs filed this action with full expectation that this Court would either dismiss or stay the action because it is undeniably duplicative of other actions that ICD previously filed against Defendants that are currently pending in state court and in arbitration proceedings.  Significantly, prior to filing this action, ICD without any evidentiary basis for doing so, filed ten (10) other lawsuits and at least one arbitration proceeding based on the same core of operative facts at issue here. *See* [ECF. No. 34-1] (Ex. 1 to Joint Consolidated Motion to Dismiss, Abstain, Compel Arbitration and/or Stay); [ECF No. 35] (Joint Request for Judicial Notice, and accompanying exhibits) (hereinafter, "Related Case Table").  In two of the lawsuits that involve, directly or indirectly, all of the Defendants here, the courts specifically held that ICD

was obligated to arbitrate all of its claims against ten of the Defendants.[1]  Remarkably, shortly after a Florida appellate court conclusively ruled that ICD must arbitrate all of its claims against three of the Defendants here, *see* Related Case No. 2, Related Case Table, "Miami-Dade Action," ICD filed this action in bad-faith trying to masquerade the same allegations as a civil RICO case. They filed this action despite the Florida appellate court ruling that claims based on such allegations are arbitrable, despite Eleventh Circuit binding precedent prohibiting improper claim splitting, and despite it being well-known that Plaintiffs' "wielding RICO almost always miss the mark." *Moss v. BMO Harris Bank, N.A.,* 258 F. Supp. 3d 289, 297 (E.D.N.Y. 2017).

None of this mattered to Plaintiffs.  They were perfectly fine with this Court dismissing or staying this case, since the Complaint would have already achieved its true objective of tarnishing Defendants' reputations and needlessly driving up Defendants' litigation costs.  Indeed, within a day of filing this lawsuit, Law Street Media published an article regarding ICD's civil RICO complaint against Defendants.[2]  Presumably, this was the very type of press coverage that Plaintiffs hoped to generate when they tried to sensationalize alleged misappropriation of trade secret claims as "criminal" conduct.  Given the timing of the press coverage, it also seems highly likely that Plaintiffs and/or their counsel worked directly with Ms. Brauer to ensure that their RICO complaint

---

[1] With regard to the other eight (8) lawsuits: courts have compelled Plaintiffs to arbitrate four of the lawsuits, *see* [ECF No. 35-16] to [ECF No. 35-30]; one of the lawsuits is stayed pending resolution of a lawsuit that two of ICD's alleged "agents" filed against ICD in California, *see* [ECF No. 35-10] to [ECF No. 35-15]; ICD has failed to serve the defendants in two of the lawsuits despite having filed the actions more than fourteen months ago; *see* [ECF No. 35-31 to ECF No. 35-33]; and ICD settled another lawsuit after recognizing that the individual had no business relationship with any of the Defendants here and that it was ICD that was wrongfully withholding money owed to that individual, *see* [ECF No. 35-34] and [ECF No. 35-35].

[2] Notably, the article was written by Emma Brauer, who only a few months before had published another article on a lawsuit brought by Plaintiffs' counsel Boies Schiller Flexner LLP. *See* https://lawstreetmedia.com/health/healthinsurance/blue-cross-blue-shield-antitrust-suit-settlement-reached/.

would be publicized immediately upon filing.  Additionally, upon information and belief, Plaintiffs' principal, Seth Cohen, has also been informing Defendants' business associates about the RICO complaint and threatening to add such associates as defendants to this action if they did not cooperate with Plaintiffs.

Moreover, shortly after filing this action, Plaintiffs proposed "staying" this case and proceeding to arbitration.  Remarkably, in response to Defendants' Motion to Dismiss, Plaintiffs go so far as to contend that this Court cannot address the sufficiency of their complaint and must immediately "stay" the proceedings because this Court lacks subject matter jurisdiction over Plaintiffs' claims.  *See* [ECF No. 48].  Of course, that would only leave Plaintiffs' false allegations lingering in the public record, while the evidence showing Plaintiffs' knowledge of the falsity remained hidden from the public records in the private arbitration.  Based on Plaintiffs' conduct, it is evident that Plaintiffs filed this instant action in bad faith solely to disparage Defendants.

Now, as Plaintiffs have already succeeded in their extrajudicial dissemination of false accusations, the only means to protect the sanctity of the judicial process and to remedy the harm Plaintiffs caused Defendants through their abuse of the judicial process is for this Court to exercise its inherent authority to dismiss Plaintiffs' action with prejudice.  Defendants also seek an award of their attorneys' fees and costs incurred in defending against this frivolous, bad faith action.

## II.    RELEVANT FACTUAL BACKGROUND

ICD publicly refers to itself as "one of the largest health and life insurance agencies in the country" and as a "health insurance agency from the South Florida area helping consumers find the plan that fits their needs and budget."  *See* Exhibit A (printouts from ICD's website, insurancecaredirect.com).  According to its website, ICD utilizes a network of "70 + Enrollment Centers" and "500+ Active Agents" to sell insurance plans. *See Id.*  In its complaint, ICD refers to these "enrollment centers" as "insurance agencies that have contracted with ICD," "call centers,"

or "downlines." *See, e.g.*, Compl. ¶¶ 37, 54. Similarly, ICD refers to the "Active Agents" as "ICD's agents," "ICD agents", or "Agents." *See, e.g.*, *Id.* ¶ 57, 96, 104, 106.

In or about April 2020, Plaintiffs, whose own business was declining due to product quality, poor agent recruiting strategies, and marketing shortcomings, decided to initiate a flurry of baseless lawsuits against a group of emerging competitors—Kratos, HTO, and Prodigy—solely to stifle legitimate competition. In order to ensure that the lawsuits would have the maximum economic impact on these burgeoning competitors, ICD filed ten (10) separate lawsuits. *See* Related Case Table.

In each of these ten lawsuits, ICD alleged that Kratos, HTO, Prodigy, along with other Defendants in this Action, conspired with "ICD Agents" to misappropriate ICD's trade secrets and to solicit ICD's "current and prospective customers." *Id.* ICD did not identify the "current and prospective" customers in any of the complaints. With regard to trade secrets, like in this matter, ICD only alleged general categories of trade secrets; ICD did not allege, and in discovery in the state court actions did not produce, any actual evidence of misappropriation. Rather, ICD's entire claim appears to be based on pure speculation that the Agents must have taken trade secrets because they now allegedly work for a competitor. Worse still, ICD falsely alleged that the Agents were still working for ICD as of April 2020, despite ICD's knowledge that all of the Agents had ceased working for the ICD downline agencies long before then. *See* Stahl Decl. ¶¶ 2-20, Exs. 1-7.

To add insult to injury, ICD decided to breach its own contractual obligations to make certain payments owed to Defendants Andrew Shader, Corey Shader, and NHS—approximately $500,000 per month since April 2020, and then used the money owed to those Defendants to fund the then (10) frivolous litigations against the burgeoning competitors. To justify these tactics, ICD alleges in the state court actions, that the Shaders "funded" Kratos, HTO, and Prodigy to compete

with ICD.  Even if these allegations were true, which they are not, ICD would still be obligated to continue to make the payments to the Shaders and NHS as the contract's restrictive covenants did not prohibit competition.  See [ECF No. 34-2] ("Agreement for Payment of Fees, Compensation, and Residuals") (the "NHS Agreement").  Rather the NHS Agreement only precluded the Shaders and NHS from trying to solicit ICD's customers and Agents. *See Id.* at Section 5; Compl. ¶ 51

Now, after a series of adverse rulings in the Related Actions requiring ICD to arbitrate their claims against these very Defendants, ICD has furthered their crusade against Defendants by filing this action, and alleging facts and information Plaintiffs know to be false.[3]  Plaintiffs now (purportedly) seek to litigate the same set of operative facts and issues that are the subject of the Parties' arbitration proceedings, but which ICD has dressed up under the federal RICO statutes.

Plaintiffs' bad faith actions and intent in this action are revealed by: (a) the timing of Plaintiffs' filing of the action; (b) Plaintiffs' efforts to publicize this action and then promptly seek to stay the action; and (c) facts and documentation obtained in the Related Actions, which demonstrate that Plaintiffs' claims in this action are either false, or if true, would not support a RICO claim.

a. The Timing of Plaintiffs' Filing of This Action Reveals Plaintiffs' Bad Faith.

ICD initiated the Related Actions identified in the Related Case Table in April 2020. Essentially, the gist of ICD's allegations in the Related Actions is that the defendants, which include eight (8) of ICD's former insurance agents, conspired to unfairly compete with ICD by "scheming" to steal ICD's business and misappropriating its alleged trade secrets. *See* Related Case Table.  Central to ICD's claims in the Related Actions were the purported Agent Agreements

---

[3] It is Defendants' position that ICD knew that such facts and information were false and/or frivolous at the time ICD filed the Related Actions.  In light of the documents and information obtained in discovery in the Related Actions, it is clear that Plaintiffs have presented knowingly false allegations in this action.

(the "Agent Agreements") between ICD and the aforementioned Agents.  However, those Agent Agreements contained mandatory arbitration clauses, which mandated arbitration for any disputes under the Agreements.

In light of the mandatory arbitration clauses, the defendants in the majority of the Related Actions, including some of the Agents (James Hardill, Francis DeSola, Alex Geissler and Ryan Kelty), as well as the defendants in the Miami-Dade Action and Related Case No. 1 of the Related Case Table ("Broward Action"), subsequently moved to compel arbitration pursuant to the Agent Agreements.  ICD vigorously argued against compelling arbitration in all of the Related Actions.

After reviewing Messrs. Hardill and DeSola's motions to compel arbitration and hearing the parties' arguments on the motions, the Broward County Circuit Court granted those motions and compelled arbitration in July 2020. *See* Related Case Nos. 6 & 8, Related Case Table.  ICD unsuccessfully appealed those rulings to the Fourth District Court of Appeal, which  affirmed the orders on March 11, 2021. *Id.*

After the trial court in the Miami-Dade Action denied the defendants' motion to compel arbitration and/or stay the litigation pending the resolution of the aforementioned arbitrations, the Third District Court of Appeal reversed and remanded the case back with instructions to grant the motion to compel arbitration. *Kratos Investments, LLC et al. v. ABS Healthcare Services, LLC, et al.,* --- So. 3d ---, 2021 WL1009277, *3 (Fla. 3d DCA Mar. 17, 2021).

In November 2020, the Broward County Circuit Court in the Broward Action stayed that case pending the aforementioned rulings from the Fourth District Court of Appeal.  After the Fourth District affirmed the orders compelling arbitration in the two Agent cases, the court in the Broward Action held a hearing on the defendants' motion to compel arbitration on April 12, 2021. Although the court did not issue a ruling then, it was clear that the court gave significant deference

to the Third District Court of Appeal's ruling compelling arbitration in the Miami-Dade Action, and that the court was likely to compel arbitration in the Broward Action. *See* Exhibit B (Apr. 12, 2021 Trans.), at 50:17-22 ("I think this Kratos case, many of the things that are referenced in here, are important to my decision in this case.  I can't see how I could just ignore their holding because so much of this seems to be interdependent upon the other.").  The court in the Broward Action subsequently granted the defendants' motion and compelled arbitration. *ABS Healthcare Services, LLC v. Shader*, 2021 WL 2115257 (Fla.Cir.Ct. May 4, 2021).

The courts' rulings in the Miami-Dade and Broward Actions effectively frustrated ICD's purpose for the Related Actions.  ICD could no longer hide behind the litigation privilege while publicly making disparaging statements about the Defendants.  Additionally, without an active court case against the Defendants, ICD could no longer seek broad, unfettered discovery from the Defendants and third parties that ICD sought in the Related Actions.

As a result, on April 21, 2021, soon after the Third District Court of Appeal's ruling compelling arbitration in the Miami-Dade Action, and almost immediately after the April 12 hearing in the Broward Action, Plaintiffs filed the instant Action.  Plaintiffs brought the instant Action even though the Complaint essentially constitutes a repackaging of ICD's claims from the Related Actions (now under the guise that they are "RICO" claims), and despite ICD having been ordered to arbitrate claims involving the same set of operative facts with 10 of the 15 Defendants in the instant action.[4]

---

[4] ICD is currently engaged in arbitration with the following Defendants:  Andrew Shader, Corey Shader, National Health Solutions, Inc. ("NHS"), Prodigy Health Group, LLC ("Prodigy"), Adam Beeman, Joy Stormont, Alliance Marketing Corporation, Kratos Investments LLC ("Kratos"), Health Team One LLC ("HTO"), and Richard Ryscik. *See* Related Case Nos. 1 & 2, Related Case Table; Exhibit E (for newly filed arbitration).

      b.   <u>Plaintiffs' Efforts to Publicize This Action and Then Promptly Seek to Stay the Action Reveal Bad Faith Conduct.</u>

With this action, Plaintiffs sought once again to use the litigation privilege as a weapon enabling Plaintiffs to publicly disparage the Defendants, branding the Defendants as "criminal[s]," and once again painting Defendants in a negative light.[5]  On April 23, 2021, immediately after Plaintiffs filed the instant Action, LawStreetMedia.com published a news "article" entitled "Florida Health Insurer Alleges Former Employees Orchestrated Racketeering Scheme to Steal Trade Secrets" (the "LawStreet Press Release").  *See* Exhibit C.  However, the LawStreet Press Release does not appear to be a typical news article reporting on new court filings.  Instead, it clearly reads as a press release that ICD subsequently transmitted to third parties and others within the industry to further disparage the Defendants. *See, e.g.*, *id.* ("The plaintiffs summarized their allegations astutely at the top of their complaint"; quoting portion of the complaint stating that ICD "had achieved great success . . . from ICD's years of hard work, development, and ingenuity.").

Plaintiffs recent position in the instant action further reveals their bad faith intentions.  As mentioned above, prior to the filing of the Defendants' Motion to Dismiss, ICD vigorously resisted Defendants' efforts to compel arbitration in the Related Actions.  However, on June 11, 2021, despite no change in circumstances since the initiation of this action, Plaintiffs sought to "move the RICO action to AAA arbitration…[and] stipulate[e] to the entry of an order that stays the case pending resolution of the arbitration." *See* Exhibit D.  Essentially, now that Plaintiffs have once again disparaged Defendants through a public filing, Plaintiffs are willing to transfer this Action

---

[5] Plaintiffs repeatedly claim in their Complaint – without any reason or purpose other than to disparage – that Beeman is a convicted felon.  Such a claim has no relevance to this dispute.  Plaintiffs also shamelessly and deplorably allege – once again without any reason or purpose other than to disparage – that Defendants are responsible for Christopher Mason's drug addiction, overdose and ultimately his death. *See* Compl., ¶¶ 6, 109.  It appears that the depths of Plaintiffs and Plaintiffs' counsel's depravity knows no bounds.

to arbitration.  Plaintiffs' position becomes even more absurd considering that on July 11, 2021, ICD filed a new arbitration against Andrew Shader, Corey Shader, NHS, Infinix, Prodigy, Adam Beeman, Joy Stormont, and Alliance Marketing Corporation, eight of the 15 Defendants in the RICO suit.  Tellingly, ICD does not seek to arbitrate the RICO Claims. *See* Exhibit E.  These contradictory positions reveal the gamesmanship of ICD, and its malicious use of litigation. Accordingly, Plaintiffs have filed this Action in bad faith, and as such, sanctions, including but not limited to the dismissal of this Action and the imposition of attorneys' fees, are appropriate.

   c. <u>The Facts and Information Alleged in this Action are False, Were Disproved in the Related Actions and/or are Subject to Arbitration, Further Revealing Plaintiffs' Bad Faith.</u>

  Plaintiffs made the same claims of misappropriation in bad faith in the 10 lawsuits that they filed more than a year ago in April 2020. *See* Related Case Table.  Based on discovery that occurred in the Miami-Dade Action, it is clear that Plaintiffs cannot show that Defendants have "used," let alone misappropriated, any of Plaintiffs' alleged trade secrets. Plaintiffs also have proffered no evidence of any "trade secrets."  *See* Stahl Decl, ¶¶ 21-34, Exs. 8-10.

  As to alleged misappropriation, Plaintiffs' entire claim is based on an assumption that anyone who is previously affiliated with ICD will inevitably use Plaintiffs' "trade secrets," if they later compete with Plaintiffs.  Such an assumption alone is insufficient to make a claim of misappropriation plausible.  And it is certainly not sufficient to constitute probable cause sufficient to support that a defendant's conduct constitutes *criminal* theft of trade secrets under 18 U.S.C. §1832.

  Furthermore, Plaintiffs appear to claim that they were "defraud[ed]" by Defendants, which led to further misappropriation of their trade secrets, because "Corey and Andrew Shader falsely represented…that they were no longer going to be in the business of selling insurance." *See* Compl. ¶¶ 170-171. That claim is contradicted by the very agreement referenced in ICD's Complaint and

by email correspondence between Seth Cohen and Corey Shader. *See* Compl. ¶¶ 51-54; [ECF No. 34-2] (NHS Agreement).[6]  Furthermore, Plaintiffs themselves allege in paragraph 54 of their Complaint that "as a result of [an email] amendment, the Shaders and NHS were permitted to market other *insurance* plans[.]" Compl. ¶54 (emphasis added).  Finally, in a January 22, 2019 email, Corey Shader explicitly told Seth Cohen (one of ICD's principals and CEO), that Corey Shader was "affiliated" with downline agencies, and that he intended on continuing those affiliations. *See* Exhibit F.  In the same e-mail, Corey Shader made it clear that if Cohen had a problem with Shader's intentions, Shader would revoke his signature on the NHS Agreement before Cohen countersigned. *Id.*  Seth Cohen responded to Corey Shader's email, confirming that such affiliations would not be a problem. *Id.*  In other words, Plaintiffs cannot even keep their own false allegations straight.

Plaintiffs have also failed to identify a single trade secret.  For example, when pressed to identify with particularity the "marketing process" that Plaintiffs allege to be the "trade secret" that Defendants misappropriated, Plaintiffs "identified" a simple prequalification script containing approximately ten questions asked by call center employees to "prequalify" individuals.  See Stahl Decl., ¶ 24.  These questions (which are too simple and obvious to have any economic value) are generally known.  The bigger  problem with Plaintiffs' claim, however, is that this is a script read over the phone to members of the public who are under no obligation to maintain secrecy.  *See id.*  Potential customers are not asked to agree to confidentiality, nor are they even told that such questions are confidential.  If a competitor wanted this information, they could easily obtain it by

---

[6] At the time the Shaders, NHS, and ICD entered into the NHS Agreement, Andrew Shader intended to step away from the insurance business for a while, but not Corey Shader.  ICD was well aware of this distinction, as this is the reason that the $12 override for all "new" sales made after the execution of the NHS Agreement were to be paid solely to Corey Shader.

entering their contact information into one of ICD's various lead sites and waiting for an ICD Agent to call and ask those exact questions.[7]  *See id.*

Similarly, when asked to identify with particularity the "customer names and information" that Plaintiffs were claiming to be the trade secret at issue, Plaintiffs initially produced a "list" containing more than ½ million names, but no addresses, emails, phone numbers, or any other identifying information.  *See* Stahl Decl, ¶ 25.  Plaintiffs subsequently produced another list, but it still did not include any phone numbers or e-mail addresses.  *See id.*, ¶ 27.  Such an omission is significant considering that Kratos, Health Team one, and Prodigy sell insurance via call centers, and a list without any phone numbers has no economic value to them.[8]

Additionally, with respect to ICD's purported "business model," of selling an association membership along with a limited benefit health insurance plan, such a model cannot be a trade secret, as *ICD publicly disclosed the aspects of their business model in litigation at least as early as 2014.  See Riley v. Unified Caring Ass'n*, 2014 WL 7335029, at *3 (D. Wy. 2014).  Therefore, since ICD's business model has been publicly known since at least 2014, another's use of such a model subsequent to that time cannot be alleged to support an allegation of a trade secret.

---

[7] Additionally, there is no evidence that Defendants are even using the same prequalification script as Plaintiffs.

[8] Moreover, when Plaintiffs filed the instant action, Plaintiffs' counsel knew the allegations that Defendants "stole" Plaintiffs' "customer base" were patently false.  In the Miami-Dade Action, the defendants were also required to produce their own customer list.  Kratos produced a list of ~54,000 customers.  When evaluating the overlap of customers between Kratos' customer list and Plaintiffs' customer list, the amount of crossover—the number of individuals on both company's customer lists—is negligible.  In fact, less than 0.4% of Plaintiffs' "customers" also did business at some point in time with a Kratos affiliate. *See* Stahl Decl., ¶ 29-31.  This paltry number cannot amount to the alleged "tens of millions of dollars" in lost business due to any purported misappropriation or theft of trade secrets, as ICD alleges in this Action. Compl. ¶196. Additionally, a careful analysis of this "crossover" shows about the same number of customers switching from ICD to Kratos as those switching from Kratos to ICD, which in turn suggests ordinary competition and nothing more. *See* Stahl Decl., ¶ 31.

Finally, Plaintiffs' knew their misappropriation claims were subject to arbitration, and yet they still filed the instant Action based on these claims, seeking to convert the assertions into criminal trade secret theft.  But, ICD has alleged essentially the same exact claims in this action that it asserted in the Related Actions.[9]  As is reflected by the allegations in these complaints,  and the court papers of the Miami-Dade and Broward Actions, ICD's allegations clearly arise from the same set of operative facts that are at issue in the ongoing arbitrations.  The RICO allegations– irrespective of their deficiencies and plausibility—should have, and could have, only been raised in arbitration.  Ultimately, however, ICD knows that its trade secret claims are without merit.

## III.   **ARGUMENT**

Based on the foregoing information, Plaintiffs have brought this action unnecessarily and in bad faith, and as such, this Court should impose sanctions.  Defendants seek dismissal of this action, with prejudice, as well as payment of Defendants' costs and fees in defending this litigation.

### a.   This Court May Impose Sanctions Pursuant to Its Inherent Authority.

The Court has inherent authority to impose sanctions on a party or its counsel for conduct amounting to bad faith. *See Barnes v. Dalton*, 158 F.3d 1212, 1213-14 (11th Cir. 1998). The inherent power "is both broader and narrower than other means of imposing sanctions."  *Peer v.*

---

[9] *Compare* Compl. ¶ 1 ("Defendants devised a criminal scheme to misappropriate, among other things, ICD's confidential information, trade secrets, customers, and business through a pattern of racketeering activity"); Compl. ¶ 3 ("The purpose of the…Enterprise…was to surreptitiously and illicitly compete with ICD and steal ICD's proprietary trade information, trade secrets, business model, agents, and customer base") *with* Miami-Dade Action, Compl. ¶ 23 ("Working in concert, the Defendants [Kratos, Health Team One, Richard Ryscik, et al.]…have conspired with others, including Andrew Shader, Corey Shader,…[NHS], and exclusive licensed agents of ICD…to steal ICD's business by…setting up sham, competing entities, . . . illicitly soliciting ICD's customers and prospective customers, and misappropriating ICD's confidential information and trade secrets.") *and* Broward Action Compl. ¶ 27 ("These Defendants [Andrew Shader, Corey Shader, NHS, Infinix, Prodigy, Beeman, Stormont, and Alliance] used Prodigy and Infinix surreptitiously…to illicitly compete with ICD and steal ICD's proprietary trade secrets, business model, agents and customer base.").

*Lewis*, 606 F.3d 1306, 1314 (11th Cir. 2010) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991)). "While the other sanction mechanisms only reach certain individuals or conduct, 'the inherent power extends to a full range of litigation abuses" and "must continue to exist to fill in the interstices.'" *Id.* The inherent power of a court "'can be invoked even if procedural rules exist which sanction the same conduct,' for these rules are not substitutes for the inherent power." *Id.* (quoting *Glatter v. Mroz (In re Mroz)*, 65 F.3d 1567, 1575 (11th Cir. 1995)). In egregious circumstances like this, dismissal with prejudice is warranted. *Obukwelu v. Board of Trustees Florida State University*, 837 F. App'x 686, 687 (11th Cir. 2020) (dismissing civil claim where plaintiff willfully made false representations in litigation); *Zocaras v. Castro*, 465 F.3d 479, 485 (11th Cir. 2006) (dismissing civil action entirely; finding lesser sanctions not effective because the plaintiff's misconduct harmed the defendants and undermined the integrity of the judicial system). *See also Byrne v. Nezhat*, 261 F.3d 1075, 1106 (11th Cir. 2001) (a court may also impose an attorney's fee sanction against the attorney and the client).

Sanctions premised upon the court's inherent power are appropriate upon a finding of recklessness or subjective bad faith. *See Barnes*, 158 F.3d at 1213-14. A finding of bad faith is warranted when a party or his attorney knowingly or recklessly raises a frivolous argument, or where a party pursues a claim without reasonable inquiry into the underlying facts. *See Id.*; *see also Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) (explaining that, in the absence of direct evidence of subjective bad faith, the standard can also be met if the party's conduct is "so egregious that it could only be committed in bad faith"). Sanctions are warranted in situations where, as here, a party pursues frivolous claims, vexatiously multiplies the proceedings, inflicts unnecessary defense costs, and needlessly delays the resolution of the claims. *See Miccosukee Tribe of Indians of Fla. v. Cypress*, 686 F. App'x 823, 827 (11th Cir. 2017)

14

(in a case asserting RICO violations, awarding sanctions after dismissal of pleadings, where the plaintiff "knew or should have known that his allegations…were patently frivolous when there was no evidence…and [plaintiff] possessed ample information that flatly contradicted his theories of wrongdoing.  Because [plaintiff] filed a complaint…in bad faith, the district court acted within its authority to sanction 'conduct which it found abused the judicial process.'") (internal brackets omitted); *see also Collar v. Abalux, Inc*., 806 Fed. App'x 860, 863 (11th Cir. 2020); *Thabico Co. v. Kiewit Offshore Servs., Ltd.*, 2:16-CV-427, 2017 WL 3387185, at *4 (S.D. Tex. Aug. 7, 2017).

      b.  <u>Plaintiffs' RICO Claims Were Brought in Bad Faith and Constitute an Abuse of the Judicial Process</u>.

          i.  Plaintiffs Have Abused the Judicial Process by Meritlessly and Vexatiously Asserting the RICO Claims to Disparage Defendants Publicly.

Sanctions are appropriate for "conduct which abuses the judicial process" and the Court has the inherent power to dismiss a lawsuit and impose attorneys' fees when a party files a lawsuit "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Gov't Emps. Ins. Co. v. Nealey*, 262 F. Supp. 3d 153, 171 (E.D. Pa. 2017); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991).  As in *Chambers*, Plaintiffs "entire course of conduct throughout the lawsuit evidence[s] bad faith and an attempt to perpetrate a fraud on the court," particularly when evaluated in connection with the Related Actions and the ongoing arbitrations.  Indeed, "the claims asserted here are merely evidence of a larger choreographed strategy by [Plaintiffs] and [their] attorneys designed to constitute a counterattack against" the slew of adverse rulings requiring ICD to arbitrate these very claims. *Gov't Emps. Ins. Co. v. Nealey*, 262 F. Supp. 3d 153, 171 (E.D. Pa. 2017).

As detailed *supra,* ICD has asserted in this action that Defendants have engaged in a scheme and "conspired with others, including exclusive licensed agents of ICD, to steal ICD's business by…setting up sham, competing entities, interfering with the ICD Exclusive Agent Agreements, illicitly soliciting ICD's customers and prospective customers, and misappropriating

ICD's confidential information and trade secrets." *See* Compl. ¶ 58.  However, both the trial court

in the Broward Action and the Third District Court of Appeal in the Miami-Dade Action have

already compelled ICD to arbitrate these claims.[10] *See ABS Healthcare Services, LLC v. Shader,*

2021 WL 2115257, at *4 (Fla.Cir.Ct. May 04, 2021); *Kratos Investments LLC v. ABS Healthcare*

*Services, LLC,* ---So. 3d ---, 2021 WL 1009277, *3 (Fla. 3d DCA March. 17, 2021).

The court in the Broward Action highlighted the following allegations within ICD's

complaint in that action as the basis for its ruling:

- "In the Complaint, ICD specifically alleges that ICD's agreements with the agents contain non-compete and confidential information provisions and that Defendants 'have conspired' with the Agents."

- "ICD also alleges that 'Defendants (in concert with the Agents) have engaged in a scheme by which they solicit customers for Plans offered by agencies other than ICD."

- "ICD further alleges that Defendants 'induc[ed] or otherwise caus[ed] the Agents to breach' the Agent Agreements."

- "'As a result of Defendants' actions, the Agents breached' the Agent Agreements."

*ABS Healthcare Services, LLC*, 2021 WL 2115257 at *3 (citing Compl. ¶¶ 24, 38, 52, 54).

Notwithstanding the aforementioned rulings, Plaintiffs have alleged the same conclusory

allegations here, based on the same set of operative facts and interdependent conduct.  In fact,

Plaintiffs simply mimicked their allegations from the Related Actions in their Complaint in the

instant action.[11]  Plaintiffs reference the same former ICD Agents (whose Agent Agreements,

---

[10] *See ABS Healthcare Services, LLC,* 2021 WL 2115257, at *3 ("After careful review of the allegations contained in the Complaint, the Court finds the claims against Defendants are arbitrable as they are intertwined with the Agent Agreements."); *Kratos Investments LLC,* 2021 WL 1009277, *2 ("The claims against appellants and the agents are based on the same set of operative facts and unquestionably premised upon substantially interdependent and concerted misconduct between the non-signatories and signatories to the Agent Agreements.").

[11] *See, e.g.,* Compl. ¶ 60 ("Defendants have engaged in a scheme by which they solicit customers for Plans offered by agencies other than ICD.  In this way, Defendants are improperly soliciting ICD's actual and prospective customers and illegally competing with ICD."), *id.* ¶ 179

containing the mandatory arbitration provisions, resulted in the aforementioned arbitrations) no less than twenty-five (25) times throughout the Complaint, as well as reference said Agent Agreements (including interfering with and/or breaching those Agent Agreements) at least a half-dozen times throughout the Complaint. *See generally* Compl.

There is no legitimate purpose for ICD to now assert these same claims in this forum, and "[t]hese tactics have undoubtedly wasted this Court's judicial resources….[and] undoubtedly had a negative impact on the" Defendants and their ability to focus on the ongoing arbitrations. *Gov't Emps. Ins. Co.*, 262 F. Supp. 3d at 171. "This is the exact type of case where a response to abusive litigation practices is warranted." *Id*. (internal quotations and citation omitted). As such, this action should be dismissed, with prejudice, as there are no "alternative sanctions…[that] would remedy the harm here….[t]he harm here to defendants is the burden of having to defend against the lawsuit itself…with deadlines and obligations to meet in [their] pending" arbitrations. *Id*.

ii. Plaintiffs' RICO Claims are Frivolous as They Are Based on Information ICD Knows to be False and/or Inaccurate, Revealing Plaintiffs' Bad Faith.

"A party acts in bad faith when he knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Hayden v. Vance*, 708 F. App'x 976, 978 (11th Cir. 2017) (*quoting Barnes*, 158 F.3d at 1214 (internal quotations omitted); *see also Miccosukee Tribe of Indians of Fla. v. Cypress*, 686 F. App'x 823, 827 (11th Cir. 2017) (holding that the plaintiff "knew or should have known that his allegations against [defendant] were patently frivolous when there was no evidence of kickbacks or fraudulent loans and [plaintiff] possessed ample information that flatly contradicted his theories of wrongdoing.").

---

("Throughout 2018 and 2019 to the present…[Defendants'] illicit competition with ICD, and [their] endeavor to steal ICD's trade secrets, business model, agents, and customer base by engaging in the practice of using leads to coerce ICD's agents to breach their contractual obligations to ICD.").

As detailed above, Plaintiffs were aware at the time of the filing of this Action that ICD could not produce any documentation or evidence of a single trade secret. ICD had previously publicly disclosed facts and information it purports to be confidential and/or alleged trade secrets.[12] For example, ICD's "business model" was publically disclosed in the case of *Riley v. Unified Caring Ass'n*, 2014 WL 7335029 (D. Wy. 2014). "Given that the alleged 'trade secrets' in this case have been publicly available in a written judicial opinion for months is further evidence of [Plaintiffs'] unreasonableness, obstructionism, and abuse." *Gov't Emps. Ins. Co.*, 262 F. Supp. 3d at 171. ICD also repeatedly disclosed purportedly confidential and/or trade secret "call scripts" that its call-center agents read to anyone that expressed an interest in obtaining insurance through ICD, without any indication that said script was confidential or a trade secret. *See* 18 U.S.C. § 1839(3) (Information is a trade secret if the owner "has taken reasonable measures to keep such information secret[.]"). Moreover, any asserted customer lists fail to constitute trade secrets where Defendants have derived no economic value from them. *Id.* ("[T]he information [must] derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.").

Nor has ICD produced any evidence that any of the Defendants, or any of the former ICD agents, improperly accessed, obtained or disclosed any of ICD's alleged trade secrets. And their theory that the Defendants must have stolen ICD's trade secrets because they once worked for or were affiliated with ICD, and now work for or as competitors, false as a matter of law. Even use

---

[12] "As explained by the U.S. Supreme Court, once "an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." *Gov't Emps. Ins. Co. v. Nealey*, 262 F. Supp. 3d 153, 171 (E.D. Pa. 2017) (*quoting Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (internal quotations omitted).

of a trade secret, that may support a civil misappropriation claim, does not constitute criminal theft of trade secrets. *See ESPOT, Inc. v.  MyVue Media, LLC*, 492 F. Supp. 3d 672, 695 (E.D. Tex. 2020) (dismissing civil RICO claims; plaintiff could not support predicate act of theft of trade secret with allegations of misappropriation alone).  Additionally, Plaintiffs' claims that the Shaders "defraud[ed]" ICD by claiming that they would be leaving the insurance industry, is also contradicted by the pleadings in this case, the NHS Agreement, and surrounding circumstances. This includes, but is not limited to the numerous payments by ICD to Corey Shader individually and the January 22, 2019 email exchange between Corey Shader and Seth Cohen.

"Congress enacted RICO to target long-term criminal activity, not as a means of resolving routine commercial disputes." *Kaye v. D'Amato*, 357 Fed. Appx. 706, 717 (7th Cir. 2009).[13]  As one federal court observed:

> [A]lthough civil RICO may be a "potent weapon," plaintiffs wielding RICO almost always miss the mark. *See Gross v. Waywell*, 628 F.Supp.2d 475, 479–83 (S.D.N.Y. 2009) (conducting survey of 145 civil RICO cases filed in the Southern District of New York from 2004 through 2007, and finding that all thirty-six cases resolved on the merits resulted in judgments against the plaintiffs, mostly at the motion to dismiss stage). Accordingly, courts have expressed skepticism toward civil RICO claims.

*Moss,* 258 F. Supp. 3d at 297 (citations omitted).[14]

---

[13] Civil RICO is considered an "unusually potent weapon," often referred to as the "litigation equivalent of a thermonuclear device." *Malvar Egerique v. Chowaiki*, 19 CIV. 3110 (KPF), 2020 WL 1974228, at *27 (S.D.N.Y. Apr. 24, 2020) (citations omitted).

[14] *See also Oceanside Lauderdale, Inc. v. Ocean 4660, LLC*, No. 2010 WL 2044893, at *1 (S.D. Fla. May 24, 2010) (dismissing action; "'RICO is not a proper vehicle for levering a breach of contract suit between citizens of the same state into federal court, and under a statute that entitles a successful plaintiff to treble damages and attorneys' fees." . . . Here, 'civil RICO plaintiffs persist in trying to fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions.'") (citing *Carr v. Tillery*, 591 F.3d 909, 918 (7th Cir. 2010) and *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992)); *Robert Suris General Contractor Corp. v. New Metropolitan Federal Sav. & Loan Ass'n,* 873 F.2d 1401, 1404 (11th Cir.1989) (affirming dismissal of RICO action where plaintiff had attempted to take "a simple breach of contract or garden variety fraud claim and attempted to boot-strap it into a 'federal case' by couching the allegations in RICO statutory language").

Despite Plaintiffs' attempts to portray this action as a "criminal scheme," this is, at best, a commercial dispute among competitors.  Hence the reason why the Parties are currently engaged in numerous ongoing arbitrations over the same disputes before the American Arbitration Association and pursuant to the *Commercial* Arbitration Rules. *See* Related Case Chart. Plaintiffs' attempts to portray this dispute as something different simply highlights their "unreasonableness, obstructionism, and abuse." *Gov't Emps. Ins. Co.*, 262 F. Supp. 3d at 171.[15]

## IV.   <u>CONCLUSION</u>

Based on the foregoing, Defendants requests that this Court temporarily lift the stay for purposes of considering this Motion, dismiss this action with prejudice and hold Plaintiffs and their counsel jointly and severally liable for Defendants' reasonable legal fees and costs incurred in preparing this Motion and defending against Plaintiffs' claims.

---

[15] Indeed, one only needs to review Plaintiffs' allegations of "bribery" in the Complaint to recognize Plaintiffs' bad faith, unreasonableness and abuse of the judicial process.  *See* Compl. ¶¶ 186-88. First, the entirety of this "bribery" claim (which Plaintiffs attempt to use as one of their alleged predicate acts) is based solely on the former ICD Agents' breach of the contractual duties to ICD, which once again, is subject to the mandatory arbitration provisions of those Agreements and subject to the Parties' ongoing arbitrations.  Moreover, the allegations of commercial bribery are nothing more than a baseless attempt to criminalize assertions of garden-variety commercial interference.

Respectfully submitted,

| /s/ Benjamine Reid | /s/ James A. Gale |
|---|---|
| By:_____ | By:_____ |
| Benjamine Reid / Fla. Bar No. 183522 | James A. Gale / Fla. Bar No. 371726 |
| E-mail:  bried@carltonfields.com | E-mail:  jgale@cozen.com |
| Alan Grunspan / Fla. Bar No. 451150 | Samuel A. Lewis / Fla. Bar No. 55360 |
| E-mail:  agrunspan@carltonfields.com | E-mail:  slewis@cozen.com |
| Clifton R. Gruhn / Fla. Bar No. 72542 | David M. Stahl / Fla. Bar No. 84713 |
| E-mail:  cgruhn@carltonfields.com | E-mail:  dstahl@cozen.com |
| CARLTON FIELDS, P.A. | Jonathan E. Gale / Fla Bar No. 106938 |
| 2 MiamiCentral, Suite 1200 | E-Mail: jegale@cozen.com |
| 700 NW 1st Avenue | COZEN O'CONNOR |
| Miami, Florida 33136 | Southeast Financial Center |
| Telephone:  305-530-0050 | 200 South Biscayne Blvd., Suite 3000 |
| | Miami, Florida 33131 |
| ***Counsel for Andrew Shader, Corey*** | Telephone:  305-358-5001 |
| ***Shader, National Health Solutions, Inc.,*** | |
| ***Alliance Marketing Corporation*** | Stephen Miller, *Admitted Pro Hac Vice* |
| | E-mail:  samiller@cozen.com |
| | Peter M. Ryan, *Admitted Pro Hac Vice* |
| /s/ Howard D. DuBosar | E-mail:  pryan@cozen.com |
| By:_____ | Catherine Yun, *Admitted Pro Hac Vice* |
| Howard D. DuBosar / Fla. Bar No. 729108 | E-mail:  cyun@cozen.com |
| E-mail:  hdubosar@wsh-law.com | **COZEN O'CONNOR** |
| Harrison R. DuBosar / Fla. Bar | One Liberty Place |
| No. 1002241 | 1650 Market Street, Suite 2800 |
| E-mail:  HRDuBosar@wsh-law.com | Philadelphia, PA 19103 |
| WEISS SEROTA HELFMAN COLE | Telephone:  305-665-2130 |
| & BIERMAN | |
| 1200 N. Federal Highway, Suite 312 | ***Counsel for Prodigy Health Group LLC, Adam*** |
| Boca Raton, Florida 33432 | ***Beeman, Joy Stormont, Kratos Investments*** |
| Telephone:  561-835-2111 | ***LLC, Health Team One LLC, Richard Ryscik,*** |
| ***Counsel for Infinix Media LLC,*** | ***Beeman's Future Inc., and C Shader*** |
| ***Scott Offutt and CS Marketing LLC*** | ***Investments LLC*** |